Todd Logan (SBN 305912)
EDELSON PC
150 California St, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300
Fax: 415.373.9435
tlogan@edelson.com

Matthew S. Tripolitsiotis (*pro hac vice*)
BURNS CHAREST LLP
757 Third Ave, 20th Floor
New York, NY 10017
Tel: 469.895.5269
mtripolitsiotis@burnscharest.com

Spencer Cox (*pro hac vice*)
BURNS CHAREST LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, D.C. 20016
Tel.: 202.577.3977
Fax: 469.444.5002
scox@burnscharest.com

(*Additional counsel on signature page.*)

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW PANDOLFI and MANDI SHAWCROFT, individually and on behalf of all others similarly situated;<br><br>        Plaintiffs,<br><br>        vs.<br><br>AVIAGAMES, INC.; VICKIE YANJUAN CHEN; PING WANG; ACME, LLC; GALAXY DIGITAL CAPITAL MANAGEMENT, L.P.; and OTHER UNNAMED CO-CONSPIRATORS;<br><br>        Defendants. | Case No. 3:23-cv-05971-EMC<br><br>CLASS ACTION<br><br>**PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date: June 24, 2024<br>Time: 1:30 p.m.<br>Dept: Courtroom 5 – 17th Floor<br>Judge: Honorable Edward M. Chen<br><br>Date filed: November 17, 2023<br>Trial Date: None Set |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................v

STATEMENT OF ISSUES TO BE DECIDED ................................................................. xiii

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................5

    A.    Avia touts the players' ability to play against other live users in legal, skill-based competitions as a key selling point of its games. ...........................................................5

    B.    Avia's apps allow users to compete for real money, and it maintains that it has no interest in the outcome of games. ...........................................................9

    C.    Avia's representations were false. It populates its games with bots and keeps the winnings for itself. ...........................................................9

    D.    The RICO Defendants.........................................................................................12

    E.    Plaintiffs ...........................................................................................................15

APPLICABLE LEGAL STANDARDS ..............................................................................15

ARGUMENT.......................................................................................................................16

I.    THE COURT SHOULD NOT "DISREGARD" THE AMPLE EVIDENCE OF WRONGDOING UNCOVERED IN THE AVIA-SKILLZ TRIAL. ....................................16

II.    CALIFORNIA'S PUBLIC POLICY DOES NOT BAR PLAINTIFFS' CONSUMER PROTECTION CLAIMS. ...........................................................19

III.    PLAINTIFFS HAVE STATED CLAIMS UNDER CALIFORNIA'S CLRA AND UCL.......24

    A.    Plaintiffs allege they saw specific misrepresentations and, in any event, do not need to allege specific misrepresentations where, as here, Defendants engaged in fraudulent omissions. ...........................................................28

    B.    Plaintiffs have sufficiently pled the lack of an adequate remedy at law.......................33

    C.    Defendants' conduct falls within the CLRA despite Defendants' arguments about "virtual currencies." ...........................................................34

IV.    PLAINTIFFS ADEQUATELY PLEAD RICO CLAIMS AGAINST EACH OF THE RICO DEFENDANTS……....................................................................................40

    A.    The Investor Defendants knowingly participated in a scheme to defraud....................41

ii

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

1. Acme's knowledge can be inferred from its due diligence, its expertise, and its positions on Avia's Board of Directors. ........................................................41

2. Galaxy, too, had knowledge of the scheme. ....................................................44

B. The Complaint's allegations sufficiently describe a distinct enterprise with a common fraudulent purpose. ..............................................................................45

1. The RICO Defendants shared a common improper purpose. ...........................45

2. The Enterprise is distinct from the RICO Defendants. ....................................47

C. Plaintiffs have alleged the Investor Defendants' conduct or participation in the Enterprise. ........................................................................................................48

D. Plaintiffs sufficiently alleged multiple predicate acts. ..................................................52

1. The Complaint alleges numerous acts as wire fraud in furtherance of Defendants' scheme to defraud. ........................................................................52

2. There is no requirement that each individual RICO Defendant commit a separate instance of mail or wire fraud. ........................................................53

3. Each RICO Defendant engaged in wire fraud constituting predicate acts. ........54

   a. The RICO Defendants were knowing participants in the scheme to defraud….. .............................................................................................54

   b. Each RICO Defendant had the intent to defraud. ................................54

   c. The RICO Defendants committed wire fraud during each RICO Defendants' participation in the scheme. ..............................................55

4. The wire fraud identified constitutes a pattern of racketeering activity. ..........56

5. Plaintiffs sufficiently allege illegal gambling transactions as additional predicate acts. ................................................................................................58

E. The Complaint adequately alleges that the fraudulent scheme proximately caused Plaintiffs' financial injury. .................................................................................59

F. Plaintiffs' financial loss is a recognized RICO injury. ..................................................62

G. The Complaint also adequately alleges that each RICO Defendant is liable under §1962(d) for RICO Conspiracy. ....................................................................63

V. THIS COURT HAS PERSONAL JURISDICTION OVER GALAXY. .................................64

A. California's long-arm statute confers personal jurisdiction over Galaxy. ....................65

1. Galaxy purposefully directed its activities toward California. ........................65

2. Plaintiffs' claims arise out of Galaxy's California activities. ..........................67

3. The exercise of jurisdiction over Galaxy in California is reasonable. ..............68

B. RICO also provides a basis for jurisdiction over Galaxy. ...........................................68

C. If the Court has any concerns, jurisdictional discovery is warranted. ..........................69

CONCLUSION ..............................................................................................................................70

iv

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

# TABLE OF AUTHORITIES

**Cases**

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006).................................................................................................60

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................................16

*Association for L.A. Deputy Sheriffs v. County of Los Angeles*,
648 F.3d 986 (9th Cir. 2011) ..................................................................................16

*Baranco v. Ford Motor Co.*,
294 F. Supp. 3d 950 (N.D. Cal. 2018) ..............................................................28, 32

*Beck v. Prupis*,
529 U.S. 494 (2000).................................................................................................41

*Beligan v. Mercedes-benz USA, LLC*,
No. SA CV 22-02035-DFM, 2023 WL 3150113 (C.D. Cal. Feb. 15, 2023)..............33, 34

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................16, 51

*Berry v. Am. Express Publ'g, Inc.*,
147 Cal. App. 4th 224 (2007) ..................................................................................38

*Bly-Magee v. Cal.*,
236 F.3d 1014 (9th Cir. 2001) .................................................................................16

*Boyle v. U.S.*,
556 U.S. 938 (2009).................................................................................................45

*Brayton Purcell LLP v. Recordon & Recordon*,
606 F.3d 1124 (9th Cir. 2010) ...................................................................................4

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008).............................................................................41, 52, 59, 62

*Brill v. Postle*,
No. 2:19-cv-002027 WBS AC, 2020 WL 2936688 (E.D. Cal. June 3, 2020)................63

*Brown v. Moll*,
No. 09-cv-05881, 2010 WL 4704372 (N.D. Cal. Nov. 12, 2010) ..........................42

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985).................................................................................................68

*Burns v. MBK P'ship*,
   No. 03-3021-CO, 2003 WL 2397014 (D. Or. Nov. 5, 2003) ...................................................62

*Butcher's Union Local No. 498 v. SDC Inv., Inc.*,
   788 F.2d 535 (9th Cir. 1986) .........................................................................................4, 68

*Calder v. Jones*,
   465 U.S. 783 (1984)..............................................................................................4, 66, 67

*Cannon v. Wells Fargo Bank. N.A.*,
   No. C-12-1376 EMC, 2014 WL 324556 (N.D. Cal. Jan. 29, 2014).....................................62

*Carroll v. Myriad Genetics, Inc.*,
   No. 22-739, 2022 WL 16860013 (N.D. Cal. Nov. 9, 2022)................................................33

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158 (2001)........................................................................................................48

*Chaset v. Fleer/Skybox Intern., LP*,
   300 F.3d 1083 (9th Cir. 2002) ........................................................................................63

*Coe v. Gen. Mills, Inc.*,
   No. 15-CV-05112-TEH, 2016 WL 4208287 (N.D. Cal. Aug. 10, 2016) .........................25

*Coffee v. Google, LLC*,
   No. 20-CV-03901-BLF, 2022 WL 94986 (N.D. Cal. Jan. 10, 2022) ..........................37, 38

*Cooper v. Pickett*,
   137 F.3d 616 (9th Cir. 1998) ..........................................................................................16

*Daniel v. Ford Motor Co.*,
   806 F.3d 1217 (9th Cir. 2015) ........................................................................................32

*Doe v. Roblox Corp.*,
   602 F. Supp. 3d 1243 (N.D. Cal. 2022) .....................................................................passim

*Doe v. Unocal*,
   248 F.3d 915 (9th Cir. 2001) ....................................................................................65, 69

*Dufour v. BE LLC*,
   No. C 09-03770 CRB, 2010 WL 2560409 (N.D. Cal. June 22, 2010)............................57

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014) ...............................................................................51, 54, 55

*Erickson v. Pardus*,
   551 U.S. 89 (2007)....................................................................................................15, 16

*Ferrington v. McAfee, Inc.*,
No. 10-CV-01455-LHK, 2010 WL 3910169 (N.D. Cal. Oct. 5, 2010)......................................39, 40

*Focht v. Sol Melia S.A.*, No. C-10-0906 EMC,
2010 WL 3155826 (N.D. Cal. Aug. 9, 2010) ...............................................................................69

*Gidding v. Anderson*,
No. C 07-04755 JSW, 2009 WL 666954 (N.D. Cal. Mar. 13, 2009) .....................................56, 58

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
492 U.S. 229 (1989)......................................................................................................56, 57, 58

*Hadley v. Kellogg Sales Co.*,
273 F. Supp. 3d 1052 (N.D. Cal. 2017) ........................................................................................25

*Hannosh v. Segal*,
328 P.3d 1049 (Ariz. Ct. App. 2014)...........................................................................................63

*Holmes v. Securities Investor Protection Corp.*,
503 U.S. 258 (1992).............................................................................................................60, 61

*Howard v. Am. Online, Inc.*,
208 F.3d 741 (9th Cir. 2000) ................................................................................................56, 64

*I.B. ex rel. Fife v. Facebook, Inc.*,
905 F. Supp. 2d 989 (N.D. Cal. 2012) ........................................................................................38

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018) ....................................................................................passim

*In re Fresh & Process Potatoes Antitrust Litig.*,
No. 4:10-MD-2186-BLW, 2012 WL 3067580 (D. Idaho July 27, 2012)........................................56

*In re GlenFed, Inc. Sec. Litig.*,
42 F.3d 1541 (9th Cir. 1994) ......................................................................................................16

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ..................................................................................39, 40

*In re Jamster Mktg. Litig.*,
No. 05CV0819 JM (CAB), 2009 WL 1456632 (S.D. Cal. May 22, 2009) ....................................46

*In re JUUL Labs, Inc. Mktg., Sales Pracs., & Prod. Liab. Litig.*,
533 F. Supp. 3d 858 (N.D. Cal. 2021) ........................................................................................57

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,
497 F. Supp. 3d 552 (N.D. Cal. 2020) ........................................................................................56

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
996 F. Supp. 2d 942 (S.D. Cal. 2014)................................................................25

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) ......................................................................28, 31

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
No. MDL 2672 CRB (JSC), 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017).................53, 54, 55, 64

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
313 F. Supp. 3d 1113 (N.D. Cal. 2018) ....................................................39, 40

*In re ZF-TRW Airbag Control Units Products Liability Litigation*,
601 F. Supp. 3d 625 (C.D. Cal. 2022) ................................................................53

*Johnson v. Riverside Healthcare Sys., LP*,
534 F.3d 1116 (9th Cir. 2008) ................................................................16, 34, 41

*Johnson v. Trumpet Behav. Health, LLC*,
No. 3:21-CV-03221-WHO, 2022 WL 74163 (N.D. Cal. Jan. 7, 2022)................................33

*Julian v. TTE Tech., Inc.*,
No. 20-CV-02857-EMC, 2020 WL 6743912 (N.D. Cal. Nov. 17, 2020) ................................34

*Just Film, Inc.v. Merchant Services, Inc.*,
No. C 10-1993, 2012 WL 6087210 (N.D. Cal. Dec. 6, 2012)..........................................60

*Kelly v. First Astri Corp.*,
72 Cal. App. 4th 462 (1999) ................................................................20, 21, 22, 23

*Ketayi v. Health Enrollment Grp.*,
No. 20-CV-1198-GPC-KSC, 2021 WL 2864481 (S.D. Cal. July 8, 2021)................................49

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
431 F.3d 353 (9th Cir. 2005) ................................................................47

*Mai v. Supercell Oy*,
648 F. Supp. 3d 1130 (N.D. Cal. 2023) ................................................................37, 38

*Marani v. Cramer*,
No. 19-CV-05538-YGR-DMR, 2024 WL 1511329 (N.D. Cal. Feb. 2, 2024)..............................66

*Marshall & Ilsley Trust Co. v. Pate*,
819 F.2d 806 (7th Cir. 1987) ................................................................60

*Menken v. Emm,*
503 F.3d 1050 (9th Cir. 2007) ................................................................67

*Moore v. Kayport Package Express, Inc.*
885 F.2d 531 (9th Cir. 1989) ...........................................................................................16

*Myers v. Bennett Law Offices,*
238 F.3d 1068 (9th Cir. 2001) ..........................................................................................67

*Nacarino v. Chobani, LLC,*
668 F. Supp. 3d 881 (N.D. Cal. 2022) ....................................................................3, 33, 34

*Ochoa v. Zeroo Gravity Games LLC,*
No. CV 22-5896-GW-ASx, 2023 WL 4291650 (C.D. Cal. May 24, 2023)..........................passim

*Odom v. Microsoft Corp.,*
486 F.3d 541 (9th Cir. 2007) ......................................................................................41, 45

*Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n,*
298 F.3d 768 (9th Cir. 2002) ............................................................................................64

*Pebble Beach Co. v. Caddy,*
453 F.3d 1151 (9th Cir. 2006) ..........................................................................................65

*Phan v. Sargento Foods, Inc.,*
No. 20-CV-09251-EMC, 2021 WL 2224260 (N.D. Cal. June 2, 2021)...........................34

*Reeves v. Niantic, Inc.,*
No. 21-CV-05883-VC, 2022 WL 1769119 (N.D. Cal. May 31, 2022)......................37, 38

*Reiter v. Sonotone Corp.,*
442 U.S. 330 (1979)..........................................................................................................62

*Salinas v. United States,*
522 U.S. 52 (1997)..................................................................................................4, 49, 64

*Schmitt v. Gibson,*
12 Cal. App. 407 (1910) ....................................................................................................21

*Schmuck v. United States,*
489 U.S. 705 (1989)...........................................................................................................52

*Schwarzenegger v. Fred Martin Motor Co.,*
374 F.3d 797 (9th Cir. 2004) ......................................................................65, 66, 67, 68

*Sedima, S.P.R.L. v. Imrex Co.,*
473 U.S. 479 (1985)..............................................................................................41, 58, 60

*Semegen v. Weidner,*
780 F.2d 727 (9th Cir. 1985) ........................................................................................2, 28

*Shaw v. Nissan North America, Inc.*,
220 F. Supp. 3d 1046 (C.D. Cal. 2016) ........................................................................46

*Sloan v. Gen. Motors LLC*,
287 F. Supp. 3d 840 (N.D. Cal. 2018) .....................................................................26, 27

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ........................................................................................33

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ......................................................................................51

*Stitt v. Citibank, N.A.*,
942 F. Supp. 2d 944 (N.D. Cal. 2013) ..........................................................................62

*Sultanis v. Champion Petfoods USA Inc.*,
No. 21-CV-00162-EMC, 2021 WL 3373934 (N.D. Cal. Aug. 3, 2021) ........................25

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) ....................................................................................3, 53

*Swearingen v. Late July Snacks LLC*,
No. 13-CV-04324-EMC, 2017 WL 1806483 (N.D. Cal. May 5, 2017)..........................30

*The Flag Co. v. Maynard*,
No. CV 05-1194-HU, 2006 WL 1030173 (D. Or. Apr. 17, 2006) ..................................62

*United States v. De Bright*,
730 F.2d 1255 (9th Cir. 1984) ......................................................................................55

*United States v. Fernandez*,
388 F.3d 1199 (9th Cir. 2004) ................................................................................49, 51

*United States v. Graham*,
534 F.2d 1357 (9th Cir. 1976) ......................................................................................21

*United States v. Green*,
523 F.2d 229 (2d Cir. 1975) .........................................................................................56

*United States v. Hernandez*,
No. CR-14-0120 EMC, 2015 WL 4498084 (N.D. Cal. July 23, 2015) ......................4, 64

United States v. Lothian,
976 F.2d 1257 (9th Cir. 1992) ......................................................................................53

*United States v. Manion*,
339 F.3d 1153 (9th Cir. 2003) ................................................................................55, 60

*United States v. Price,*
623 F.2d 587 (9th Cir. 1980) ........................................................................................55

*United States v. Stapleton,*
293 F.3d 1111 (9th Cir. 2002) ............................................................................53, 54, 57

*Wallace v. Opinham,*
73 Cal. App. 2d 25 (1946) ...........................................................................................21

*Wells Fargo & Co. v. Wells Fargo Express Co.,*
556 F.2d 406 (9th Cir. 1977) ........................................................................................69

*Whitten v. Clarke,*
41 F.4th 1340 (11th Cir. 2022) ....................................................................................42

*Williams v. Gerber Prods. Co.,*
552 F.3d 934 (9th Cir. 2008) ........................................................................................25

*Williams v. Yamaha Motor Co.,*
851 F.3d 1015 (9th Cir. 2017) ......................................................................................65

*X Corp. v. Ctr. for Countering Digital Hate Ltd.,*
No. 23-CV-03836-CRB, 2024 WL 1245993 (N.D. Cal. Mar. 25, 2024) ........................................67

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,*
433 F.3d 1199 (9th Cir. 2006) ................................................................................66, 67

**Statutes**

18 U.S.C. § 1961(1) ....................................................................................................24

18 U.S.C. § 1965(b) ....................................................................................................69

Cal. Bus. & Prof. Code § 17200 ........................................................................24, 25, 27

Cal. Bus. & Prof. Code § 17539.3(e) ..............................................................................24

Cal. Civ. Code § 1761(a) ..............................................................................................38

Cal. Civ. Code § 1761(b) ..............................................................................................35

Cal. Civ. Code § 1770(a) ........................................................................................25, 35

Cal. Civ. Code §§ 1770(5) ............................................................................................25

**Rules**

Fed. R. Civ. P. 8(a)(2)..................................................................................................15

Fed. R. Civ. P. 9(b) ...........................................................................................................16, 41, 55

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

**STATEMENT OF ISSUES TO BE DECIDED**

Pursuant to Local Rule 7-4(a)(3), this motion raises the following issues:

1.      Should the Court disregard allegations substantiated by exhibits and testimony introduced in a trial between Avia and one of its competitors?

2.      Does California public policy bar victims of fraud from recovering losses where victims were fraudulent induced into participating into rigged games of chance?

3.      Accepting Plaintiffs' allegations as true, have Plaintiffs stated a claim upon which relief can be granted against the Avia Defendants under the UCL and CLRA?

4.      Accepting Plaintiffs' allegations as true, have Plaintiffs stated a claim upon which relief can be granted against RICO Defendants under 18 U.S.C. § 1962(c) or (d)?

5.      Accepting Plaintiffs' allegations as true, have Plaintiffs plausibly alleged a basis for the Court to exercise personal jurisdiction over Galaxy?

**INTRODUCTION**

AviaGames, Inc. ("Avia") is a leading provider of online games where users purportedly compete in games of "skill" against other real people for money. Indeed, Avia claims that it "guarantees [its] players a fair, high-quality gaming experience," that it employs a "complex algorithm" that purports to "assess and match each player's ability in order to create" a "fair gaming environment," that "this sophisticated algorithm is constantly monitored and updated to prevent players from cheating the system," and that "[m]aking sure that players are matched by skill level has always been a major focus of [its] app development." Doc. 92, First Am. Complaint ("FAC" or "Complaint") ¶¶ 4, 30, 34, 41, 82.

As detailed in the Complaint, however, that is all a lie. Instead of matching users against live human competition, Avia manipulates the games by using "bots" that can control the outcome of the games.

A recent patent trial made public, for the first time, internal Avia documents and correspondence that exposed the fraud perpetuated on Avia's users. Those documents show egregious, knowing wrongdoing. Avia's platform uses multiple algorithms with names like "CASH_ROBOT" and "SHARK_ROBOT" to control the outcomes of games. When Avia's bots win, it keeps the money. And, when players won, Avia would call in its bots to address the situation. *See* Tripolitsiotis Decl.[1] Ex. A (*Skillz* Doc. 645-38) at 16 (internal chat noting that when Avia was faced with a player winning regularly, "it feels that we cannot hold back this kind of player . . . It is necessary to call in the guider"). These documents—and others in the trial record—confirm that Plaintiffs' allegations have merit and

---

[1] "Tripolitsiotis Decl." refers to the May 15, 2024 Declaration of Matthew Tripolitsiotis in Support of Plaintiffs' Response to Defendant Acme LLC's Request for Judicial Notice & Cross Motion for Judicial Notice, submitted herewith.

should not be "disregarded." When asked about Avia's bot use at deposition (in the only transcript publicly available), Defendant Chen asserted her Fifth Amendment right not to answer.

This case is not, as Avia suggests, a case brought by disgruntled gamblers unhappy about their losses. It is a consumer fraud suit—brought by unsuspecting consumers who were defrauded into paying to enter what they thought were "skill-based" competitions against other live, human competition. California's public policy against the judicial resolution of gambling disputes does not apply because (1) Avia's misrepresentations that players will play against other human beings in real-time and that it does not have an interest in the outcome of games are actionable, regardless of whether Avia's conduct constitutes illegal gambling; (2) California's public policy does not apply when the plaintiff is an unwitting victim in the defendant's illegal gambling scheme; and (3) Plaintiffs' ability to sue Defendants is authorized by statute.

On behalf of a putative class, Plaintiffs Andrew Pandolfi and Mandi Shawcroft bring state law claims against Avia under California's Consumer Legal Remedies Act and Unfair Competition Law and federal claims under the Racketeer Influenced and Corrupt Organizations Act.

Avia's arguments to dismiss the state law claims can be denied under controlling California and federal case law because the Complaint gives Defendants more than sufficient notice to defend against the charged conduct here. *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). As described below, the Complaint contains detailed allegations regarding the misrepresentations that Plaintiffs (and all Avia users) saw and that they would not have played Avia's games had they known the truth. Those allegations are sufficient, especially considering those misrepresentations were made a part of Avia's long-term advertising campaign and where Plaintiffs additionally allege material omissions.

Avia's request to dismiss Plaintiffs' state law claims for equitable relief is premature. At this early stage of the case, a plaintiff need only either allege that she lacks an adequate remedy at law or

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

plead her claims in the alternative. *Nacarino v. Chobani, LLC*, 668 F. Supp. 3d 881, 896 (N.D. Cal. 2022).

Avia's last state-law argument that Plaintiffs' CLRA claims must be dismissed because this is a "virtual currency" case is simply factually wrong. This is not a case where Plaintiffs bought virtual currency to spend on virtual loot boxes or other intangible goods. In contrast to the cases Avia cites, these Plaintiffs spent real money to enter skill-based contests with real people—a benefit they did not receive—and potentially "Win REAL CASH" as Avia advertised. Unlike those other cases, the transaction between Plaintiffs and Avia begins and ends with real money.

Defendants' motions to dismiss the federal RICO claims also misapply the law to the facts. Plaintiffs bring RICO claims for both traditional § 1962(c) liability and for RICO conspiracy under § 1962(d). The complaint contains sufficient allegations that, when read as a whole and taken as true, support an inference of knowledge and agreement on the part of <u>all</u> the RICO Defendants to secretly employ bots to manipulate games even as they promoted Avia to the public as a provider of "skill-based" games and that users would play against other people in real-time. That includes the Investor Defendants, Acme and Galaxy, whose due diligence, expertise, public statements, and positions on Avia's Board of Directors collectively make it more likely than not that those Defendants were aware of and participated in the enterprise alleged here.

The Complaint further alleges that the enterprise, distinct from the RICO Defendants, was operated for a common fraudulent purpose, and that the Investor Defendants had some part in directing the enterprise's affairs. That is all controlling Supreme Court precedent requires. The Complaint also identifies a plethora of specific predicate acts committed in furtherance of the scheme. And established law rebuts Defendants' protest that the Complaint must identify separate predicate acts for each Defendant. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) ("[T]here is no absolute

requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify false statements made by each and every defendant.").

Defendants' contention that RICO causation and injury are not sufficiently alleged is not difficult to address. Although it was in the context of a patent case, the court there addressed the same issues at play in a pretrial ruling, noting that "users would have relied on AviaGames' representations about its games in response to reviews and questions in choosing to download and/or play Pocket7Games. It is also reasonable to infer that users who relied on AviaGames' misrepresentations would be harmed by losing money to bots in Pocket7Games." Tripolitsiotis Decl. Ex. B (*Skillz* Doc. 509 at 6-7) (internal citations omitted). The causation chain is straightforward and leads directly to Plaintiffs' injury to their "business or property"—*i.e.*, money.

Defendants' only argument against Plaintiffs' RICO conspiracy claim is predicated on the presumed complete failure of the traditional § 1962(c) claim. But a conspiracy claim may be maintained against a conspirator even if that conspirator's role would not support § 1962(c) liability. *See Salinas v. United States*, 522 U.S. 52, 63-64 (1997); *United States v. Hernandez*, No. CR-14-0120 EMC, 2015 WL 4498084, at *5 (N.D. Cal. July 23, 2015) (Chen, J.).

Lastly, this Court has personal jurisdiction over Galaxy. Traditional jurisdiction under California's long-arm statute is appropriate under the tests articulated in *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010), and *Calder v. Jones*, 465 U.S. 783 (1984). The four requirements of RICO's "ends of justice" provision are met here, providing an independent basis for personal jurisdiction. *See Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538-39 (9th Cir. 1986).

For the foregoing reasons, and as further detailed below, Plaintiffs respectfully ask that the Court deny Defendants' motions to dismiss in their entirety.

## FACTUAL BACKGROUND

Avia makes a variety of mobile games playable on its online platform Pocket7Games, mobile browsers, and standalone applications. FAC ¶ 25. Avia's games are among the most popular gaming apps in Apple's App Store. *Id.* ¶ 32.

**A.      Avia touts the players' ability to play against other live users in legal, skill-based competitions as a key selling point of its games.**

The key to the popular appeal of Avia's games is players' ability to play against other live users in skill-based competitions. Avia claims that it "guarantee[s]" its users "a fair, high-quality gaming experience." *Id.* ¶¶ 30, 34. Avia tells potential users that it employs a "complex algorithm" that purports to "assess and match each player's ability in order to create [this] fair gaming environment." *Id.* ¶ 34. It adds that "this sophisticated algorithm is constantly monitored and updated to prevent players from cheating the system." *Id.* Avia further states it uses its "fair and secure matching algorithm" to make sure that "players are matched by skill level." *Id.* According to Avia, matching players of similar skill "has always been a major focus of [its] app development. *Id.* Avia further tells its users and prospective users that "[g]amers play against others," and refers to its games as "skill-based." *Id.* ¶ 35.

Avia tells players that its games allow people to compete against other live users in real-time, skill-based competitions when they download Avia's apps through Apple's App Store, Android's Google Play (Android App), and Samsung's Galaxy Store. *Id.* ¶¶ 31-32, 44. For example, Avia explains to players downloading 8 Ball Strike on Apple's App store that they will "[c]ompete in real time against other players" with "only [their] strategy and skill." *Id.* ¶ 35. Before users download Pool Strike, Avia tells users on Apple's App Store that they will "[g]o head-to-head against opponents and strategize to defeat them!" FAC App'x A ¶ 11. Under a "Play Against Real Players" caption, the App Store's description promises future players that they will be "[m]atch[ed] with real players of similar skill levels" so that they can "compete in classic, fun, and fair skill-based cash games!" *Id.* Avia tells those

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

who wish to download the Pocket7Games platform that they will participate in a "REAL PLAYER FACEOFF," or "Skill-based Real Player Competition." App'x A ¶ 42. Each user who downloads Avia's games necessarily sees these statements. *Id.* ¶¶ 35, 44.

Avia's represents that its games are skill-based and not gambling in other forums as well. In the Frequently Asked Questions section of its website, Avia claims that its games are legal: "We promote skill-based competitions that are legal in most jurisdictions. In contrast to traditional gambling, where games are based purely on chance or luck, our cash games are designed to test and reward players' skills and abilities." *Id.* ¶ 36. Avia claims to be "committed to providing a safe, fair, and legitimate gaming environment for all of [its] users," and it "take[s] pride in [its] reputation as a responsible and trustworthy operator of skill-based cash games." *Id.*

Avia's representations to users continue when users play games on Avia's apps. Avia intentionally designs its games to show players that they are playing against other live human opponents in real time. *See id.* ¶ 45. At the beginning of each standalone game, players are asked to wait until the app finds them purported "opponents" to play against. *Id.* ¶ 45. At the end of the game, Avia shows players a scoreboard with their score ranked among the scores of other "players" who supposedly played the game along with them. *Id.* ¶ 45.

Avia's Blockolot provides an illustrative example of these representations in action. Blockolot is a block puzzle game similar to the Nintendo game Tetris. At the start of a Blockolot game, players receive four-block shapes and choose the best way to stack them in empty space. FAC App'x A ¶ 57. Players earn points by filling all spaces in a row or a column. The match will end when the player runs out of space to place blocks and/or when the time runs out. *Id.*

6

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC



Before users download the app, Avia represents to users that Blockolot is a game of skill and that players will play against real players. The App Store advertisement promises Blockolot's players that they will "[p]lay Against Real Players" and that the game will "[m]atch [them] with real players of similar skill levels to play classic, fun, and fair skill-based cash games[]." *Id.* App'x A ¶ 58. According to the advertisement, "[a]nyone can play this simple block game, but it takes skill to walk away a champion!" *Id.* The game invites players to "[u]se [their] skills to pay the bills!" *Id.*

And Avia again makes these representations within Blockolot itself. At the beginning of each game, players are instructed to wait until the app finds them their purported "opponents" for the game.

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC



*Id.* At the end of the game, are shown a scoreboard where their performance is compared with other "players" that purportedly played the game with them. *Id.* App'x A ¶ 59.

Avia makes similar representations with respect to each game in Appendix A to Plaintiffs' First Amended Class Action Complaint. *See id.* ¶¶ 35, 4344; App'x A. Players downloading the games see those statements as game descriptions when they access the relevant app store, such as Apple's AppStore or Samsung's Galaxy Store, and when they play the games. *Id.* ¶¶ 35, 43-44.

In keeping with those representations, Avia affirmatively dispels any potential concerns raised by players that the games might not be what they seem. For example:

- A Solitaire Clash player commented on the App Store that many of the accounts are "obviously faked" because the profile pictures of the players allegedly often "conflict[] with person's name (e.g. 'Zach' with a picture of an older woman and 'Jessica' with a beard)." *Id.* ¶ 47(i). The commenter continued that some players do not finish the game at all or take more time than other players; yet, they turn out as champions. *Id.* Avia responded maintained that the "app is skill-based real money gaming platform where *you always compete against real people of similar skills.*" *Id.* (emphasis added).

- A Bingo Clash player complained that the game is "full of bots to take your money." *Id.* ¶ 47(ii). Avia responded that it "would like to assure you that all of your opponents are real players, not bots." *Id.* (emphasis added).

- A Blockolot player complained that the game "is a scam" and the "[n]ame of the people are not real." *Id.* ¶ 47(iii). Avia replied that the "game is a skill-based real money gaming platform where <u>you always compete with real people around your skill level</u>." *Id.*

In response to these complaints and others like them, Avia consistently affirmed that the players compete against other real players, as consistently advertised on its website, on the App Store, on Galaxy Store, or by Avia's representatives, and replicated on Galaxy's and Acme's portfolio websites. *Id.* ¶ 48.

**B. Avia's apps allow users to compete for real money, and it maintains that it has no interest in the outcome of games.**

Avia promises its users "the chance to win real money." *Id.* ¶ 67. For example, the Pocket7Games platform informs users that they can "Play Fun Games" and "Win REAL CASH." *Id.*; FAC App'x A ¶ 3. To win money, Avia instructs users to "participate in matches with cash prize pools." *Id.* ¶ 67. Avia makes similar statements promising the chance for financial gain are made in relation to specific games. Match n Flip, for example, challenges the players to "[t]est [their] skills and win REAL MONEY." *Id.* ¶ 70. Bingo Flash promises users to "participate in cash games to win real money." *Id.* Many games even invite players to "Use [their] skills to pay the bills!" *Id.*; FAC App'x A ¶¶ 50 (8 Ball Strike), 54 (Bubble Buzz), 58 (Blockolot).

Avia further claims that it has "no financial interest in the outcome of cash games," nor "any stake in who wins or loses." *Id.* ¶ 37. It explains that its "goal is to provide a safe and fun gaming environment where players can compete on the basis of their skills, without worrying about any external factors." *Id.*

**C. Avia's representations were false. It populates its games with bots and keeps the winnings for itself.**

The representations described above are false. Instead of competing with real humans, Avia's game applications are filled with—or controlled by—non-human computer robots ("bots").

As described in Plaintiffs' initial Complaint, Avia's bot use was first disclosed in a patent action brought against Avia by another mobile gaming company, Skillz.[2] *See* Doc. 1 ¶ 48. Since Plaintiffs filed this case, Skillz's lawsuit against Avia has gone to trial, and a jury awarded Skillz $43 million in damages for willfully infringing Skillz's patents. FAC ¶ 50. The exhibits admitted during the lawsuit have proven that Avia uses bots, conceals them from its users, and keeps the money when a player loses to a bot. *Id.*

Avia's internal documents are littered with references to bots. In one exhibit, an Avia employee says, "Competition challenges are matched with robot users." *Id.* ¶ 51 (quoting *Skillz* Doc. 645-25 at 5). Another employee said, the "robot assists the player to quickly match with an opponent." *Id.* (quoting *Skillz* Doc. 645-19 at 93). In yet another document, an Avia employee said, "Starting from January 6 [2022,] robot kind = 8 will appear in every cash game slot." *Id.* (quoting Zhang Trial Tr. 386:13-18 and PTX 164). According to a gaming industry expert, the source code to Avia's apps references bots in its code with the letters "A.I.," meaning artificial intelligence. *Id.* (citing Zagal Trial Tr. 610:5-15). For example, one Avia employee messaged another that the bot, "is implemented through ai at the customer end." *Id.* (quoting *Skillz* Doc. 645-26 at 10).

And there is not just one bot. One Avia employee noted, "In fact, there are quite a few robots playing with people." *Id.* ¶ 52. (quoting *Skillz* Doc.645-19 at 94). The Pocket7Games platform uses multiple algorithms named "ROBOT." These algorithms include "CASH_ROBOT," "NOOB_ROBOT," "COMFORT_ROBOT," "SUBSTITUTE_ROBOT," "SHARK_ROBOT," "INDUCTION_ROBOT," "CASH_COMFORT_ROBOT," "COINS_SUBSTITUTE_ROBOT," AB_SUBSTITUTE_ROBOT," "CHALLENGE_ROBOT," and SYNC_GAME_ROBOT." FAC ¶ 52 (quoting *Skillz* Doc. 645-24 at 5-6).

---

[2] The case is *Skillz Platform Inc. v. Aviagames Inc.*, No. 5:21-cv-02436-BLF (N.D. Cal.) ("*Skillz*").

When Pocket7Games relies upon a "ROBOT" to place a user into a cash match, Avia does not match the user with another user playing at or around the same time who also paid an entry fee to compete for the cash prize. *Id.* ¶ 53. Instead, Avia matches with a "ROBOT" which competes against them in the match. Avia now calls these bots a "historical playthrough," which can include a video recording of a match previously played by another user. *Id.* (citing Zhang Trial Tr. 412:3-9; Zagal Trial Tr. 624:1-4). Avia does not award the user whose play generated the historical playthrough if his or her historical playthrough wins the match. *Id.* If a "historical playthrough" wins a match, Avia keeps all entry fees paid by live human users but does not pay out a cash prize. *Id.* (citing Trial Tr. A-1.2 (1/25/24 Chen Depo. Tr.) 161:14-22; Zagal Trial Tr. 727:3-5). At least one of these bots—"CASH_ROBOT"— was still in use as of the *Skillz* trial in February 2024. FAC ¶ 53 (citing Zhang Trial Tr. 385:4-5).

Avia can and does dial the win rate of its bots. Avia can choose to either match a bot with a similar skill level to a given user, or it can use one that has a higher skill rating or a higher score than the user does to optimize the win rates of its bots. *Id.* ¶ 54 (citing Zagal Trial Tr. 726:12-727:17) (a gaming industry expert testimony that "Avia…keeps the money from those matches when the bot wins," "Avia changes the scores" of its bots, and Avia "also determines the win rates" of its bots, which involves taking into account that the "win rates were too low and they need to recoup the costs"); *Skillz* Doc. 645-22 at 3 ("the win rate of the guide has been adjusted, and this part of the cost must be recovered first"); *Skillz* Doc. 645-20 at 13 ("It uses a set of logic. \n Methods to alleviate online guides' excess theoretical points. On the basis of the current situation, the score of the guide being higher than that of the player can be reduced.").

Avia does not disclose its bots to players. Rather, Avia pairs an Avia-generated new avatar and new username, not the profile of the human whose video the bot is using. *Id.* ¶ 55 (citing *Skillz* Doc. 645-39 at 3).

It was not until December 2023, after Plaintiffs filed this lawsuit, that Avia disclosed that it both controlled the outcomes of games and sat on the other side of the table by pitting users against "historical playthroughs." FAC ¶ 56. Buried in Section 13 of its updated Terms of Service, Avia first disclosed the use of "historical playthroughs." *Id.*; *see also* Decl. of Jianing Qu in Support of Defendant's Opposition to Plaintiffs' Motion for a TRO, Doc. 44-1 at 18-38 ("Exh. A") ("2023 TOS"). A Historical Playthrough is "a record of [a user's] playthrough of any game or contest and resulting scores and statistics." FAC ¶ 56; *see also* 2023 TOS § 13. For the first time, Avia disclosed that it pits users not against live opponents but against other users' Historical Playthroughs—and keeps the winnings for itself. FAC ¶ 56; *see also* 2023 TOS § 13 (explaining that when Historical Playthroughs win, "Aviagames will keep the prize(s) won by those score(s)"). With this recent addition to the TOS, Avia has admitted many of the key facts underlying the Complaint.

**D.     The RICO Defendants**

Plaintiffs have named four RICO Defendants. (Avia is not a RICO Defendant; it is only a defendant on the consumer protection claims.) **Vickie Yanjuan Chen** ("Chen") and **Ping Wang** ("Wang"). Chen and Wang co-founded Avia. FAC ¶¶ 14-15. Ms. Chen is Avia's CEO, and Ms. Wang is Avia's VP of Strategy and Business development. *Id.*

Ms. Chen and Ms. Wang knew that using bots would make Avia's apps more appealing to players like Plaintiffs and boost its revenue and market share as a result. *Id.* ¶ 64. For instance, in a chat involving both Ms. Wang and Ms. Chen discussing Avia's bot use, another employee asked: "Is the fairness issue less important given the co-existence of both huge market space…and rapid growth? Pinduodu…had all sorts of fraudulent fake goods, but it still did not prevent [it] from becoming a hot spot in the capital market." *Id.* (quoting *Skillz* Doc. 645-29 at 6). When asked about this conversation during a deposition in the *Skillz* case, Ms. Chen confirmed that Avia expanded its team through the use

of "historic playthroughs and guides." *Id.* (quoting Trial Tr. A-1.2 (1/25/24 Chen Depo Tr.) 203:16-205:02). And at that trial, Ms. Wang touted Avia's "invention" of "historical playthroughs" as solving a matchmaking problem common to the industry as one of the reasons for Avia's success. *Id.* (quoting Wang Trial Tr. 233:10-24, 234:24-235:4).

Ms. Chen and Ms. Wang repeatedly made false statements about Avia's bots throughout the *Skillz* case. At her first deposition, Ms. Chen insisted that Avia has never used bots and that when a player is matched against an opponent, that player sees the avatar and user name of their human opponent. *Id.* ¶ 60. Neither of these statements are true. As described above, Avia's internal documents and source code are littered with references to bots, and when players match with bots, they see an Avia-generated username and avatar. *Id.* ¶¶ 51-55.

Vice President, Ping Wang, repeatedly testified (falsely) that Avia does not use bots, despite numerous internal documents variously describing Avia's robots as both "bots" and "AI." *Id.* ¶ 59 (citing Wang Trial Tr. at 235:5-20, 238:6-9; *Skillz* Doc. 645-21 at 16 ("skillz … does not dare to use robots"); *Skillz* Doc. 645-49 at 1 (describing GAAP revenue for "AI" matches)).

Ms. Chen also invoked her Fifth Amendment right to testify when pressed on key facts during the *Skillz* case. For example, she refused to answer questions about her personal discussions with Defendant Acme partner and Avia board of directors member Hany Nada regarding the use and concealment of bots in Avia's games on the basis that it might incriminate her. *Id.* ¶¶ 80, 122, 124. She asserted her Fifth Amendment right against self-incrimination when asked: "The board of directors of AviaGames is aware of AviaGames' use and concealment of robots in its cash games, correct?" *Id.* ¶ 122 (quoting *Skillz* Doc. 642-12 at 22:2-4).

**Defendant ACME LLC** ("Acme") is a venture capital investment firm that "invests in breakthrough technologies that fuel platform shifts and disruptive business models that capitalize on

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

new platforms." *Id.* ¶ 16. Acme's partners are intimately involved with Avia's operations. Acme partner Hany Nada sits on Avia's Board of Directors, and Acme partner Alex Fayette is Avia's "Board Observer." *Id.* Acme's membership in the Board of Directors comes with voting power and, as a result, the ability to influence Board's decisions. *Id.* ¶ 174.

Acme touts its "due diligence" into the firms with which it invests, like Avia. In Acme's "Firm Brochure," the company brags that its "due diligence and decision-making process is structured to understand and mitigate key technical, regulatory, execution and competitive risks among its portfolio investments." Doc. 108-1 at 14. The brochure also points out that Acme may use certain outside consultants to conduct pre-investment due diligence. *Id.* at 6. Acme's due diligence into Avia is commensurate with its investment that bought two positions on Avia's board of directors. And that due diligence gave Acme first-hand knowledge of the "key technical" and "regulatory" risks of Avia's scheme to secretly employ bots.

In addition to Acme's due diligence, Mr. Nada's experience in the gaming sector shows that he and Acme have the expertise to understand Avia's inner workings. FAC ¶ 78. Indeed, Mr. Nada's knowledge about Avia is so vast that Avia offered him as an expert on the Avia's history during the *Skillz* case. *Id.* ¶ 80 (citing *Skillz* Doc. 616-4).

**Defendant Galaxy Digital Capital Management, L.P.** ("Galaxy") is a venture capital firm that "invest[s] in pioneering content, technology, and social commerce companies that enable and amplify our agency and self-expression through integration of our digital and physical lives." FAC ¶ 17. While Galaxy does not have a voting position on Avia's board, Galaxy's partner Ryan You serves as an observer. *Id.* ¶¶ 78, 123. As with Acme's Mr. Nada, Mr. You has an extensive experience with investing in the gaming industry. *Id.* ¶ 129. Mr You is the "co-head of gaming at Galaxy," an engineer "by training," a "technology and video game enthusiast," and has a wealth of experience at other game

studios and companies that provide "backend support for game studios." *Id.* ¶ 78. Galaxy's public website disseminates the same falsehoods as Avia's FAQ. It describes Avia as a company that "uses a complex algorithm to assess and match each player's ability in order to create a fair gaming environment." *Compare id.* ¶ 34, *with id.* ¶ 120.

Together, Acme and Galaxy are the RICO Investors. And the RICO Investors, Ms. Chen and Ms. Wang are the RICO Defendants.

### E.    Plaintiffs

Plaintiffs Andrew Pandolfi and Mandi Shawcroft have spent hundreds or thousands of dollars to play Defendants' games believing that they were participating in skill-based competitions against other human opponents. *Id.* ¶¶ 9-12. Mr. Pandolfi and Ms. Shawcroft played Avia's Pocket7Games and Bingo Clash on their mobile phones for real money. *Id.* And they both allege they incurred monetary harm as a result of misleading statements. *Id.* ¶¶ 10, 12. They filed this action on behalf of themselves and those similarly situated to hold Avia and other Defendants accountable for their misrepresentations to consumers and stop them from continuing to exploit Avia's games users.

Their claims fall into two buckets. First, Plaintiffs assert consumer protection claims against Avia under California's Consumers Legal Remedies Act ("CLRA") and Unfair Competition Law ("UCL") for the deceptive and unfair business practices employed by Avia. Second, Plaintiffs assert claims against Avia and the RICO Defendants under the RICO statute to remedy the harm caused by the Defendants' illegal gambling enterprise and fraudulent statements.

### APPLICABLE LEGAL STANDARDS

Rule 8 requires a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see Erickson v. Pardus*, 551 U.S. 89, 93 (2007). While they have done so here, Plaintiffs are not required to plead "detailed factual allegations" to state

their claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Erickson*, 551 U.S. at 93. Rather, plaintiffs need only set forth enough facts to state claims that are facially plausible. *See Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1123 (9th Cir. 2008). Even if "it may appear on the face of the pleading that recovery is very remote and unlikely," *id.*, all that is required is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts all allegations as true, considers them as a whole, and draws all reasonable inferences in the plaintiff's favor. *See Association for L.A. Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011).

Where a claim sounds in fraud, Rule 9(b) requires the allegations "be specific enough to give defendants notice of the particular misconduct." *Bly-Magee v. Cal.*, 236 F.3d 1014, 1019 (9th Cir. 2001). But Rule 9(b) does not apply to fraudulent intent: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Moreover, in this Circuit, Rule 9(b) "may be relaxed as to matters within the opposing party's knowledge." *Moore v. Kayport Package Express, Inc*. 885 F.2d 531, 540 (9th Cir. 1989); *see Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1998) ("[W]e cannot make Rule 9(b) carry more weight than it was meant to bear.") (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1554 (9th Cir. 1994) (en banc)).

## ARGUMENT

### I. THE COURT SHOULD NOT "DISREGARD" THE AMPLE EVIDENCE OF WRONGDOING UNCOVERED IN THE AVIA-SKILLZ TRIAL.

As detailed above, a separate lawsuit between Avia and its competitor, Skillz, involved some of the same issues as in this case and provided ample evidence of the Avia Defendants' wrongdoing. At the time of the initial Complaint here, many of the documents in that case were under seal or otherwise unavailable to Plaintiffs. Thus, Plaintiffs were left to rely on statements that were publicly available on the Court docket. The Avia Defendants challenged the initial Complaint by arguing that

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

"the Court should *disregard* the numerous allegations that quote or cite to unproved pleadings and argument made by counsel representing Avia competitor 'Skillz' in another case." Doc. 89 at 5 (emphasis added). A jury trial took place in the Skillz case in February of this year, making available previously unavailable documents. Following that trial, Plaintiffs amended their Complaint to, among other things, take advantage of the material now publicly available because of the recent trial. The Avia Defendants now again ask the Court to turn a willful blind eye to the evidence of their wrongdoing and argue that the allegations concerning the Skillz documents "have no bearing on the issues before this Court" and, thus, the "Court should *disregard* them." Avia Br. 6-7 (emphasis added).[3] But, the documents speak for themselves and highlight that there is egregious wrongdoing here.

The documents from the Skillz trial provide direct evidence that shows the allegations here are well-founded. For example, the trial uncovered an Avia employee conceding that "Competition challenges are matched with robot users." Tripolitsiotis Decl. Ex. C (*Skillz* Doc. 645-25) at 5. In fact, the Pocket7Games platform uses multiple algorithms named "ROBOT." Tripolitsiotis Decl. Ex. D (*Skillz* Doc. 645-24) at 5-6. And, Avia controls the win rate of its bots. Tripolitsiotis Decl. Ex. E (*Skillz* Doc. 645-22) at 3 (noting that "In the past half a month, the win rate of guides has increased a lot" and "the win rate of the guide has been adjusted, and this part of the cost must be recovered first"). When Avia's bots win, it keeps the money. *See* Tripolitsiotis Decl. Ex. F (*Skillz* Doc. 645-49) at 1 (describing GAAP revenue for "AI" matches). And, when players won, Avia would call in its bots to address the situation. *See* Tripolitsiotis Decl. Ex. A (Skillz Doc. 645-38) at 16 (internal chat noting that when Avia was faced with a player winning regularly, "it feels that we cannot hold back this kind of player . . . It

---

[3] Defendants' memoranda in support of their motions to dismiss are referred to as "Avia Br." (Doc. No. 110), "Acme Br." (Doc. No. 107), "Galaxy Br." (Doc No. 109), respectively.

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

is necessary to call in the guider"). These documents—and others in the trial record—confirm that Plaintiffs' allegations have merit and should not be "disregarded."

While the Avia Defendants' language is broad and seeks to avoid the consideration of any Skillz case evidence, their argument is truly only focused on two things:

*First*, the Avia Defendants' take issue with references to Ms. Chen's invocation of her Fifth Amendment right to not incriminate herself. Avia Br. 14. Plaintiffs raise this point three places in the First Amended Complaint; each time it deals with a specific question related to Ms. Chen's discussions with the Board/Investors regarding the use of bots. *Id*. (citing FAC ¶¶ 80, 122, 124). Avia claims this is improper because it has nothing to do with the underlying patent case and because she later sat for another deposition. However, Plaintiffs do not have the transcript of that subsequent deposition. Nor has Avia provided that transcript or even the instances of where she answered the questions at issue. The Avia Defendants know what was said in the totality of that deposition. Plaintiffs only have access to some limited, quoted material from proposed findings of fact. Thus, Plaintiffs' continued citation of Ms. Chen's Fifth Amendment invocation—in the absence of any contrary proffer from Avia on the specific subject for which it is raised—is appropriate. Furthermore, even if Defendants attempted to controvert this fact with sworn testimony from Ms. Chen, it would only, at best, create a fact issue. At the pleading stage, Plaintiffs get the benefit of all allegations.

*Second*, the Avia Defendants incorrectly take issue with how the Court's crime-fraud ruling in Skillz was represented in the Complaint. Avia Br. 14-15. The Court's crime-fraud ruling is refenced in one sentence of the Complaint: "The Court in the Skillz case has already found that Avia's representations to users with respect to its bot use were fraudulent." FAC ¶ 118. This is in accord with what the Magistrate in the Skillz case found when she explained "Even adopting, *en arguendo*, Avia's position that a previously video-taped game is not a 'bot,' its response that the opponent is 'real' to the

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

users' complaint that the opponent is 'not live' is an intentional, material misrepresentation, and Avia's argument to the contrary at the hearing was unavailing." Tripolitsiotis Decl. Ex. G (Skillz Doc. 435) at 14; *see id*. Ex. B (Skillz Doc. 509) at 6 (affirming Magistrate order and noting the "magistrate judge also found that AviaGames made 'intentional, material misrepresentations' with respect to the statements in the Opinion Letter and AviaGames' statements in response to user complaints"). The District Court agreed, noting "users would have relied on AviaGames' representations about its games in response to reviews and questions in choosing to download and/or play Pocket7Games. It is also reasonable to infer that users who relied on AviaGames' misrepresentations would be harmed by losing money to bots in Pocket7Games." *Id*. at 6-7 (internal citations omitted). The plain language of these orders speak for themselves and support the one sentence reference in the Complaint.

Accordingly, the Court should consider the totality of Plaintiffs' allegations—buttressed by actual documents from the Skillz case—in evaluating whether Plaintiffs have claims.

## II. CALIFORNIA'S PUBLIC POLICY DOES NOT BAR PLAINTIFFS' CONSUMER PROTECTION CLAIMS.

California's public policy against the judicial resolution of gambling disputes does not apply here because (1) Avia's misrepresentations that players will play against other human beings in real-time and that it does not have an interest in the outcome of games are actionable, regardless of whether Avia's conduct constitutes illegal gambling; (2) California's public policy does not apply when the plaintiff is an unwitting victim in the defendant's illegal gambling scheme; and (3) Plaintiffs' ability to sue Defendants is authorized by statute.

*First*, Avia's argument overlooks key categories of fraud that Plaintiffs allege. Broadly speaking, Plaintiffs allege that Avia's misrepresentations fall into three buckets: (a) that its games are skill-based, (b) that those playing its games will play against real players in real time, and (c) that Avia has no interest in the outcome of games. But the dividing line between legal games of skill and illegal

games of chance (gambling) only relates to the first bucket. Even if Avia's games are skill-based (as it claims), Plaintiffs still have viable claims for deceptive and unfair practices based on Avia's other misrepresentations.

Regardless of whether its conduct meets the definition of gambling, Avia engaged in fraud when it told Plaintiffs, for example, that players "[c]ompete in real time against other players" knowing full well that, "[i]n fact, there are quite a few robots playing with people." FAC ¶¶ 35, 51. And Avia's claims that it has neither a "financial interest in the outcome of cash games" nor "any stake in who wins or loses" would still be deceptive because Avia keeps human players' entry fees if its bot wins a match, no matter if its games are skill- or chance-based. FAC ¶¶ 37, 53. So, Plaintiffs' UCL and CLRA causes of action based on Defendants' fraudulent and deceptive trade practices is viable—with or without technical gambling.

*Second*, California's public policy does not apply where, as here, the gravamen of the fraud was to induce unwitting victims into participating in the alleged gambling conduct. It is true that "California has a strong, broad, and long-standing public policy against judicial resolution of civil disputes arising out of gambling contracts or transactions." *Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462, 477 (1999). But this case arises out of neither a gambling contract nor a gambling transaction. Put another way, a contract requires a meeting of the minds between two parties. There was no such meeting here where the gravamen of Plaintiffs' claims is that they were defrauded into paying money to enter what they thought were skill-based games against live human opponents, when in reality the games' outcomes were determined not by skill, but by Defendants' bots (sometimes called "guides") that manipulated and preordained the final scores so that Avia could keep the "winnings."[4]

_____

[4] Defendants report that the FAC's allegations belie "any argument that Plaintiffs were 'tricked' into gambling." Avia Br. at 9-10. Avia supports its argument by taking three snippets from the FAC out of context. When Plaintiffs used the words "clearly prohibited by California law," Plaintiffs did so in

In contrast, Defendants constantly represented to players, including Plaintiffs, that it hosted legal, skill-based contests, and Defendants consistently denied that its operations were gambling, that it used bots to manipulate the results of games, and that Avia had any financial interest in the outcome. That these representations were false should not immunize Avia's conduct. Indeed, it would thwart California's public policy to allow companies like Avia to hoodwink unsuspecting victims, so long as the result of the scheme is to induce unwitting gambling.

The cases giving rise to California's public policy support this view. In *Wallace v. Opinham*, for example, the plaintiff alleged that the defendant used marked cards to defraud him during a blackjack game. 73 Cal. App. 2d 25, 25 (1946).[5] The California Court of Appeals noted that the Penal Code "specifically prohibited" blackjack. *Id.* The court held that "[w]here the parties *voluntarily engage in a gambling game* which is prohibited by law . . . neither courts of law nor equity will aid or assist either party to enforce rights growing out of that illegal transaction." *Id.* at 26 (emphasis added). It reasoned, if someone "thus *voluntarily puts himself in a condition to be cheated*, through his illegal act he cheats the government, and the other person cheats him, and they must be left to settle the affair between themselves." *Id.* at 27. And in *Schmitt v. Gibson*, the plaintiff sued the defendant to recover money he bet on a fight. 12 Cal. App. 407, 408-10 (1910). The plaintiff placed the bet because the

reference to "the game of blackjack, which is provided by Avia under the name '21 Gold', [and] is clearly prohibited by California law" and a Ninth Circuit opinion that provides "The operation of a 'blackjack' game is clearly prohibited by West's Ann. Cal. Pen. Code, section 330 and, thus, is violative of this section's prohibition against illegal gambling businesses.'" FAC ¶ 115 (quoting *United States v. Graham*, 534 F.2d 1357 (9th Cir. 1976)). There is no allegation that Plaintiffs ever played 21 Gold. *See id.* at ¶¶ 9-12.

Defendants' other examples—user complaints that Avia's games are "obviously faked" and "full of bots"—ignore that Avia responded to the complaints to affirmatively dispel the user's concerns. *See id.* ¶ 47.

[5] The *Kelly* court relies heavily on *Wallace. See Kelly*, 72 Cal. App. 4th at 480-83 (summarizing *Wallace*, 73 Cal. App. 2d at 26).

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

defendant told him that a particular fighter would win because his cousin had fixed the fight. *Id.* at 409. Ultimately, the defendant's co-conspirators ran away with the money. The California Court of Appeals declined to help the plaintiff get his money back because the plaintiff had brought "an action based upon the breach of [an] unholy agreement, to which he *deliberately and knowingly became a party.*" *Id.* at 412 (emphasis added).

The cases Defendants cite do not counsel otherwise. In all but one of Defendants' cited cases, the plaintiff knowingly and voluntarily participated in a gambling transaction with a casino or the like.[6] Defendants' final case, *Ochoa v. Zeroo Gravity Games LLC*, supports Plaintiffs' position. The plaintiffs in *Ochoa* played "casino-style slot games for mobile devices" published by the defendants. No. CV 22-5896-GW-ASx, 2023 WL 4291650, at *1 (C.D. Cal. May 24, 2023). The plaintiffs asserted two types of claims against the defendants. First, they alleged that the defendants' applications violated California's gambling laws, and the defendants' unlawful conduct, in turn, gave rise to consumer protection and common law causes of action. *Id.* at *4. Second, the plaintiffs asserted false advertising, consumer protection, and common law claims based on the defendants' advertisements that exaggerated the discount offered for virtual currency to play the defendants' games during a supposed "Super Sale." *Id.* at *8-9.

---

[6] *See Jamgotchian v. Sci. Games Corp.*, 371 F. App'x 812, 813 (9th Cir. 2010) (plaintiff used machines to bet on horse races); *Hang Ngoc Lam v. Hawaiian Gardens Casino*, No. CV-19-3989-DMG (MRWx), 2020 WL 806655, at *1 (C.D. Cal. Jan. 8, 2020) ("Plaintiffs went to Defendant's casino to play a version of baccarat called Fortune 7 Baccarat."); *Tak Chun Gaming Promotion Co. Ltd. v. Long*, 96 Cal. App. 5th 1027, 1030 (2023), *as modified on denial of reh'g* (Nov. 17, 2023) (plaintiff "own[ed] and operate[d] gaming clubs inside Macanese casinos . . . [and] loan[ed] funds to gamblers); *Kelly*, 72 Cal. App. 4th at 471 (plaintiff played games of twenty-one at the Sycuan Casino); *Strickland v. Bicycle Casino, Inc.*, No. B233575, 2012 WL 3756980, at *1 (Cal. Ct. App. Aug. 30, 2012) (plaintiffs "entered a no-limit poker tournament organized by defendant, The Bicycle Casino"); *Mason v. Mach. Zone, Inc.*, 140 F. Supp. 3d 457, 460 (D. Md. 2015), *aff'd*, 851 F.3d 315 (4th Cir. 2017) (plaintiff knowingly entered in-game "Casino").

Defendants here quote *Ochoa* to argue that "California's bar on adjudicating gambling disputes applies even where plaintiffs claim to be 'victims of [d]efendants' fraud and unknowing participants in illegal gambling.'" Avia Br. 9 (quoting *Ochoa*, 2023 WL 4291650, at \*4). But the *Ochoa* court only applied the public policy bar to the plaintiffs' first category of claims—those predicated on express violations of California's gambling law. *See Ochoa*, 2023 WL 4291650, at \*4-5. The court did *not* apply it to the second set of claims based on the defendants' misleading advertisements. *Id.* at \*8-9. To the contrary, after the court dismissed some causes of action under the public policy, it found: that the plaintiffs' false advertising claims met Rule 9(b)'s requirements (*id.* at \*9); that a plaintiff lacked standing to sue one defendant for violations of California law (*id.* at \*11-12); that the plaintiffs' CLRA claims could proceed (*id.* at \*13); that the plaintiffs' claims for unjust enrichment were duplicative of their statutory claims (*id.*); and that the plaintiffs had failed to allege a sufficient connection between a defendant and the app publisher (*id.*). Even with the plaintiffs' claims based on the defendants' illegal gambling, the court allowed the plaintiffs' claims for public injunctive relief under California's consumer protection statutes to proceed. *Id.* at \*5. And so, *Ochoa* is not as expansive as Defendants suggest.[7]

*Third*, California's public policy against the judicial resolution of civil claims arising out of gambling contracts or transactions only applies "in the absence of a statutory right to recover," *Kelly*, 72 Cal. App. 4th at 466. Plaintiffs have statutory rights to recover for Defendants' conduct.

The UCL allows consumers to sue companies that damage them through acts of "unfair competition." Unfair competition includes "any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Cal. Bus. & Prof. Code § 17200.

---

[7] Applied to this case, *Ochoa* would only require that the Court dismiss claims for damages expressly predicated on violations of gambling law. That is a small subset of Plaintiffs' claims.

Section 17539. 1(a) of that chapter prohibits certain "unfair acts or practices undertaken by, or omissions of, any person in the operation of any contest." A "contest" "includes any game, contest, puzzle, scheme, or plan that holds out or offers to prospective participants the opportunity to receive or compete for gifts, prizes, or gratuities as determined by skill or any combination of chance and skill and that is, or in whole or in part may be, conditioned upon the payment of consideration." Cal. Bus. & Prof. Code § 17539.3(e). Avia has violated these provisions by operating contests in which users can compete for prizes and failing to disclose that it uses bots to control the outcomes of games and "win" users' entry fees that it keeps for itself.

Likewise, RICO provides a statutory action allowing those injured by a pattern of racketeering activity to bring a claim against an enterprise and its members if the enterprise engages in certain predicate acts. One such predicate act is 18 U.S.C. § 1955, which "relat[es] to the prohibition of illegal gambling businesses." 18 U.S.C. § 1961(1). As described in more detail in Plaintiffs' response to Defendants' RICO-specific arguments, Defendants effectively operate an illegal online casino, where the players play against Avia as the "house." Avia has its own stake in the games and is free to determine the results of the matches regardless of the skills of the players.

*Fourth*, even in cases in which the public policy applies, it does not extend to bar equitable or injunctive relief. *See Ochoa*, 2023 WL 4291650, at *5. Accordingly, Plaintiffs can obtain declaratory and public injunctive relief under the UCL and CLRA without running afoul of California's public policy against gambling.

## III. PLAINTIFFS HAVE STATED CLAIMS UNDER CALIFORNIA'S CLRA AND UCL.

Plaintiffs bring separate claims under California's CLRA and UCL. The CLRA prohibits certain "unfair methods of competition and unfair or deceptive acts or practices . . . undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any

consumer." Cal. Civ. Code § 1770(a). Practices proscribed by the CLRA include "[r]epresenting that goods or services have . . . characteristics . . . that they do not have" and "[a]dvertising goods or services with intent not to sell them as advertised." Cal. Civ. Code §§ 1770(5), (9). Likewise, the UCL creates a cause of action for business practices that are unlawful, unfair, or fraudulent. Cal. Bus. & Prof. Code § 17200. "Each 'prong' of the UCL provides a separate and distinct theory of liability." *Sultanis v. Champion Petfoods USA Inc.*, No. 21-CV-00162-EMC, 2021 WL 3373934, at *8 (N.D. Cal. Aug. 3, 2021). The allegations in Plaintiffs' First Amended Complaint satisfy both the CLRA and all three prongs under the UCL.

*First*, Plaintiffs have pled a plausible claim under the CLRA and the UCL's fraud prong. Defendants that violate the CLRA also violate the UCL's fraud prong. *Id.* ("A violation of . . . the CLRA is also a violation of the fraud prong of the UCL."). Because "the same standard for fraudulent activity governs" both the CLRA and the UCL, courts analyze the statutes together. *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1063 (N.D. Cal. 2017); *see also In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 985 (S.D. Cal. 2014) ("Courts often analyze these statutes together because they share similar attributes.").

Under the CLRA and the UCL's fraud prong, conduct is misleading if it is "likely to deceive" a "reasonable consumer." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Courts do not usually resolve whether the defendants' conduct is deceptive at the pleading stage. *Id.* at 938-39. Rather, "[g]ranting a motion to dismiss is appropriate only in 'the rare situation' where 'the advertisement itself [makes] it impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived.'" *Coe v. Gen. Mills, Inc.*, No. 15-CV-05112-TEH, 2016 WL 4208287, at *5 (N.D. Cal. Aug. 10, 2016) (quoting *Williams*, 552 F.3d at 939).

Here, Avia's misrepresentations that those using its app would play against real players in contests of skill—and that it did not have an interest in outcomes—were likely to deceive reasonable consumers. Consumers viewing statements that they will "[c]ompete in real time against other players" with "only [their] strategy and skill" (FAC ¶ 35; FAC App'x. A ¶ 11); that they will "[g]o head-to-head against opponents and strategize to defeat them!" (FAC App'x. A ¶ 11); that they will be "[m]atch[ed] with real players of similar skill levels" so that they can "compete in classic, fun, and fair skill-based cash games!" (FAC ¶ 35); that they will participate in a "REAL PLAYER FACEOFF" (FAC ¶ 42; FAC App'x A ¶ 32) or a "Skill-based Real Player Competition" (FAC ¶ 42) would believe that they would be playing against real players in skill-based contests.

Fraudulent omissions can also support a cause of action under the CLRA or the UCL's fraud prong. Plaintiffs can prove such a cause of action by demonstrating that: "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 864-65 (N.D. Cal. 2018), *order clarified*, No. 16-CV-07244-EMC, 2018 WL 1156607 (N.D. Cal. Mar. 5, 2018), *and on reconsideration*, 438 F. Supp. 3d 1017 (N.D. Cal. 2020) (Chen, J.). Here, the test is met:

- Plaintiffs allege that Avia concealed a material fact—its games are populated by bots and the company keeps the bots' winnings. This fact is material because Plaintiffs were led to believe that they were competing against other human users and had no reason to believe they were engaged in games *against* Avia.

- A duty to disclose may arise "when the defendant had exclusive knowledge of material facts not known to the plaintiff; . . . when the defendant actively conceals a material fact from the plaintiff; and . . . when the defendant makes partial

representations but also suppresses some material fact." *Sloan*, 287 F. Supp. 3d at 865. No one disputes that Avia had exclusive knowledge of its bot use.

- Avia either actively concealed its bot use or made misleading, partial representations when Avia did not inform Mr. Pandolfi, for example, that he was playing against bots "after he raised some concerns about the nature of the games and reached out to customer support." FAC ¶ 10.

- Plaintiffs allege that Avia's executive team understood that the company's bot use would boost its revenue and market share by making its app more appealing to players. For instance, the First Amended Complaint describes a chat between two executives who questioned whether "the fairness issue [was] less important given the co-existence of both huge market space…and rapid growth" and spoke positively about another app maker whose "fraudulent fake goods … did not prevent [it] from becoming a hot spot in the capital market." FAC ¶ 64. It quotes an executive who concluded that the "optimal solution [to achieve such growth] is to expand the team[] relying on robots," even though he acknowledged that "this mode can't go public[.]" *Id.*

- Finally, Plaintiffs allege that they were unaware of Avia's bot use, would not have played Avia's games if they had known, and suffered damage as a result. FAC ¶¶ 9-12.

*Second*, Plaintiffs also state a cause of action under the UCL's unfair prong. Under the UCL, "unfair competition" includes "any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Cal. Bus. & Prof. Code § 17200. Section 17539. 1(a) of that chapter prohibits certain "unfair acts or practices undertaken by, or omissions of, any person in the operation of any contest or sweepstakes," including "(1) Failing to clearly and conspicuously disclose, at the time of the initial contest solicitation, at the time of each precontest promotional solicitation and each time the payment of money is required to become or to remain a contestant, the total number of contestants anticipated based on prior experience and the percentages of contestants correctly solving each puzzle used in the three most recently completed contests conducted by the person," and "(4) Misrepresenting in any manner, the rules, terms, or conditions of participation in a contest." Plaintiffs allege that Avia has violated these provisions by hosting contests and failing to disclose that it has filled or controlled its games with bots.

27

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

*Third*, Plaintiffs also plead a valid cause of action under the UCL's unlawful prong. "The 'unlawful' prong claim is derivative of the other alleged violations, so it rises or falls with them." *Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1260 (N.D. Cal. 2022). As described more fully in Plaintiffs' section on RICO, Defendants' conduct constitutes wire fraud and violates state and federal gambling laws.

> **A.** **Plaintiffs allege they saw specific misrepresentations and, in any event, do not need to allege specific misrepresentations where, as here, Defendants engaged in fraudulent omissions.**

Defendants' objection that Plaintiffs have not sufficiently plead the specific statements they saw or relied on should be overruled for three reasons. First, contrary to Defendants' description, the Complaint does in fact contain detailed allegations as to the misrepresentations that Mr. Pandolfi and Ms. Shawcroft—like all Avia users—saw and that they would not have played Avia's games had they known that the outcome was being manipulated by Avia bots. Second, the law does not require hyper-specificity when the Defendants' misrepresentations are part of a "long-term advertising campaign." *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009). And third, Defendants' arguments ignore that Plaintiffs' claims are *also* based on omissions, and reliance in the omissions context "differs from affirmative misrepresentation principles where reliance requires the consumer to have seen or read the misrepresentation." *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 967 (N.D. Cal. 2018) (Chen, J.).

As an initial matter, the Complaint includes sufficient details to "give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir. 1985). Plaintiffs allege that Avia misrepresented to all users downloading Avia's games, which necessarily includes Plaintiffs, that they would be taking part in skill-based competitions against real players. FAC ¶ 35. Avia makes mobile games playable on its online platform Pocket7Games,

mobile browsers, and standalone applications. FAC ¶ 31. Avia misrepresents its games through each of these means.

Players downloading the games see those statements as game descriptions when they access the relevant app store, such as the Apple's AppStore or Samsung Galaxy Store. *Id.* ¶ 44. For example, Plaintiffs allege that Avia's AppStore page for Pocket7Games prepares the users to participate in a "REAL PLAYER FACEOFF," or "Skill-based Real Player Competition." *Id.* ¶ 42. Avia's Bingo Clash AppStore page tells those downloading the application on their mobile phones that they will play against players of similar skill in a "REAL PLAYER FACEOFF." FAC App'x A ¶ 32. Avia also claims on that page it will match players up with "real players of similar skill levels to compete in classic, fun, and fair skill-based cash games!" *Id.* App'x A ¶ 33. These statements, and others like them, are visible to each user who downloads Avia's games. *Id.* ¶ 35.[8]

Plaintiffs further allege that Avia designs each game to give users the illusion that they're playing against real people. At the beginning of each Avia game, the app informs the player that it is looking for their opponent for the game. FAC ¶ 43. After a few seconds, the player is matched with "opponents" in a number sufficient to play the game. *Id*. At the end of each game, the player is directed to a scoreboard with their score ranked among the scores of other "players" that supposedly played the game along with them. *Id*. Plaintiffs allege that these representations are false. "Avia's game applications are filled with—or controlled by—non-human computer robots ('bots')." FAC ¶ 49. And

---

[8] Further, Plaintiffs allege that on Avia's website, Avia tells players that it "guarantees players a fair, high-quality gaming experience," that it employs a "complex algorithm" that purports to "assess and match each player's ability in order to create" a "fair gaming environment," that "this sophisticated algorithm is constantly monitored and updated to prevent players from cheating the system," and that "[m]aking sure that players are matched by skill level has always been a major focus of [its] app development." FAC ¶ 4.

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

the opponents displayed are not live human players that the user played against but rather "an Avia-generated new avatar and new user name" for the bot. FAC ¶ 55.

Like all Avia users, Mr. Pandolfi and Ms. Shawcroft saw these misrepresentations when they downloaded and played Avia's games. Plaintiffs allege that both Mr. Pandolfi and Ms. Shawcroft used Avia's Pocket7Games and played Bingo Clash on their mobile phones, FAC ¶¶ 9-12, which requires downloading the games from the relevant app store where the representations described above were displayed. FAC ¶ 44. And because Plaintiffs both played Avia's games, they could see the matchmaking screen and post-match scoreboard that Avia designed to give them the false impression they were playing against real people.

Plaintiffs also allege that both Plaintiffs relied on Avia's representations. Mr. Pandolfi decided to play Avia's games to go head-to-head against real players. FAC ¶ 10. He "believed he was playing with real people," and "lost thousands of dollars playing those games." FAC ¶ 9-10. Mr. Pandolfi "would not have continued to spend money on Avia's platform had he known that its games were populated or controlled with bots instead of human competitors." FAC ¶ 10. Ms. Shawcroft was drawn to Avia's games because she wanted to play skill-based solitaire and bingo-related games. FAC ¶ 12. Like Mr. Pandolfi, Ms. Shawcroft "incurred monetary harm as a result of Avia's misleading statements." FAC ¶ 12.

In any event, Plaintiffs need not plead actual reliance because "a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Engalla v. Permanente Med. Group, Inc.*, 15 Cal. 4th 951, 977 (1997). Representations are material if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of an action in the transaction in question." *Swearingen v. Late July Snacks LLC*, No. 13-CV-04324-EMC, 2017 WL 1806483, at *4 (N.D. Cal. May 5, 2017) (Chen, J.).

Here, a reasonable consumer would attach importance to Avia's misrepresentations that they were playing skill-based games against real people. Players need someone to play against. FAC ¶ 63. If there are not enough real players and the players need to wait to get the results of their match, they are less likely to keep playing. *Id.* The reviews complaining about bots in Avia's games also suggest that the use of bots is an issue they care about. *See* FAC ¶ 47.

Avia also knew that consumers would care about whether they played against real people or bots when deciding to play their games. Avia makes many of these misrepresentations on the Frequently Asked Questions section of its website. *See* FAC ¶ 36-37.[9] That Avia makes these statements on the "FAQs" section of its website is a reasonable basis to infer people frequently ask those questions and these issues matters to them. Indeed, and Avia's answers to those questions feeds into their decision whether to play Avia's games. FAC ¶ 38.

*Second,* Plaintiffs do not need to detail the exact misrepresentations they saw when they allege the misrepresentations are part of a "long-term advertising campaign." *In re Tobacco II Cases*, 46 Cal. 4th at 328. The plaintiffs in *Chrysler-Dodge-Jeep Ecodiesel*, for example, alleged that they bought their cars because they believed them to be low emissions vehicles due in part to a (false) "EcoDiesel" logo on each car. *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 946 (N.D. Cal. 2018) (Chen, J.). The Court held that, "[b]ecause the 'EcoDiesel' logo is on the face of each . . . [v]ehicle, there is a plausible assertion of pervasive advertising from which an inference of reliance could be made." *Id.* at 1013 n.18. To hold otherwise would have required "'an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements.'" *Id.* (quoting *Tobacco II*, 46 Cal. 4th at 328).

---

[9] The current FAQ has a section titled "Am I playing against real, live players." *See* https://www.pocket7games.com/support-faq.

31
Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

Like the defendants in *Chrysler-Dodge-Jeep* that put the logo on every car, Avia misrepresented to every user who downloaded its games that they would play against real people on each app store. FAC ¶ 33. Avia made these representations across all of its games. *See* FAC App'x A. And within the games themselves, Avia deceives players into thinking they are playing against other people. FAC ¶ 43. Accordingly, Avia, like the defendants in *Chrysler-Dodge-Jeep Ecodiesel* has engaged in "pervasive advertising," and Plaintiffs' reliance on Avia's misrepresentations can be presumed.

But even if Plaintiffs had not pled with such specificity, Defendants' arguments against reliance would still fail. Reliance in the omissions context "differs from affirmative misrepresentation principles where reliance requires the consumer to have seen or read the misrepresentation." *Baranco*, 294 F. Supp. 3d at 967. Rather, in omissions cases, "a plaintiff must simply 'establish a plausible method of disclosure and . . . that they would have been aware of information disclosed using that method.'" *Id.* (ellipses in original) (quoting *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1227 (9th Cir. 2015)). And to show reliance in omissions cases, "a plaintiff may 'prov[e] that, had the omitted information been disclosed, one would have been aware of it and behaved differently.'" *Id.* at 966 (brackets in original).

Put simply, Plaintiffs' Complaint meets Rule 9(b)'s pleading requirements by giving Defendants the "who, what, when, where, and how of the misconduct charged*." Roblox*, 602 F. Supp. 3d at 1254. The "who" is Avia. The "what" is inducing customers into reasonably believing that they would be participating in skill-based contests against real people. The "when" is when they downloaded Avia's games and when they played the games. The "where" is on the games' app store pages and during the pre-match matchmaking and post-match scoreboard screens. The "how" is by telling users that they would be playing games of skill against other real people, designing its games to give users the illusion that they played against real people, and concealing its bot use from its customers.

**B.      Plaintiffs have sufficiently pled the lack of an adequate remedy at law.**

Defendants, relying heavily on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), argue that the Court should dismiss Plaintiffs' UCL and CLRA claims for equitable relief because Plaintiffs "fail to plead an inadequate remedy at law." Avia Br. 10. That argument is misplaced for two primary reasons.

*First*, Avia's motion ignores Plaintiffs' request for injunctive relief. Plaintiffs have adequately alleged that damages for past conduct will not sufficiently protect Plaintiffs and the public from irreparable harm because Avia "continues to injure the public by misleading consumers about participating in games of skill against real, live players." FAC ¶ 156.

*Second*, because of the uncertainty that exists at the pleading stage regarding which of a plaintiff's claims are or are not viable, *Sonner* does not apply this early with the harshness that Avia suggests. *See Beligan v. Mercedes-benz USA, LLC*, No. SA CV 22-02035-DFM, 2023 WL 3150113, at *5 (C.D. Cal. Feb. 15, 2023) (discussing the limitations of *Sonner* at the pleading stage and citing *Carroll v. Myriad Genetics, Inc.*, No. 22-739, 2022 WL 16860013, at *6 (N.D. Cal. Nov. 9, 2022)). At this early stage of the case, a plaintiff need only either allege that she lacks an adequate remedy at law <u>or</u> plead her claims in the alternative. *Id*. at *5; *see also Johnson v. Trumpet Behav. Health, LLC*, No. 3:21-CV-03221-WHO, 2022 WL 74163, at *3 (N.D. Cal. Jan. 7, 2022) (stating that "because *Sonner* was decided at a later posture" than a motion to dismiss, "if a plaintiff pleads that she lacks an adequate legal remedy, *Sonner* will rarely (if ever) require more this early in the case"); *Nacarino v. Chobani, LLC*, 668 F. Supp. 3d 881, 896 (N.D. Cal. 2022), *motion to certify appeal denied*, No. 20-CV-07437-EMC, 2022 WL 833328 (N.D. Cal. Mar. 21, 2022) (collecting and agreeing with cases finding pleading in the alternative available). The reasoning of *Beligan*, *Johnson*, and *Nacarino* is "consistent with

Federal Rule of Civil Procedure 8 which allows for pleading in the alternative." *Nacarino*, 668 F. Supp. 3d at 896.

More specifically here, Avia has also moved to dismiss Plaintiffs' CLRA damages claims on the grounds that "[t]he CLRA does not apply to transactions involving virtual currencies or software." Avia Br. 14-16. Avia separately alleges that Plaintiffs' RICO claims are not viable because they contend Plaintiffs claims are for "gambling losses." Avia Br. 17. If Avia's arguments are correct (and they are not), then Plaintiffs do <u>not</u> have an adequate remedy at law for damages and Plaintiffs' UCL claim for restitution should proceed. The reality is that, as is common and permissible, both Plaintiffs and Avia plead and argue in the alternative, evidencing the uncertain nature of the merits of a case in its early stages and justifying the sensibility of cases like *Beligan*, *Johnson*, and *Nacarino*, which all held alternative claims permissible.[10]

### C. Defendants' conduct falls within the CLRA despite Defendants' arguments about "virtual currencies."

Defendants' final argument is that the Court should dismiss Plaintiffs' CLRA claim because "Plaintiffs do not allege that they purchased 'goods' or 'services' covered by the statute." Avia Br. 14-16. This is because, according to Defendants, virtual currency does not fit neatly into the CLRA's

---

[10] Should the Court dismiss Plaintiffs' CLRA and UCL equitable claims on this basis, Plaintiffs request that Court grant Plaintiffs leave to amend to add allegations regarding their lack of an adequate remedy at law. *See, e.g.*, *Beligan*, 2023 WL 3150113, at \*7. And if leave to amend is not granted, any dismissal should be "without prejudice so that Plaintiff may bring the claim back in should Plaintiff find facts, during discovery, showing that the legal remedy would not be adequate." *Phan v. Sargento Foods, Inc.*, No. 20-CV-09251-EMC, 2021 WL 2224260, at \*6 (N.D. Cal. June 2, 2021); *Julian v. TTE Tech., Inc.*, No. 20-CV-02857-EMC, 2020 WL 6743912, at \*5 (N.D. Cal. Nov. 17, 2020) (Chen, J.) ("The dismissal, however, is without prejudice such that, should Plaintiffs uncover during discovery a basis for claiming that legal remedies do not provide for adequate relief, they may seek to amend.").

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

definition of "tangible chattels" and "the CLRA does not cover software downloaded from the internet." *Id.* at 14-15. But courts in this district have cautioned against applying CLRA so rigidly.

The court rejected a similar argument in *Roblox*, 602 F. Supp. 3d at 1243. The defendants in that case owned and operated an online metaverse. *Id.* at 1250. The plaintiffs bought in-game currency that they would use to purchase items within the defendant's metaverse and alleged that the defendant violated the CLRA by periodically deleting these items to induce users to buy more. *Id.* As in this case, the defendant in *Roblox* argued that neither in-game currency nor online software fits into the CLRA's definition of "goods and services." *Id.* at 1263. In rejecting the defendant's argument, the court noted that the CLRA "prohibits certain unfair methods of competition and deceptive practices 'in a transaction intended to result or that results in the sale or lease of goods or services to any consumer.'" *Id.* (quoting Cal. Civ. Code § 1770(a)). It further noted that "services" under the CLRA include "work, labor, and services for other than a commercial or business use." *Id.* (quoting Cal. Civ. Code § 1761(b)). The defendant's metaverse was "comfortably classified as an online entertainment service," and when a user purchases in-game currency for real money "they are engaging in a transaction with Roblox to make use of a part of that entertainment service." *Id.* Accordingly, the *Roblox* court held that the purchase of in-game currency fell within the definition of a "service" under the CLRA. *Id.* at 1263-64. The court reasoned that this transaction was "at the core of the 'service'" because, "when a consumer buys in-game currency, she is engaging with the online entertainment service in one of the key ways consumers are intended to." *Id.* at 1264.

The same was true in *Ochoa v. Zeroo Gravity Games LLC*, No. CV 22-5896-GW-ASx, 2023 WL 4291650 (C.D. Cal. May 24, 2023). The plaintiffs in *Ochoa* sued the defendant under the CLRA because the defendant's advertisements for in-game coins in its slot-machine application falsely communicated that "(1) the normal and prevailing offer for a quantity of coins was a stricken dollar

35
Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

amount, despite other players being offered much better deals, and (2) the offered sale was available for only a limited time (4 hours), where in reality it would be offered repeatedly for weeks or longer whenever a user logged in, exited the store or ran out of coins." *Id.* at *8. Like the defendants in this case and in *Roblox*, the defendants in *Ochoa* argued that the transactions for in-game currency were not "goods or services" under the CLRA. *Id.* at *13. And as in *Roblox*, the *Ochoa* court rejected that argument. The court held that the "Plaintiffs' claims fall within the purview of the CLRA," particularly "[i]n light of the CLRA's underlying purpose to protect consumers and the liberal construction with which courts should interpret it." *Id.* In an earlier opinion coming to the same conclusion, the court summed up its reasoning with the following rhetorical question: "The question is what did Plaintiff get in return if not a good or a service?" *Ochoa v. Zeroo Gravity Games LLC*, No. CV 22-5896-GW-ASx, 2023 WL 4291974, at *7 (C.D. Cal. Feb. 1, 2023).

Plaintiffs' purchases of in-game currency to play Avia's games fall within the CLRA's definition of "service." Like the defendants in *Roblox* and *Ochoa*, Avia operates an online gaming service. Avia describes itself as a company "dedicated to building a worldwide social game competition platform that guarantees [their] players a fair, high-quality gaming experience." FAC ¶ 30. Avia claims to be "committed to providing a safe, fair, and legitimate gaming environment for all of [its] users," and to "take pride in [its] reputation as a responsible and trustworthy operator of skill-based cash games." FAC ¶ 36. When users like Plaintiffs pay real money to Avia for in-game currency to play its "skill-based cash games," Plaintiffs are—like the *Roblox* users—engaging in a transaction with Avia to make use of its service. And so, *Roblox*'s reasoning—that this transaction is at the "core" of Avia's service because Plaintiffs have interacted with Avia's service in one of the key ways consumers are intended to—also applies to this case. Indeed, what did Plaintiffs get in return for their money if not a good or service?

The cases Avia cites do not change this outcome. Both *Mai*[11] and *Reeves*[12] are distinguishable. In *Mai* and *Reeves*, players redeemed in-game tokens for a chance to obtain something that enhanced play. *Mai*, 648 F. Supp. 3d at 1133-34; *Reeves*, 2022 WL 1769119, at *2. In *Mai*, the plaintiffs paid for "loot boxes" that gave them a random in-game item. *Mai*, 648 F. Supp. 3d at 1133. The court concluded that the purchase of these in-game tokens did not cause a loss of money or property because the player got what they paid for, namely, the ability to purchase loot boxes within the game's universe. *See id.* at 1134. The Ninth Circuit recently affirmed the district court's opinion on this ground, holding that the plaintiffs "have not shown a sufficient economic injury-in-fact" because "they received exactly what they expected: at least one mystery virtual item." Mem. Op., *Mai v. Supercell Oy*, No. 23-15144, 2024 WL 2077500, at *1 (9th Cir. May 9, 2024).

The facts in *Coffee v. Google, LLC*, No. 20-CV-03901-BLF, 2022 WL 94986 (N.D. Cal. Jan. 10, 2022) are similar to the facts in *Mai*. As in *Mai*, the plaintiffs in *Coffee* bought virtual currency to exchange for loot boxes and that offered random, in-game rewards. *Id.* at *1. And like the *Mai* court, the *Coffee* court found that the plaintiffs could not show they had suffered an injury in purchasing those loot boxes because the "[p]laintiffs received exactly what they paid for." *Id.* at *10. The court further held that the plaintiffs could not complain that the defendant, Google, injured them when they exchanged their virtual currency for loot boxes because the plaintiffs' only interaction with Google was downloading the app. *Id.*

Likewise, the plaintiffs in *Reeves* bought "PokeCoins"—"a certificate that merely allows them to buy virtual goods within [the defendant's] virtual world." 2022 WL 1769119, at *2. The court noted that the "CLRA defines 'goods' as 'tangible chattels,' including 'certificates' or 'coupons' that are

---

[11] *Mai v. Supercell Oy*, 648 F. Supp. 3d 1130 (N.D. Cal. 2023).

[12] *Reeves v. Niantic, Inc.*, No. 21-CV-05883-VC, 2022 WL 1769119 (N.D. Cal. May 31, 2022).

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

exchangeable for tangible chattels." *Id.* (quoting Cal. Civ. Code § 1761(a)). The court found that PokeCoins did not meet that definition because "are not tangible, nor are they certificates that can be exchanged for something tangible." *Id.*

Here, in contrast to *Mai*, *Reeves*, and *Coffee*, Plaintiffs spent real money to enter skill-based contests with real people—a benefit they did not receive—and potentially "Win REAL CASH" as Avia advertised. Unlike *Mai*, *Reeves*, and *Coffee*, the transaction between Plaintiffs and Avia begins and ends with real money. Avia explains that "[g]amers play against others to earn either tickets or real cash," and advertises its games accordingly. FAC ¶ 67. The Pocket7Games platform, for example, informs users that they can "Play Fun Games" and "Win REAL CASH." *Id.* ¶ 6 7. Match n Flip challenges the players to "[t]est [their] skills and win REAL MONEY." *Id.* ¶ 70. Bingo Flash promises the users to "participate in cash games to win real money." *Id.* ¶ 70. In the end, someone is supposed to win real money deposited into their real-world account. *See id.* ¶¶ 67-69. And Avia's connection to the Plaintiffs' injury is much more direct than the defendant's connection to the plaintiffs in *Coffee*: Plaintiffs paid Avia directly to enter Avia-hosted contests that Avia claimed would be bot-free. So, like the court in *Ochoa*, this Court should decline to follow *Mai* because exempting Avia's conduct from liability would conflict with the "CLRA's underlying purpose to protect consumers and the liberal construction with which courts should interpret it." *See Ochoa*, 2023 WL 4291650, at *13.[13]

---

[13] The *Roblox* court could not address the *Reeves* decision because *Roblox* was decided only a few days before *Reeves*, but it did address the decisions on which *Reeves* and Defendants rely—*I.B. ex rel. Fife v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1007-08 (N.D. Cal. 2012) and *Coffee*, 2021 WL 493387, at *11 (N.D. Cal. 2021). The court in *Roblox* found that these decisions stemmed from another decision: *Berry v. Am. Express Publ'g, Inc.*, 147 Cal. App. 4th 224 (2007). *Roblox*, 602 F. Supp. 3d at 1263 ("*Berry* is the taproot for all of these cases."). The *Roblox* court noted that *Berry* did not address in-game currency. *Id.* at 1264. Rather, *Berry* held that the "issuance of credit was not a CLRA service . . . based largely on legislative history removing references to 'credit' and on its finding that extension of credit is 'separate and apart' from the sale or lease itself." *Id.* at 1263-64 (citing *Berry*, 147 Cal. App. 4th at 230-32). The *Roblox* court declined to extend that holding "to the context of purchases of in-game

Finally, the cases the Avia Defendants cite to support the proposition that "the CLRA does not cover software downloaded from the internet," Avia Br. 15, are also distinguishable. Neither case concerns a lengthy, ongoing relationship between the plaintiffs and the software provider; rather those cases were about one-time software downloads. The court in *Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2010 WL 3910169 (N.D. Cal. Oct. 5, 2010), held that the plaintiffs' one-time software purchase and download from the internet did not meet the CLRA's "express limitation of goods to 'tangible chattels.'" *Id.* at *19. The court left open the possibility, however, that the defendants' software subscription service could be a "service" under the CLRA. *Id.* at *19 & n.7. Likewise, the court's finding in *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040 (N.D. Cal. 2012), that software was not a "good" for purposes of the CLRA only applied to allegations "to the extent Plaintiffs' allegations are based solely on software." *Id.* at 1070. But, the court ultimately found the plaintiffs had stated a CLRA cause of action because "the gravamen of the [plaintiffs'] CLRA claim . . . [was] not that free apps downloaded by Plaintiffs were deficient, but rather that the iPhones (a 'good' covered by the CLRA) purchased by the class members did not perform as promised." *Id.* at 1071.

The same judge, Judge Koh, decided both *Ferrington* and *iPhone*. When a defendant in a third, later case, tried to make the same argument Avia makes in this case—that software never qualifies as either a "good" or "service" under the CLRA—Judge Koh clarified that "[t]he holdings in those cases are not as expansive as Defendants suggest." *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1141 (N.D. Cal. 2018). She clarified that in *Ferrington*, she "did not hold that software can never constitute a 'good,' but only 'that *the software Plaintiffs purchased* [was] not a good covered by the CLRA.'" *Id.* (quoting *Ferrington*, 2010 WL 3910169, *19) (emphasis in *Yahoo!*). And

---

currency" because the plaintiffs buying in-game currency in that case were "engaging with the online entertainment service in one of the key ways consumers are intended to." *Id.* at 1264.

in *iPhone*, she "concluded that software downloaded into a tangible good may be subject to the CLRA where the claim arises from the 'sale of [the] good, and not the downloading of free software.'" *Id.* (quoting *iPhone*, 844 F. Supp. 2d at 1071) (brackets in *Yahoo!*). The takeaway is that there is no blanket rule against software. "Instead, a court must analyze the particular facts at issue to determine whether the software at issue falls within the definition of 'service.'" *Id.*

In *Yahoo!*, Judge Koh held that the plaintiffs adequately alleged the defendants provided a "service" encompassed by the CLRA. *Id.* at 1142. The defendant, Yahoo!, operated Yahoo! Mail. *Id.* The plaintiffs did not purchase and download Yahoo! Mail on the internet. "Rather, Plaintiffs have signed up for accounts on a web-based platform, maintained by Yahoo!, where they can engage in activities ranging from private email communication to bank and stock trading to photo storage." *Id.* The court reasoned that Yahoo! Mail was a service because "Yahoo continually upkeeps and updates the system." *Id.* The court noted that Yahoo! employing "Terms of *Service*" further supported its conclusion. *Id.* (emphasis in original).

Here, unlike *Ferrington* and *iPhone*, Plaintiffs claims do not arise solely out of one-time, free software downloads of Avia's application. They arise out of Avia's recurring and ongoing provision of an online service akin to Yahoo! Mail. Avia operates a mobile gaming platform, Pocket7Games, and multiple standalone gaming applications. FAC ¶ 31. The issue is not about the software itself; it's the service Avia portends to provide (running skill-based tournaments) versus what it actually provides (rigged games of chance where Avia participates). Accordingly, like Yahoo! Mail, Avia's applications constitute a service for purposes of the CLRA.

## IV. PLAINTIFFS ADEQUATELY PLEAD RICO CLAIMS AGAINST EACH OF THE RICO DEFENDANTS.

Plaintiffs allege violations of two separate parts of the RICO statute: 18 U.S.C. §§ 1962(c) and (d). Section 1962(c) "makes it unlawful for any person employed by or associated with an enterprise

40
Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

engaged in or affecting interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008). Section 1962(d) authorizes civil suits brought by anyone injured "by reason of a conspiracy" to violate any RICO provision, including § 1962(c). *See Beck v. Prupis*, 529 U.S. 494, 500 (2000).

Federal RICO law should "be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 498 (1985); *see Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) ("As Congress admonished and as the Court repeated in *Sedima*, RICO should be liberally construed to effectuate its remedial purposes."). Plaintiffs' well-pleaded RICO allegations meet the applicable standard and state a "facially plausible" claim. *Johnson*, 534 F.3d at 1123.

**A. The Investor Defendants knowingly participated in a scheme to defraud.**

The Investor Defendants argue that they knew nothing of the alleged bot scheme and merely engaged in routine business conduct. But, as reviewed below, the Complaint contains sufficient factual allegations from which a reasonable inference to the contrary can be drawn. Taking those allegations as true, as the Court must at this stage, they plausible allege that the RICO Investors knowingly joined a conspiracy to secretly employ bots to manipulate users who thought they were competing against live human opponents.[14]

**1. Acme's knowledge can be inferred from its due diligence, its expertise, and its positions on Avia's Board of Directors.**

The Complaint alleges sufficient facts concerning Acme's involvement from which it can be reasonably inferred that Acme had knowledge of the scheme. As an initial matter, although Acme

---

[14] Defendants contend that Plaintiffs' RICO allegations must satisfy the particularity requirement of Rule 9(b). But knowledge need only be pleaded generally: "Malice, intent, *knowledge*, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b) (emphasis added). Allegations of knowledge, therefore, must only be plausible, as they are here.

describes itself in its motion as a "small creditor," its financial involvement with Avia is deep enough to garner Acme one seat on Avia's Board of Directors, filled by Acme partner Hany Nada, and a second seat as a Board Observer, filled by Acme partner Alex Fayette. FAC ¶ 16. Acme's membership in the Board of Directors comes with voting power, hence the ability to influence Board's decisions. FAC ¶ 174. Acme's representatives on Avia's board are not like the true *outside* directors as in the cases on which they rely.[15] Rather, Acme's representatives on Avia's board represent a stakeholder in Avia (Acme), which defies the definition of an outside director as someone who is a "member of a company's board of directors who is not an employee or stakeholder in the company."[16]

In fact, Acme's "Firm Brochure," which it requests the Court to take judicial notice of, describes Acme's "due diligence" into the companies in which it invests: "ACME's due diligence and decision-making process is structured *to understand and mitigate* key technical, regulatory, execution and competitive risks among its portfolio investments." Doc. 108-1 at 14 (emphasis added). The brochure also points out that Acme may use certain outside consultants to conduct pre-investment due diligence. *Id*. at 6. Of course, the fact that Acme would invest serious time into researching and understanding potential investments makes perfect sense—especially where that level of investment is high enough to buy two positions on the board of directors—but it also supports an inference of knowledge of Avia's "key technical" and "regulatory" risks. As opposed to *Brown*, where the court identified "no allegations . . . that the improper revenue recognition at issue was so egregious or its existence so "clear on its face" that audit committee approval of financial statements and audit controls would suffice to show bad faith on the part of the audit committee members," in Avia, the usage of bots is a "key technical"

---

[15] *See Whitten v. Clarke*, 41 F.4th 1340, 1351 (11th Cir. 2022); *Brown v. Moll*, No. 09-cv-05881, 2010 WL 4704372, at *3 (N.D. Cal. Nov. 12, 2010).

[16] https://www.investopedia.com/terms/o/outsidedirector.asp

detail so egregious that it suffices to show Acme's knowing participation. Thus, contrary to Acme's suggestion, it is even more relevant that Acme's investment (and the due diligence that preceded it) occurred in 2021, when the scheme was alleged to have already been in full force.

Acme and Mr. Nada both have the requisite expertise to investigate and understand Avia's real mechanism of operation. The Complaint notes that Mr. Nada has experience in the gaming sector, FAC ¶ 78, from which it can be inferred that he has the expertise to understand Avia's inner operations. That inference is further supported by the fact that Mr. Nada was identified as a witness to testify about Avia's "history" in its patent litigation with a competitor. FAC ¶ 80. It is especially curious that Avia identified Mr. Nada, given that Acme describes itself as a "small creditor" that had no knowledge of Avia's inner workings.

Mr. Nada has held himself out to the investing public as knowledgeable of Avia's activities in public statements. *See* FAC ¶ 120 ("Vickie and Ping have incredible gaming experience, are in tune with what consumers want and are creating compelling, interactive games that get people from a wide range of demographics engaged and coming back for more"). Public statements made from a position of purported knowledge support an inference of actual knowledge. *See In re Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 973 (finding that a CEO's public statements were sufficient to support an inference of knowledge). And, like the CEO in *Chrysler-Dodge-Jeep*, Mr. Nada's position and experience strongly imply that he was aware of the regulatory challenges associated with the business of which he spoke. *Cf. id.* at 976.

Mr. Nada's knowledge can be further inferred from Ms. Chen's refusal to answer questions at deposition "about her personal discussions with Mr. Nada regarding the use and concealment of bots in Avia's games" on the basis that it might incriminate her. *Id*. ¶ 80. Acme takes exception to this fact because she apparently later decided to sit for another deposition. Acme Br. 6-7. But, as discussed

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

above, that subsequent testimony is not publicly available and no Defendants has provided it here. Thus, although Defendants claim Ms. Chen answered every question she was asked at the later deposition, they are conspicuously silent as to whether she was asked again about Mr. Nada at all, or, if so, what the actual questions and answers were. Thus, Plaintiffs are left with only the fact that when asked about her bot discussions with Mr. Nada at her earlier deposition, Ms. Chen refused to answer.

### 2. Galaxy, too, had knowledge of the scheme.

Like Acme, Galaxy used its public website to help disseminate information about Avia's games, describing Avia as a company that "uses a complex algorithm to assess and match each player's ability in order to create a fair gaming environment." FAC ¶¶ 41, 134. Regardless of how many site visits Galaxy's website gets, the fact that it purports to speak publicly on Avia's "algorithm" and how that algorithm "matches" players by ability implies that Galaxy knows what it is talking about. While Galaxy does not have a voting position on Avia's board of directors, Galaxy's partner Ryan You serves as an observer. *Id.* ¶¶ 78, 123. As with Acme's Mr. Nada, Mr. You has extensive experience with investing in the gaming industry. *Id.* ¶ 129.

Like Mr. Nada, an inference of Mr. You's knowledge is supported by the fact that Ms. Chen refused at her deposition to answer questions about the extent of the Board of Director's knowledge (separately from Mr. Nada) and whether the board was aware of Avia's use and concealment of robots in cash games. *Id.* ¶ 122. Further like Acme, Galaxy's investment in Avia occurred in 2020, and, like Acme, it is reasonable to infer that Galaxy performed competent due diligence before making a financial commitment large enough to garner it an observer spot on the board of directors.

For the same reasons discussed above, these facts, taken as a whole, sufficiently support an inference that Galaxy had knowledge of Avia's inner workings.

The Investor Defendants' theory that they, too, could have been "tricked" by Avia is unlikely. Even now, despite the significant and actual evidence described in the Complaint, neither investor has ever removed Avia from its website, distanced itself from the scheme and those involved, or otherwise attempted to withdraw or rectify its position. The more plausible inference is that Acme and Galaxy, through their representatives, knew what was happening behind the scenes. That suffices at the motion to dismiss stage.

**B. The Complaint's allegations sufficiently describe a distinct enterprise with a common fraudulent purpose.**

An "association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle v. U.S.*, 556 U.S. 938, 946 (2009). "An association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id*. The RICO Defendants dispute the purpose and structure elements. Avia Br. 18-19; Acme Br. 1-2; Galaxy Br. 9.

**1. The RICO Defendants shared a common improper purpose.**

While the RICO Defendants attempt to reframe their motivations and conduct as "routine" business activity, parties cannot "hide behind lawful commercial dealings to avoid RICO liability." *In re Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 981 (citing *Odom*, 486 F.3d at 552).

Although Defendants undoubtedly also shared a more "general purpose" of wanting to grow Avia as a business, the Complaint more specifically alleges that instead of offering fair games as promised, the RICO Defendants shared an additional unlawful purpose of tricking customers into believing that they are playing against actual, human players, when, in reality, they were playing against computer bots. As evidenced by Avia's internal documents, the motivation behind that scheme was simple—to increase the attractiveness of Avia's games to users, and thus Defendants' ultimate profits,

by deceiving those users into thinking they were playing in legitimate contests against other human beings in real time when they were not. *See* FAC ¶ 64 (quoting statements from Avia's Mr. Leung that the "optimal solution [to achieve such growth] is to expand the team[] relying on robots."); *id.* ¶ 119 (describing how the RICO Defendants planned to trick customers into playing to reap greater financial benefits as a result of the larger user base).

The Complaint's particularized allegations regarding the scheme's implementation through bots "set[s] forth sufficient allegations to distinguish ordinary business conduct from fraudulent conduct." *In re Jamster Mktg. Litig.*, No. 05CV0819 JM (CAB), 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009). And the presence of fraudulent intent—noticeably absent in the cases on which Defendants rely—causes the action to necessarily fall outside the scope of "routine commercial relationships" or "ordinary business conduct." *Cf. Shaw v. Nissan North America, Inc.*, 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016). Unlike *Shaw*, Plaintiffs here offer specific and detailed allegations showing that the enterprise engaged in a collaborative scheme to defraud.

The Complaint alleges that "Avia's game applications are filled with—or controlled by—non-human computer robots," FAC ¶ 49; that "Avia can dial the win rate of its bots," *id.* ¶ 54; that Avia "controlled the outcome of games and sat on the other side of the table," *id.* ¶ 56; that "Avia keeps the money" when a player loses to a bot, *id.* ¶ 58; and that Avia lied to users about all of the above, *id.* ¶¶ 5, 83. The use of hidden bots like the "CASH_ROBOT," "NOOB_ROBOT," or "SHARK_ROBOT" to manipulate game outcomes could only have had a deceitful purpose and no other legitimate business interest. *See In re Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 981 (noting that the vehicular device identified by plaintiffs as fraudulent "plausibly had only a deceitful purpose" and thus was "not developed by accident or as part of routine business dealings").

A "CASH_ROBOT" or "SHARK_ROBOT" simply has no innocent explanation. The bots in Avia's games could not have been developed accidentally, or unintentionally. Rather, they were the result of Defendants' conscious calculated decision to defraud customers, and discussed openly in Avia's internal communication. *See* FAC ¶¶ 6, 51 ("Competition challenges are matched with robot users"; "robot assists the player to quickly match with an opponent"; "robot kind = 8 will appear in every cash game slot."); ¶ 53 ("Cucumber means robot"; "Do we need to match the cucumber"; "The guide is a robot"); ¶ 54 ("*the win rate of the guide has been adjusted*, and this part of the cost must be recovered first") (emphasis added).

Plaintiffs provided particularized allegations required by Rule 9(b) supporting the inference that parties had a common purpose to engage in fraudulent conduct and Plaintiffs identify specific allegations in support of that common purpose. *See id.* ¶¶ 64, 117 (alleging separate existence of the RICO Defendants as opposed to the Enterprise), ¶ 118 (identifying systemic linkages to other participants in the Enterprise), ¶ 119 (explaining Enterprise's shared purpose advanced by RICO Defendants), ¶¶ 120-125 (identifying specific actions that RICO Defendants did to advance that common shared purpose). Regardless of Defendants' proffered alternative framing of their conduct, the Complaint's allegations, taking as true and read as a whole, describe a common fraudulent purpose.

### 2. The Enterprise is distinct from the RICO Defendants.

In attacking the structural prong, the RICO Defendants claim that they are not distinct from the Enterprise. However, there is no "distinctness" concern in view of the Ninth Circuit's decision in *Living Designs, Inc.*, wherein the Ninth Circuit concluded that defendant DuPont and the law firms it employed were distinct entities that could form an "associated-in-fact" enterprise. *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361-62 (9th Cir. 2005). As in *Living Designs*, the Enterprise is distinct from the RICO Defendants. Each of the RICO Defendants have separate existence

from the Enterprise, including distinct legal statuses and individual personhood. *See* FAC ¶ 117. Avia is not a RICO Defendant but rather the vehicle of the enterprise. Its business of providing online and mobile games is certainly different from the RICO Investors' business of providing venture capital to gaming companies, or from Ms. Chen's and Ms. Wang's "business" in providing executive and management skills for gaming companies.

Defendants incorrectly rely on the *Cedric* case to argue that there is unity between Avia and the RICO Defendants. They claim that, because some of the RICO Defendants acted as officers of Avia, the alleged Enterprise is just a RICO defendant "referred to by a different name." Galaxy Br. 8; Acme Br. 10 (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166 (2001)). Yet, the RICO Defendants misread *Cedric*, which supports Plaintiffs' position. The Supreme Court in *Cedric* required nothing more than "formal legal distinction between 'person' and 'enterprise' (namely, incorporation)" and held that a president and sole shareholder of a corporation could be a "person" distinct from the enterprise. *See Cedric*, 533 U.S. at 165. As the Supreme Court explained, a "corporation and its employees are not legally identical." *Id*. at 166. Further, it is irrelevant whether the employee or officer acted within the scope of corporate authority: "[T]he RICO provision before us applies when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority." *Id*.

Because the Investor Defendants and the Individual Defendants are distinct from the enterprise and Avia, the RICO Defendants argument about "distinctiveness" fails.

### C. Plaintiffs have alleged the Investor Defendants' conduct or participation in the Enterprise.

The Investor Defendants argue that Plaintiffs have failed to adequately plead their "conduct or participat[ion], directly or indirectly, in the conduct of" the enterprise's affairs as required by 18 U.S.C.

§ 1962(c). *See* Galaxy Br. 12-14; Acme Br. 15-17.[17] That argument should be rejected because the conduct or participation prong does not require, as Galaxy argues, that a defendant have "a managerial role" in the enterprise's affairs. Galaxy Br. 12. Rather, as the Supreme Court has explained, "the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

"In the Ninth Circuit, to assess whether a defendant had a sufficient role in operation or management to meet the standard of § 1962(c) [and *Reves*], courts consider whether the defendant (1) gave or took directions; (2) occupied a position in the 'chain of command' through which the affairs of the enterprise are conducted; (3) knowingly implemented decisions of upper management; or (4) was indispensable to achievement of the enterprise's goal in that the defendant's position is 'vital' to the mission's success." *Ketayi v. Health Enrollment Grp.*, No. 20-CV-1198-GPC-KSC, 2021 WL 2864481, at *12 (S.D. Cal. July 8, 2021) (cleaned up). These factors are disjunctive—not conjunctive.

The Complaint here meets multiple factors. For example, the Complaint alleges that the Investor Defendants occupied a position in the chain of command given not only their board positions but also how the enterprise operates. Acme's Hany Nada was offered as a witness on the history of Avia during the *Skillz* trial. FAC ¶ 80. Further, on information and belief, Nada was directing Avia's legal defense

---

[17] The Individual Defendants do not advance this argument. Further, relying on the Supreme Court's decision in *Salinas v. United States,* 522 U.S. 52, 62 (1997), the Ninth Circuit has made clear that this requirement does not apply to claims brought under § 1962(d). *See United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005) (noting that this requirement is required to plead the "underlying substantive § 1962(c) violation," but there is no "requirement that the defendant have actually conspired to operate or manage the enterprise herself").

as evidenced by, among other things, his attendance at and participation in the Skillz trial.[18] And, in this litigation, the Investor Defendants have indicated that Avia may claim privilege over some of the documents in *the Investors'* possession. That is to say that there may be relevant, privileged Avia documents about the issues in this case that are found in the Investor Defendants' hands. This suggests further participation in directing the enterprise. In addition, Galaxy's board observer is the "co-head of gaming at Galaxy" who holds himself out as a gaming industry "investor/advisor." *Id.* ¶ 78. He is an engineer "by training" and a "technology and video game enthusiast" with a wealth of experience at other game studios and companies that provide "backend support for game studios." *Id*. Acme and Galaxy didn't just implement the decisions of upper management; in many ways they were upper management who held significant power over the enterprise. They adopted and amplified the enterprise's characterization of the platform as "skill-based" gaming, *id.* ¶ 40, and Galaxy portrayed Avia as a platform that "guarantees players a fair, high-quality gaming experience" and that creates "a fair gaming environment," *id.* ¶ 41, despite their expertise in gaming technology and backend support. No part of Galaxy's statements was true.

As with the Investors' knowledge, the relationship between the Investor Defendants and the enterprise is further demonstrated—at this point with no discovery—by Ms. Chen refusing to answer questions "about her personal discussions with Mr. Nada regarding the use and concealment of bots in Avia's games" on the basis that it might incriminate her. FAC ¶ 80. She invoked her Fifth Amendment right not to testify when pressed at her deposition. *Id*. While Acme takes exception to this fact because she apparently later decided to sit for her deposition again, Acme Br. 6-7, 16, that subsequent deposition has not been produced in this action and is not publicly available. *See* Part I, above. Thus, Plaintiffs are

_____

[18] While the Complaint alleges Mr. Nada's participation in the *Skillz* trial, based on new information, Plaintiffs are prepared to amend the Complaint if necessary to state the allegation that Mr. Nada and Acme had a controlling role in the litigation.

left with only the fact that when asked about her bot discussions with Mr. Nada, Ms. Chen claimed that answering the question might incriminate her. And, in any event, even if she later did answer those questions, it would only—at best—create a fact issue.

The Investor Defendants argue that merely providing financial services is insufficient to trigger § 1962(c) liability, Acme Br. 16-17; Galaxy Br. 13, but there is more to this case than a simple transfer of money. Unlike in the cases relied upon by Defendants,[19] the Investor Defendants not only provided "financial grease," but took stakes in the enterprise's success and held active roles on Avia's board.

Avia has only been the vehicle through which the Enterprise was effectuated. The Investors were leaders of that vehicle and circumstantial evidence suggests they were involved in the vehicle. Discovery will show the full extent of that involvement and Plaintiffs' allegations provide "'enough fact to raise a reasonable expectation that discovery will reveal evidence' to support the allegations." *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)). Even if its close, the "tie goes to the plaintiffs." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014). Thus, the Court should not dismiss the 1962(c) claim against the Investors as they urge.[20]

---

[19] For example, *Reves* involved a claim against an accounting firm that had reviewed a series of transactions and incorrectly certified records. 507 U.S. at 179. The Investors here were not offering an ancillary service; they were more ingrained in the company. In *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 606 (N.D. Cal. 2020), the Court found some defendants operated ordinary business operations, but here the business operations were intertwined with the enterprise. And, in *High v. Choice Mfg. Co.*, No. 11-cv-5478-EMC, 2012 WL 3025922, at *9 (N.D. Cal. July 24, 2012), the defendants only provided "financial grease" to Avia, without any direction or control ambitions. Here, the RICO Investors have not provided just "financial grease," but also business acumen, leadership on Avia's board of directors, and made public representations promoting Avia. Indeed, the relationship between a venture capital firm and its portfolio company in the present case qualitatively differs from a pure transactional relationship as in *High*.

[20] As noted above, the Investor Defendants' argument is directed solely at, and only applies to, the RICO claim alleged under § 1962(c)—not the RICO claim alleged under § 1962(d). *See Fernandez*, 388 F.3d at 1230.

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

**D.    Plaintiffs sufficiently alleged multiple predicate acts.**

Plaintiffs sufficiently allege wire fraud and illegal gambling as predicate acts and a pattern of racketeering activity. In particular, the Complaint identifies over a dozen specific uses of wires. Contrary to each Defendants' main argument, there is no requirement that each individual RICO Defendant commit a separate instance of mail or wire fraud, as long as they are knowing participants in the scheme. Here, the RICO Defendants were knowing participants in the scheme, each RICO Defendant had an intent to defraud, and each Defendant is responsible for the predicate acts of wire fraud and illegal gambling described in the Complaint. Further, the RICO Defendants' arguments about the illegal gambling predicate acts fail, as described below.

**1.    The Complaint alleges numerous acts as wire fraud in furtherance of Defendants' scheme to defraud.**

"Any mailing or an intestate wire that is incident to an essential part of the scheme satisfies the mailing or wiring element, even if the mailing or wire itself contains no false information." *Bridge*, 553 U.S. at 647 (quoting *Schmuck v. United States*, 489 U.S. 705, 712 (1989)) (cleaned up). A use of the mails or wires can qualify as mail or wire fraud even if that use is "routine and innocent in and of itself." *Schmuck*, 489 U.S. at 711-12. Here, Plaintiffs specifically enumerate how Defendants, including Acme and Galaxy, relied on wires to effectuate the fraudulent scheme.

Plaintiffs allege over a dozen specific uses of wires that involved or were foreseeable to Defendants, ranging from individual wire usages by each Defendant to too-numerous-to-count categories of wire transmissions made in furtherance of the scheme (such as receiving player deposits and transmitting the games online). For reference, each of these uses are presented in "Who/What/Why/Where/When" format in Attachment A. These wire fraud allegations satisfy Rule 9(b), as they include the time, place, content, and parties to the communications necessary for Defendants to be on notice of the conduct with which they are charged. *See In re ZF-TRW Airbag*

*Control Units Products Liability Litigation*, 601 F. Supp. 3d 625, 743 (C.D. Cal. 2022) ("To be pleaded with particularity, allegations of fraud must 'be specific enough to give defendants notice of the particular misconduct.'").

### 2. There is no requirement that each individual RICO Defendant commit a separate instance of mail or wire fraud.

The law does not, as each RICO Defendant suggests, require that a Plaintiff identify a specific instance of mail or wire fraud committed by each individual defendant. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) ("[T]here is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent statement scheme, the complaint must identify false statements made by each and every defendant."). As the Ninth Circuit explained in *United States v. Stapleton*:

> Just as acts and statements of co-conspirators are admissible against other conspirators, so too are the statements and acts of co-participants in a scheme to defraud admissible against other participants. . . . Like co-conspirators, **"knowing participants in the scheme are legally liable" for their co-schemers' use of the mails or wires**.[21]

"As a result, each member of the scheme does not need to make separate misrepresentations." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *12 (N.D. Cal. Oct. 30, 2017) (quoting *Stapleton*, 293 F.3d at 1117).

The RICO Defendants' arguments that "there is no allegation that Defendant Wang transmitted anything at all"; that the Complaint does not sufficiently allege an instance of wire fraud committed by Acme; and that the Complaint relies in part on statements that are not attributed to a particular individual are thus irrelevant. If there is a scheme to defraud involving fraudulent misrepresentations, every member does not necessarily have themselves used wires.

---

[21] 293 F.3d 1111, 1117 (9th Cir. 2002) (quoting *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992)) (emphasis added).

### 3. Each RICO Defendant engaged in wire fraud constituting predicate acts.

A defendant engages in mail or wire fraud for purposes of RICO if "(1) the defendant was a knowing participant in a scheme to defraud; (2) the defendant had the intent to defraud; and (3) a co-schemer committed acts of mail or wire fraud during the defendant's participation in the scheme, and those acts were within the scope of the scheme." *Volkswagen*, 2017 WL 4890594, at *12 (citing *Stapleton*, 293 F.3d at 1117-18).

### a. The RICO Defendants were knowing participants in the scheme to defraud.

As explained in Part IV.A above, the Complaint's allegations give rise to a reasonable inference that each RICO Defendant knowingly joined a conspiracy to secretly employ bots to manipulate users who thought they were competing against live human opponents.[22] Both Investor Defendants had positions on the Board of Directors and both tout their experience in the gaming industry. It is reasonable to infer that both performed extensive due diligence on the "key technical" details of Avia's operations. And both made public statements purporting to be familiar with Avia's games and, for Galaxy, Avia's matching algorithm. At her deposition, Ms. Chen refused to answer questions about board members' knowledge on Fifth Amendment grounds.

### b. Each RICO Defendant had the intent to defraud.

The Investor Defendants' arguments that the Complaint does not adequately plead their intent to defraud can be rejected under controlling case law. As an initial matter, like knowledge, intent may be pleaded generally. Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Allegations of fraudulent intent, therefore, must only be plausible, as they are here. *See Eclectic Props.*, 751 F.3d at 995 n.5. Moreover, fraudulent intent may

---

[22] Defendants Chen and Wang do not challenge the Complaint's allegations regarding their knowledge.

54

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

be inferred from the scheme itself. *Volkswagen*, 2017 WL 4890594, at *15 (citing *Eclectic Props.*, 751 F.3d at 997).

The Complaint sufficiently alleges a scheme that, by its very existence, demonstrates fraudulent intent. The Complaint alleges that Avia games are filled with bots, FAC ¶ 49; used to manipulate the games, *id.* ¶¶ 54, 56; Avia keeps the money when a player loses to a bot, *id.* ¶ 58; and Avia lied to its users about all of the above, *id.* ¶ 55. The use of hidden bots like the "CASH_ROBOT" to manipulate game outcomes could only have had a deceitful purpose (and no other legitimate business interest). *See In re Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 981.

Moreover, as in *Eclectic Properties*, the Complaint alleges "deceitful concealment of material facts." *Eclectic Props.*, 751 F.3d at 1000; *see* FAC ¶¶ 98, 135, 159. Specific intent to defraud can thus be inferred from the fact that Galaxy and Acme concealed the presence of bots. They not only failed to disclose it in their description of Avia as a part of their investment portfolio on their website, but even masked it by describing the games as fair or skill-based. *See* FAC ¶¶ 120, 173.

### c. The RICO Defendants committed wire fraud during each RICO Defendants' participation in the scheme.

Plaintiffs identify several wire fraud predicate acts (each identified in Attachment A). Plaintiffs also allege illegal gambling predicate acts (discussed in Part IV.D.5 below). At the outset, Galaxy and Acme's protests that they were not original investors in Avia says nothing about whether they participated in the scheme. *See* Acme Br. 5; Galaxy Br. 4, 20. "[T]he intentional devising of a scheme is not an essential element of mail or wire fraud. [It is only] 'necessary to show willful participation in a scheme with knowledge of its fraudulent nature and with intent that these illicit objectives be achieved.'" *United States v. Manion*, 339 F.3d 1153, 1156 (9th Cir. 2003) (citing *United States v. Price*, 623 F.2d 587, 591 (9th Cir. 1980), *overruled on other grounds by United States v. De Bright*, 730 F.2d 1255 (9th Cir. 1984)). It is black-letter law that all co-conspirators do not have to join the conspiracy

at the same time. *See, e.g.*, *In re Fresh & Process Potatoes Antitrust Litig.*, No. 4:10-MD-2186-BLW, 2012 WL 3067580, at *11 (D. Idaho July 27, 2012) (noting a "conspirator can theoretically join an ongoing conspiracy at any time") (citing *United States v. Green*, 523 F.2d 229, 233 (2d Cir. 1975)).

The Complaint identifies at least six discrete predicate acts of wire fraud that occurred beginning in July 2021, when Acme joined the enterprise, a total that does not include repetitive uses of the wires that continue to occur now (*e.g.*, receiving user deposits and transmitting games over the internet). *See* Attachment A. And the Complaint identifies at least 19 discrete predicate acts of wire fraud that occurred beginning in 2020, when Galaxy joined the enterprise, a total that again does not include the repetitive uses of the wires. *Id.*

### 4. The wire fraud identified constitutes a pattern of racketeering activity.

Plaintiffs also sufficiently allege pattern of racketeering activity by use of the wires. "A RICO pattern consisting of different acts by the Enterprise is shown where the acts are [1] 'related' and [2] extend over a 'substantial' period of time." *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 617 (N.D. Cal. 2020) (citing *Howard v. Am. Online Inc.*, 208 F.3d 741, 750 (9th Cir. 2000)). Even only two "incidents" of wire fraud might be enough to establish a pattern if they share similar purposes, results, participants, victims, or methods or commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events. *See Gidding v. Anderson*, No. C 07-04755 JSW, 2009 WL 666954, at *6 (N.D. Cal. Mar. 13, 2009) (citing *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 232 (1989)). As in *Juul*, although the predicate acts were possibly made through different channels, the goal of the scheme remained the same: to lull customers into a belief that Avia's games are games of skill when they were in fact being matched with bots. Each predicate act was related in that each was intended to, and did, further the purpose of facilitating the enlistment and ultimate defrauding of Avia users.

Plaintiffs also sufficient allege continuity of the activity over several years, as well as the threat of continuity in the future. The "threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *H.J.*, 492 U.S. at 242-43. Alternatively, "[t]he continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting [a] defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise." *Id.*

Deploying bots was Avia's regular way of doing business, as was its description of its games as "skill-based," and its use of the wires to conduct its games and receive users' deposits. The Investor Defendants' investments in Avia and their public promotion of its games, which the Investors themselves characterize as their "routine" business activity also continues. The Complaint alleges that all those acts occurred over a continuous period of years and that they are likely to repeat in the future.[23]

Moreover, the Investor Defendants' contention that the acts they personally committed do not make a pattern relies on the incorrect premise that only an individual defendant's actions can constitute the pattern as to that defendant. That is not the law. "Plaintiffs are not required to show that each RICO defendant [] personally committed at least two acts of mail or wire fraud to establish a pattern of racketeering." *In re JUUL Labs, Inc. Mktg., Sales Pracs., & Prod. Liab. Litig.*, 533 F. Supp. 3d 858, 871 (N.D. Cal. 2021) (citing *Stapleton*, 293 F.3d at 1117); *c.f. Dufour v. BE LLC*, No. C 09-03770 CRB, 2010 WL 2560409, at *11 (N.D. Cal. June 22, 2010) ("Therefore, it is not necessary for [defendant] to have sent any messages himself; it is sufficient that he knew of the scheme and participated in it.").

---

[23] There is no dispute, for example, that Avia continues to advertise its games as skill-based, that it continues to employ so-called "historical playthroughs," that the Investor Defendants continue to serve on Avia's board, and that the Investors Defendants continue to promote Avia on their websites.

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

**5.** **Plaintiffs sufficiently allege illegal gambling transactions as additional predicate acts.**

In light of the robust allegations of mail and wire fraud, Defendants' arguments that the Complaint does not adequately allege gambling as a predicate act are largely moot. Allegations of wire fraud would be sufficient to satisfy RICO requirements in this case. It is sufficient to allege one "type" of racketeering activity as long as the requirements of a pattern, *i.e*, continuity and relatedness, are satisfied. *See Gidding*, 2009 WL 666954, at *6 (citing *H.J.*, 492 U.S. at 232). In any event, the RICO Defendants are nevertheless still wrong on the facts and law with regard to the gambling predicate acts.

*First*, Galaxy's argument that wire fraud allegations are not "separate" from the illegal gambling allegations misses the point. *See* Galaxy Br. 19. Allegations of illegal gambling are inherently different from fraudulent statements. Both can exist without each other. Defendants could have committed illegal gambling without resorting to fraudulent statements, and vice versa. And as a factual matter, the instances of wire fraud alleged range from classic misrepresentations to funds transfers. Each of those are inherently different and separate from conducting unlawful gambling.

*Second*, the gambling activity alleged meets the requirements for a pattern. Deploying bots, determining their winning rate, and keeping the wins has been a regular and continuous manner of conducting the enterprise. Since the bots were deployed repeatedly, FAC ¶ 6, those acts are not "isolated events." *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. at 496 n.14.

*Lastly*, Acme's contention that it cannot be held liable for participation in gambling because it did not know that it was indeed participating in a gambling enterprise, Acme Br. 21, raises a factual dispute that cannot be resolved at this state. The Complaint alleges that Acme must have known that deploying bots made Avia's games of chance rather than skill, and hence subject to gambling regulation, based on Acme and its partners' claimed expertise in the industry. *See* FAC ¶¶ 77-79. It is

reasonable to infer that Acme and its partners, as self-identified experts, know the difference between games of chance and games of skill.

**E.      The Complaint adequately alleges that the fraudulent scheme proximately caused Plaintiffs' financial injury.**

The Complaint adequately alleges that Plaintiffs suffered financial injury by reason of Defendants' fraudulent enterprise. As detailed above in Part III.A, the Complaint contains detailed allegations as to the misrepresentations that Mr. Pandolfi and Ms. Shawcroft—like all Avia users— saw and that they would not have played Avia's games had they known that the outcome was being manipulated by Avia bots. The Complaint further alleges that Mr. Pandolfi and Ms. Shawcroft each lost money playing manipulated games. FAC ¶¶ 10-12. Each of the Investor Defendants' arguments to the contrary either conflict with Ninth Circuit law or are premature at the motion to dismiss stage.

Here, the Complaint sets forth straightforward allegations that show that the conduct alleged was both the but-for and proximate cause of Plaintiffs' financial loss. Both named Plaintiffs downloaded and paid cash to play Avia games believing that they were playing against real human opponents and that the outcome would be based on skill. *Id.* ¶¶ 10-12. In reality, the games were manipulated by bots that controlled the outcome so that Avia could keep Plaintiffs' money. The wrongful acts alleged—misrepresentations about the nature of the games and using bots to predetermine outcomes—constitute a direct and straightforward but-for and proximate cause of Plaintiffs' financial losses.

Acme and Galaxy's primary argument against finding causation is that Plaintiffs must show a direct, immediate link between each individual Defendants' specific conduct and Plaintiffs' injuries. This is directly at odds with Supreme Court and Ninth Circuit precedent. The relevant inquiry is whether there is a sufficiently direct connection between the *scheme* and the injury. *Bridge*, 553 U.S. at 649. Plaintiffs "are not required to show that each individual predicate act caused them an injury, but

rather that the pattern of racketeering activity did." *Just Film, Inc.v. Merchant Servs., Inc.*, No. C 10-1993, 2012 WL 6087210, at *12 (N.D. Cal. Dec. 6, 2012) (citing *Sedima*, 473 U.S. at 497). "[T]he plaintiff must prove only 'an injury directly resulting from some or all of those activities comprising the violation.'" *Id.* (citing *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809 (7th Cir. 1987)). That makes sense because "a 'knowing participant' in a fraudulent scheme may be held liable both for his or her own acts of mail or wire fraud *and* be held vicariously liable for the acts of co-schemers." *United States v. Manion*, 339 F.3d 1153, 1156-57 (9th Cir. 2003) (emphasis in original).

Acme's citation to *Anza* to imply that there must be a specific and direct connection from specific Acme actions to Plaintiffs' loss is off-base for two reasons. Immediately before the snippet Acme cites, the *Anza* Court was clear that "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged *violation* led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added). And then immediately after, the Court reiterated that the "proximate-cause inquiry, however, requires careful consideration of the 'relation between the injury asserted and *the injurious conduct* alleged.'" *Anza*, 547 U.S. at 462 (2006) (emphasis added) (citing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). And in any event, *Anza* found a lack of proximate cause between the Plaintiff and *any* defendant because the plaintiff was not the direct victim of the scheme. *Anza*, 547 U.S. at 458 ("The direct victim of this conduct was the State of New York, not Ideal.").

Defendants' other causation arguments should also be rejected. Acme's argument that Defendants' misrepresentations to lure users to play its games could not have been a proximate cause because it is "what happens while playing" that matters completely ignores the allegations (supported by plenty of real-world evidence) that "what happens while playing" is that Avia's bots rig the games so that, over time, Avia wins no matter how well or poorly a user plays. Acme's attempt to silo the two

parts of the scheme (bots and lies about the bots) ignores that it is "what happens while playing" that makes the initial misrepresentations misleading in the first place.

Acme's argument in passing that the class is defined too broadly because it includes all users who lost money playing Avia's games, Acme Br. 23, is an argument better suited for class certification. As Plaintiffs will demonstrate, and can be reasonably inferred here, virtually no user would choose to play Avia games knowing, up front, that the host employed bots masquerading as live opponents to "win" the users' money.

In evaluating proximate causation, courts are to consider (1) whether a better suited plaintiff has incentive to sue; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to the RICO violation; and (3) whether the courts will need to adopt complicated rules apportioning damages to prevent multiple recoveries. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) at 269-70. Each of these are met here. There are no better suited Plaintiffs to sue than Avia users like Mr. Pandolfi and Ms. Shawcroft who played Avia's games believing they were playing against live human opponents, only to lose their money to hidden bots that ensured the live players could not win. Despite Acme's suggestions to the contrary, determining the amount of money users lost will not be complicated, nor is there any danger of multiple recoveries. Any suggestion to the contrary necessarily relies on unsupported lawyer speculation and would be improper to resolve on a motion to dismiss. Plaintiffs "must be allowed to make their case through presentation of evidence, including experts who will testify about the ... market ... and the effects of the illegal scheme." *See Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002). At this stage, what matters is whether *these* Plaintiffs have sufficiently alleged causation—and they have.

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

"Any person injured in his business or property by reason of a violation of section 1962" has standing to bring a private cause of action. *See* 18 U.S.C. § 1964(c). Civil RICO plaintiffs may recover all damages that are the "foreseeable and natural consequence[s]" of the scheme. *See Bridge*, 553 U.S. at 658. Plaintiffs allege that they lost money as a result of being deceived into playing so-called "skill-based" games that, in reality, were rigged from the start. "*Money, of course, is a form of property.*" *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979) (emphasis added) ("[T]he word 'property' has a naturally broad and inclusive meaning. In its dictionary definitions and in common usage property comprehends anything of material value owned or possessed.").

Plaintiffs' alleged injury—money lost they allege they would never would have paid but-for the deception—is well-recognized in the law. *See Stitt v. Citibank, N.A.*, 942 F. Supp. 2d 944, 953-54 (N.D. Cal. 2013) (finding RICO injury when plaintiffs "would not have paid the fees but for [d]efendants' deception").[24] Here, Plaintiffs would not have deposited money into Avia's games if Defendants had disclosed that they would be matched with robots rather than actual, human players. As in *Cannon*, this suffices to establish RICO injury.

Avia's reframing of Plaintiffs' alleged injury as "gambling without a chance to lose" misstates the injury in two ways. *First*, as detailed above, a core piece of the scheme was convincing Plaintiffs and Avia users that Avia's games were *not* gambling. *Second*, Avia's reframing inverts what happened once users were deceived into paying to play the games. It's not that the scheme inserted a chance to

---

[24] *Accord Cannon v. Wells Fargo Bank. N.A.*, No. C-12-1376 EMC, 2014 WL 324556, at *3 (N.D. Cal. Jan. 29, 2014) (Chen, J.); *The Flag Co. v. Maynard*, No. CV 05-1194-HU, 2006 WL 1030173, at *13 (D. Or. Apr. 17, 2006) ("Plaintiff alleges that it would not have purchased the services if it had known they were illegal."); *see also Burns v. MBK P'ship*, No. 03-3021-CO, 2003 WL 2397014, at *18 (D. Or. Nov. 5, 2003) (plaintiffs "would not have purchased properties or constructed homes 'but for' defendants' fraudulent acts").

lose money that Plaintiffs complain about; it's that the scheme, implemented through bots that manipulated outcomes, controlled results and led to losses.

The Individual Defendants' citation to *Chaset v. Fleer/Skybox Intern., LP*, 300 F.3d 1083, 1087 (9th Cir. 2002), highlights the factual difference between this case and that one. *Fleer* involved plaintiffs who purchased packages of trading cards hoping to unwrap a special "insert card." *Id.* The court held that the *Fleer* plaintiffs had not experienced an injury because "they received value—eight or ten cards, one of which might be an insert card—for what they paid as a purchase price." *Id.* at 1087. Not finding an "insert card" was not an injury because the *Fleer* plaintiffs received the chance that they had paid for. *See id.* Similarly, the *Brill* and *Hannosh* cases the Individual Defendants cite are inapposite because plaintiffs there also received what they bargained for—in *Brill*, plaintiffs paid for a chance to play a poker game, even though they alleged that one of the players was cheating; and in *Hannosh*, the plaintiff paid for a chance to bet on sporting events on the Internet and understood the risk of the gamble.[25] In each of those cases, the plaintiffs knowingly and voluntarily participated in gambling.

In contrast, Plaintiffs and the class paid to enter skill-based games that were anything but. Unlike the *Fleer*, *Brill*, and *Hannosh* plaintiffs, the FAC alleges that Plaintiffs paid to compete for real money in a fair skill-based competition. FAC ¶¶ 9-12. Whereas the *Fleer* plaintiffs received the chance they paid for, Avia's users never had a chance at all.

### G. The Complaint also adequately alleges that each RICO Defendant is liable under §1962(d) for RICO Conspiracy.

The Investor Defendants' attempts to dismiss Plaintiffs' RICO conspiracy claim under § 1962(d) rely on the same arguments they advance in the context of § 1962(c). Galaxy Br. 21; Acme Br. 24. Because Plaintiffs' § 1962(c) claims are adequately pled, the § 1962(d) conspiracy claims are,

---

[25] *See Brill v. Postle*, No. 2:19-cv-002027 WBS AC, 2020 WL 2936688 at *9 (E.D. Cal. June 3, 2020); *Hannosh v. Segal*, 328 P.3d 1049, 1053 (Ariz. Ct. App. 2014).

too. *See Volkswagen*, 2017 WL 4890594, at *17 ("The same allegations that demonstrate Bosch's participation in the enterprise support the … conspiracy claim."). In the alternative, liability under § 1962(d) may still be found even if the Court finds the Complaint's allegations lacking as to the RICO Defendants under § 1962(c). *See Salinas v. United States*, 522 U.S. 52, 63-64 (1997) ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.").

In the § 1962(d) context, knowledge of the scheme and agreement—even if implicit—is everything. As this Court held, "proof of an agreement the objective of which is a substantive violation of RICO (such as conducting the affairs of an enterprise through a pattern of racketeering) is sufficient to establish violation of section 1962(d)." *United States v. Hernandez*, No. CR-14-0120 EMC, 2015 EL 4498084, at *5 (N.D. Cal. July 23, 2015) (Chen, J.). A defendant need not have agreed to commit or facilitate every part of the offense, but only must be "aware of the essential nature and scope of the enterprise and intended to participate in it." *Howard v. Am. Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000). And, finally, the "agreement need not be express as long as its existence can be inferred from words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002)

As discussed above, the Complaint alleges that each of the RICO Defendants was aware of the alleged scheme and agreed to its common goals. *See* Part IV.A. So long as a RICO defendant knowingly agreed with the goals of the enterprise and provided support in some form, as the RICO Defendants did here, § 1962(d) liability is appropriate.

## V. THIS COURT HAS PERSONAL JURISDICTION OVER GALAXY.

Galaxy is the lone defendant that contends that the Court lacks personal jurisdiction over it; but, as described below, there are two separate bases for this Court to assert jurisdiction over Galaxy. In

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

analyzing personal jurisdiction at the motion to dismiss stage, plaintiffs "need only make a prima facie showing of jurisdictional facts." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006) (quoting *Doe v. Unocal*, 248 F.3d 915, 922 (9th Cir. 2001), *abrogated on other grounds by Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017)). Uncontroverted allegations in the complaint must be accepted as true, and the Court must resolve all factual disputes in favor of the plaintiff. *Id*. Even if Galaxy's jurisdictional arguments regarding the lack of contacts between Galaxy and California were true (*quod non*), Galaxy's alleged contacts with the United States are sufficient to support the Court's exercise of jurisdiction over it under RICO.

### A. California's long-arm statute confers personal jurisdiction over Galaxy.

Plaintiffs allege sufficient minimum Galaxy contacts with California to support the existence of jurisdiction under Cal. Code Civ. P. § 410.10. The parties agree that a California court's exercise of jurisdiction over Galaxy is proper if (1) Galaxy purposefully directed its activities at California; (2) the Plaintiffs' claims arise out of Galaxy's activities in California; and (3) the exercise of jurisdiction is reasonable. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)). Galaxy simply disagrees about the application of the allegations to these standards. As set forth below, each of the three prongs is met.

### 1. Galaxy purposefully directed its activities toward California.

*First*, there must be either purposeful availment of the privilege of conducting activities in California, or purposeful direction of activities toward California. When a claim sounds in tort, as opposed to contract, courts use a purposeful direction analysis. *Schwarzenegger*, 374 F.3d at 802 ("purposeful direction analysis, on the other hand, is most often used in suits sounding in tort"). Because the underlying action against Galaxy is brought under RICO, which is characterized as tort

rather than contract, purposeful direction is the applicable standard. *See Marani v. Cramer*, No. 19-CV-05538-YGR-DMR, 2024 WL 1511329, at *4 (N.D. Cal. Feb. 2, 2024).

The Ninth District evaluates purposeful direction using the three-part "*Calder*-effects" test, from *Calder v. Jones*. *See Schwarzenegger*, 374 F.3d at 803 (citing *Calder v. Jones*, 465 U.S. 783 (1984)). Under this test, "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc) (cleaned up). There is no requirement that the defendant have any physical contacts with the forum. *See Schwarzenegger*, 374 F.3d at 803.

Galaxy acted with intent in joining the other RICO Defendants to support and profit from an enterprise that duped Plaintiffs and class members into wagering real money in games Defendants easily manipulated, instead of competing in games of skill as advertised. *E.g.* FAC ¶ 7. The conspiracy was aimed at using and concealing bots from U.S. customers, including California residents. Galaxy knew and intended that consumers would deposit money into Avia's games because those users were misled to believe that they are playing against actual, human players in skill-based games.

Plaintiffs' claims against Galaxy arise from Galaxy's activities expressly aimed at California. Galaxy invested in a California company, knowing it was based in California. Galaxy's partner Ryan You, who is based out of San Francisco,[26] served as an observer on Avia's board. FAC ¶¶ 27, 78. It is a reasonable inference from Avia's business and user base that Galaxy also knew that Avia had many users based in California. Thus, Galaxy's argument that if the Court finds jurisdiction proper every minority shareholder would be subject to personal jurisdiction in the place where that company is located is exaggerated and can be rejected. Plaintiffs do not base their jurisdictional allegations simply

---

[26] https://www.linkedin.com/in/rongchangyou/details/experience/ [last accessed 05-01-2024]

on Galaxy's ownership or proprietary interest only but identify instances of how Galaxy and its representatives participated in Avia's activities.

The final *Calder* effects element requires that Galaxy's conduct caused harm that it knew was likely to be suffered in the forum. *See Yahoo!*, 433 F.3d at 1206. This element is satisfied when the defendant's intentional act has "foreseeable effects" in the forum. *See X Corp. v. Ctr. for Countering Digital Hate Ltd.*, No. 23-CV-03836-CRB, 2024 WL 1245993, at *12 (N.D. Cal. Mar. 25, 2024). In this case, it was foreseeable that players would be harmed by Defendants' conduct and, given the fact that Avia's games were available to download and play throughout the United States, that some of the harm would occur in California, where some of the Class Members reside. California is the most populous state and therefore it is reasonable to expect that many users from California would be impacted. Consequently, Plaintiffs have satisfied the third and final element of the Calder-effects test.

### 2.     Plaintiffs' claims arise out of Galaxy's California activities.

*Second*, moving to the next prong of the *Schwarzenegger* test, Plaintiffs' claims arise out of Galaxy's activities in California. To determine if a plaintiff's claim arises out of or relates to the defendant's forum-related activities, "the Ninth Circuit follows the 'but for' test." *Menken v. Emm,* 503 F.3d 1050, 1058 (9th Cir. 2007) (citing *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1075 (9th Cir. 2001)). Under the "but for" test, Plaintiffs must show that they would not have been injured "but for" Defendants' California-related conduct. Plaintiffs meet this standard here. Galaxy participated in the operations of a California-based company and spread misinformation regarding the nature of its business to, inter alia, California consumers. But for Galaxy's involvement in Avia and its knowing agreement to the scheme, Plaintiffs would not have been injured.

Galaxy was involved in Avia's operations and knew of Avia's fraudulent activities. *E.g.* FAC ¶¶ 27, 122. It knowingly participated in concealing the use of bots in Avia's games and was aware of

the efforts that Avia went through to conceal its use of bots. Plaintiffs specifically allege that involvement in the Complaint. *E.g. id.* ¶¶ 27, 124. These specific allegations distinguish the present case from the facts of the *Butcher's Union* case, relied on by Galaxy, where the court ruled that "[t]he only possible reference to appellees' contacts with the state is contained in the amended complaint's assertion that venue was appropriate because 'the claim arose in this district, and/or each defendant resides, is found, has an agent and/or transacts his affairs in this district.'" *Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986). As detailed above, more is presented here.

### 3. The exercise of jurisdiction over Galaxy in California is reasonable.

*Third*, this Court's exercise of jurisdiction is reasonable. Once a plaintiff has made a *prima facie* showing of sufficient contacts between the defendant and the forum, the burden shifts to the defendant to present a "compelling case" that the exercise of jurisdiction would be unreasonable and therefore violate due process. *Schwarzenegger*, 374 F.3d at 802 (referring to *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)). Galaxy does not argue reasonableness in its motion and thus has not met its burden here.

### B. RICO also provides a basis for jurisdiction over Galaxy.

RICO provides an independent basis for the Court's jurisdiction over Galaxy. See 18 U.S.C. § 1965(b); *Butcher's Union*, 788 F.2d at 539 ("Congress intended the 'ends of justice' provision [of § 1965(b)] to enable plaintiffs to bring all members of a nationwide RICO conspiracy before a court in a single trial."). To demonstrate that a court has jurisdiction over a defendant under § 1965(b), plaintiffs must meet four requirements.

*First*, they must "allege[] a multidistrict conspiracy that encompasse[s] [the defendants]." *Butcher's Union*, 788 F.2d at 539. Plaintiffs have done that here—the RICO conspiracy involves

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

Defendants from a variety of states and a scheme that targeted users nationwide. *Second*, "the court [must have] personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy." *Id*. Defendants here do not dispute that the Court has jurisdiction over Ms. Chen, Ms. Wang, and Acme. *Third*, there must be "no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *Id*. Here, accepting Galaxy's argument on traditional jurisdiction, no other district court has personal jurisdiction over all of the alleged co-conspirators because Galaxy would only be amenable to jurisdiction in New York whereas (following the logic of Galaxy's argument) the other Defendants would not be subject to personal jurisdiction there. *Fourth*, the defendants must be served in the United States. *See Doe v. Unocal Corp.*, 27 F. Supp. 2d 1174, 1182 (C.D. Cal. 1998), *aff'd*, 248 F.3d 915. Galaxy has accepted service through its attorneys in the United States. Thus, RICO provides an independently sufficient basis of jurisdiction.

### C. If the Court has any concerns, jurisdictional discovery is warranted.

In the alternative, if the Court concludes that Plaintiffs have not made a *prima facie* case that personal jurisdiction over Galaxy is proper under the long arm statute or RICO, jurisdictional discovery is warranted to permit Plaintiffs to develop the factual record regarding Galaxy's conduct in the district.

Jurisdictional discovery ordinarily should be granted "where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977) (holding that district court abused its discretion in refusing to permit jurisdictional discovery) (citations omitted). To be entitled to jurisdictional discovery, plaintiffs need only show some evidence of a defendant's contacts with the forum. *See Focht v. Sol Melia S.A.*, No. C-10-0906 EMC, 2010 WL 3155826, at *2 (N.D. Cal. Aug. 9, 2010). Plaintiffs allege that Galaxy participated in a conspiracy implemented through a California company on whose board a Galaxy member sat. Discovery of that board member's

Avia-related contacts and conduct in California is likely to yield evidence of attendance at board (and other) meetings in California along with communications and involvement with Avia employees in California. If the Court concludes that more specific allegations are required as to each Defendant's conduct, Plaintiffs should have the opportunity to fully develop the record and amend their Complaint.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Defendants' motions to dismiss in their entirety.

Dated: May 15, 2024

Respectfully submitted,

*/s/ Matthew S. Tripolitsiotis*

Matthew S. Tripolitsiotis (*pro hac vice*)
BURNS CHAREST LLP
757 Third Ave, 20th Floor
New York, NY 10017
Tel: 469.895.5269
mtripolitsiotis@burnscharest.com

Spencer Cox (*pro hac vice*)
BURNS CHAREST LLP
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Tel: 202.577.3977
scox@burnscharest.com

Amanda K. Klevorn (*pro hac vice*)
BURNS CHAREST LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
Tel: 504.799.2847
aklevorn@burnscharest.com

Todd Logan (SBN 305912)
EDELSON PC
150 California St, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300
Fax: 415.373.9435
tlogan@edelson.com

Pls.' Consol. Opp. to Defs.' Motions to Dismiss First Am. Compl.
Case No. 3:23-cv-05971-EMC

*Counsel for Plaintiffs and the Proposed Class*

## <u>CERFICATE OF SERVICE</u>

I hereby certify that on May 15, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel or parties of record electronically by CM/ECF.

/s/ Matthew S. Tripolitsiotis
Matthew S. Tripolitsiotis