UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW PANDOLFI, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>AVIAGAMES, INC., et al.,<br><br>    Defendants. | Case No. 23-cv-05971-EMC<br><br>**ORDER DEFERRING RULING ON AVIA DEFENDANTS' MOTION TO COMPEL ARBITRATION**<br><br>Docket No. 73 |

    Plaintiffs Andrew Pandolfi and Mandi Shawcroft have filed suit against AviaGames, Inc. ("Avia") and its co-founders (collectively, the "Avia Defendants"), as well as two companies that invested in Avia. The Avia Defendants have moved to compel arbitration pursuant to the Federal Arbitration Act. Having considered the parties' briefs and accompanying submissions, as well as the supplemental briefs filed by the parties post-hearing, the Court hereby **DEFERS** ruling on the motion to compel.

                  I.    **FACTUAL & PROCEDURAL BACKGROUND**

A.    First Amended Complaint

    In the operative first amended complaint ("FAC"), Plaintiffs allege as follows.[1]

    Avia is a provider of online games. *See* FAC ¶ 1. It hosts a variety of games through its Pocket7Games platform and makes certain games available for download as individual apps, including Bingo Clash. *See* FAC ¶ 31. The games feature online tournaments in which players

---

[1] The Court acknowledges that, at the time the Avia Defendants moved to compel arbitration, the operative complaint was Plaintiffs' original complaint and not the FAC. The Court's citation to the FAC here does not prejudice either party because the gist of Plaintiffs' case is the same, whether the original complaint or the FAC is considered.

pay entry fees to compete and potentially win cash prizes. *See* FAC ¶ 67. Avia tells players that, in these tournaments, they are "playing against other, real people in games of skill. It claims that its games are not games of chance, that it is not the 'house' against whom players are betting, and that, instead, it merely collects a fee for running its various games." FAC ¶ 5. But, according to Plaintiffs, these claims are false: "players are actually playing against computer bots in a stacked game of chance." FAC ¶ 6.

Based on, *inter alia*, the above allegations, Plaintiffs bring claims for violation of California Business & Professions Code § 17200; violation of the California Consumer Legal Remedies Act; and violation of the federal Racketeer Influenced and Corrupt Organizations Act.

B.   Terms of Service

In conjunction with the pending motion to compel arbitration, the Avia Defendants have provided evidence related to Avia's Terms of Service ("Terms").

Avia requires individuals to agree to its Terms as a condition of playing an Avia game. *See* Qu Decl. ¶ 6. Periodically, Avia updates its Terms.[2] It notifies players of updated Terms via in-app pop-up notifications, which require click-through assent to continue gameplay. *See* Qu Decl. ¶¶ 6, 8.

As relevant with respect to the case at bar, Avia updated its Terms in December 2022 and again in July 2023. Avia notified players, including Plaintiffs, of these updated Terms through pop-up notifications. On January 12, 2023, Ms. Shawcroft clicked "Agree" on a pop-up notification on the Pocket7Games platform stating that Avia had "updated [its] . . . Terms of Service" and that "[b]y continuing to use Aviagames' services, you agree to the updated Terms of Service." Qu Decl. ¶ 13. On January 13, 2023, Mr. Pandolfi clicked "Agree" on an identical pop-up notification in the Bingo Clash app. *See* Qu Decl. ¶ 12. Finally, on July 4, 2023, Ms.

---

[2] According to the Avia Defendants, players agree to the Terms at multiple points during gameplay (*e.g.*, when they first create accounts and when verifying their age, which is a prerequisite to playing games with cash prizes). *See* Qu Decl. ¶¶ 20, 24. However, for purposes of the pending motion, the Avia Defendants argue that there was an agreement to arbitrate based on acceptance of the updated Terms only (which, as described *infra* are noticed by pop-ups). Accordingly, the Court focuses on the updated Terms only.

Shawcroft clicked "Agree" on a pop-up with identical wording in the Pocket7Games app.[3]  *See* Qu Decl. ¶ 17.

The updated Terms at issue (both the December 2022 Terms and the July 2023 Terms) made several revisions to the arbitration agreement that was a part of the previously existing Terms.  These changes include the following:

- adding a clause delegating certain issues of arbitrability to the arbitrator;
- incorporating the AAA's Consumer Arbitration Rules and the AAA's Supplementary Rules for Multiple Case Filings;
- establishing a bellwether process for arbitration if 25 or more similar claims are asserted by "the same or coordinated counsel or are otherwise coordinated"; and
- adding a severability clause.

The text of the relevant pop-ups did not identify these changes to the Terms nor otherwise mention the arbitration provision.  The pop-ups are displayed below, respectively:

/ / /

---

[3] Plaintiffs claim that a "technical glitch" allowed players to circumvent the pop-ups by closing the app and reopening it, but as indicated above, Plaintiffs here nevertheless clicked "Agree" on the January and/or July pop-ups.  Mr. Pandolfi was able to circumvent one of the pop-ups, but he clicked "Agree" on the operative Terms in January 2023.  *See* Qu Decl. ¶ 18.



Qu Decl. ¶¶ 11, 16.

The Avia Defendants contend that, by agreeing to the updated Terms via the pop-ups, Plaintiffs agreed to the arbitration clause contained therein; that clause provides that "[a]ll disputes, claims or controversies arising out of or relating to these Terms, any Services, or the relationship between you and Aviagames . . . includ[ing] claims that accrued before you entered into this Agreement" shall be resolved by binding arbitration. Qu Decl., Ex. 1 (Terms at 11). The Avia Defendants also claim that Plaintiffs validly assented to the delegation clause contained within the arbitration agreement. The agreement states that "disputes arising out of or relating to interpretation or application of this arbitration provision, including the enforceability, revocability, or validity of the arbitration provision or any portion of the arbitration provision" must be arbitrated. Qu Decl., Ex. 1 (Terms at 12). The Avia Defendants have moved to compel arbitration of Plaintiffs' claims.

4

## II.      DISCUSSION

A.      Legal Standard

Under the Federal Arbitration Act ("FAA"), a written contractual provision to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The "final clause of § 2 . . . permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 432 (9th Cir. 2015) (internal citation omitted).

B.      Existence of Agreement to Arbitrate

In the instant case, there is no dispute that the updated Terms include an arbitration provision. However, as an initial matter, the Court must determine whether Plaintiffs entered into an agreement to arbitrate with Avia in the first place. This is an issue for a court to decide. *See Ahlstrom v. DHI Mortg. Co., L.P.*, 21 F.4th 631, 635 (9th Cir. 2021) (holding that a court decides the issue of whether an agreement to arbitrate was ever formed; the issue cannot be delegated to an arbitrator to decide). The Avia Defendants bear the burden of proving the existence of an agreement. *See Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019) (stating that "the party seeking to compel arbitration[] must prove the existence of a valid agreement by a preponderance of the evidence").

"In determining whether a valid arbitration agreement exists, federal courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (internal citation omitted). Here, both parties have assumed that California law on the formation of contracts applies. The Court therefore does the same. Under California law, "'mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contact.'" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (internal citation omitted). The Ninth Circuit has noted that this principal of contract formation "appl[ies] with equal force to contracts formed online." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Thus, an enforceable online contract exists when "(1) the website provides reasonably conspicuous notice of the terms to which the consumer

will be bound [*i.e.*, inquiry notice]; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.*

- A reasonably conspicuous notice is "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Id.* A hyperlink may properly "disclose terms" to a reasonably prudent user, but "the fact that a hyperlink is present must be readily apparent," meaning that it must be "sufficiently set apart from the surrounding text." *Id.* at 857 (internal citation omitted).

- Unambiguous manifestation of assent may be established via "[a] user's click of a button . . . only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Id.*

Consistent with the above, "courts have routinely found clickwrap agreements enforceable." *Id.* A clickwrap agreement involves the situation "in which a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Id.* In contrast, courts have been more reluctant to enforce browsewrap agreements. With a browsewrap agreement, "a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Id.*

In the instant case, the Avia Defendants argue that there was an agreement to arbitrate with each Plaintiff because each Plaintiff was essentially presented with a clickwrap agreement and each accepted. The Court agrees with the Avia Defendants.

Two Ninth Circuit cases are instructive. In *Lee v. Ticketmaster*, 817 Fed. Appx. 393 (9th Cir. 2020), the Ninth Circuit found valid assent to Ticketmaster's Terms and its arbitration provision where the plaintiff clicked a "Sign In" button to sign into his Ticketmaster account and three lines below the button, the website displayed the phrase, "By continuing past this page, you agree to our Terms of Use," since this constituted an "explicit textual notice . . . of the user's intent to be bound." *Id.* at 394-95. Similarly, in *Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505 (9th Cir. 2023), the Ninth Circuit concluded that Ticketmaster's Terms were enforceable

because notice of the Terms was "not buried on the bottom of the webpage or placed outside the action box, but rather w[as] located directly on top of or below each action button" and the "'Terms of Use' hyperlink [wa]s conspicuously distinguished from the surrounding text." *Id.* at 516-17; *see also Hansen v. Ticketmaster Entertainment, Inc.*, 20-cv-02685-EMC, 2020 WL 7319358, at *3-4 (N.D. Cal. Dec. 11, 2020) (holding that the plaintiff validly assented to the Terms of Use, including its arbitration provision, for several reasons: (1) the webpage at issue was "relatively uncluttered" since the "sign-in box itself was prominently featured" and the text reading "By continuing past this page, you agree to the Terms of Use" was directly above the button, making it "conspicuous," (2) this text was not "markedly smaller" than other text, and (3) the gray font color was in "sufficient contrast" to the white background).

The instant case is analogous to the authorities cited above. Here, the pop-ups presented to Plaintiffs gave them reasonably conspicuous notice that the Terms were being updated. The pop-ups were uncluttered and gave the short and straightforward message that Avia had updated its Terms of Use. The pop-ups also gave a clear opportunity to read the updated Terms as evidenced by the blue button stating "Click to Read." Finally, Plaintiffs unambiguously assented to the updated Terms by clicking on the orange "Agree" button which was placed right below the statement that the Terms were being updated and that, "By continuing to use Aviagames' services, you agree to the updated Terms . . ."

Plaintiffs' arguments that they did not validly assent to the arbitration agreement because, *e.g.*, the pop-ups did not refer to the arbitration clause in the Terms or mention what changes had been made to the Terms are not on point. Such arguments go to the unfair surprise of the arbitration agreement, which is a matter related to unconscionability. It does not negate a finding of contract formation.

C.      Validity of Agreement to Arbitrate

   1.      Delegation to Arbitrator

Plaintiffs argue that, even if an agreement to arbitrate was formed, the agreement should be deemed invalid because it is unconscionable. *See Sakkab*, 803 F.3d at 432 (noting that the FAA allows arbitration agreements to be invalidated by generally applicable contract defenses,

including unconscionability). In response, the Avia Defendants contend that this gateway issue of arbitrability is a matter for the arbitrator to decide, and not the Court. The Avia Defendants do not dispute that, typically, a court decides not only the gateway issue of whether there is an agreement to arbitrate but also gateway issues of whether "the agreement encompasses the dispute at issue" and whether the agreement is valid and enforceable. *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000); *Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011). But it is permissible for parties to agree to delegate the latter gateway issues to the arbitrator to decide in lieu of a court. *See Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) ("[W]hen the parties' contract delegates the arbitrability question to an arbitrator . . . a court possesses no power to decide the arbitrability issue.").

Delegation to an arbitrator, however, must be clear and unmistakable. *See Chiron Corp.*, 207 F.3d at 1130; *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see also Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). "There is no presumption in favor of arbitration of arbitrability." *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1031 (N.D. Cal. 2022) (internal citation omitted).

According to the Avia Defendants, there is a clear and unmistakable delegation of these arbitrability issues to the arbitrator in the instant case. The Avia Defendants assert that there was delegation in two ways: (1) because the arbitration agreement incorporates the AAA's Consumer Arbitration Rules, specifically Rule 14(a) which empowers arbitrators to rule on questions of arbitrability; and (2) because the arbitration agreement contains an express delegation clause that requires arbitration of all "disputes arising out of or relating to interpretation or application of this arbitration provision, including the enforceability, revocability, or validity of the arbitration provision or any portion of the arbitration provision." Qu Decl., Ex. 1 (Terms at 12).

The Court rejects the Avia Defendants' first argument. As the Court recently noted in a different case, "incorporation of the AAA rules is insufficient to establish a clear and unmistakable agreement to arbitrate arbitrability" where "at least one party is unsophisticated." *MacClelland*, 609 F. Supp. 3d at 1031-32; *cf. Brennan*, 796 F.3d at 1131 (expressly limiting its holding that incorporation of the AAA rules clearly and unmistakably delegates arbitrability to the arbiter to

the facts of the case, which only involved sophisticated parties). Because there is no showing here that Plaintiffs are sophisticated, the Court does not find a clear and unmistakable agreement to delegate by virtue of incorporation of the AAA rules.

The Avia Defendants' second argument, however, has merit. The delegation clause in Avia's Terms is almost identically worded to the delegation clause in *Mohamed v. Uber Techs., Inc.*, which the Ninth Circuit ruled "clearly and unmistakably delegated the question of arbitrability to the arbitrator." 848 F.3d 1201, 1208 (9th Cir. 2016) ("Such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision."). The Court therefore holds that there was a clear and unmistakable delegation of arbitrability issues to the arbitrator.

2. Enforceability of Delegation Clause

Confronted with this situation, Plaintiffs argue that the Court should nonetheless decline to give effect to the delegation clause (*i.e.*, the Court should address the issues of arbitrability instead of the arbitrator) because the delegation clause is not enforceable in and of itself – specifically, because it is unconscionable.

Even when a contract's delegation clause provides clear and unmistakable evidence of the parties' assent to delegate gateway arbitrability issues, courts still inquire as to "whether the agreement to delegate arbitrability – the delegation clause – is itself unconscionable." *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1000 (9th Cir. 2021). Challenges to the enforceability of the agreement to delegate arbitrability must be directed toward "the delegation provision specifically." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010). However, the challenging party may cite provisions outside of the delegation clause so long as these provisions "make *the fact of an arbitrator deciding arbitrability* unconscionable." *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1002 (9th Cir. 2023) (emphasis in original); *see also Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1012 (9th Cir. 2023) ("reject[ing] the notion that the court is limited to a clause-bound interpretation" of the delegation clause because "[w]ithout considering the context of the contract, a court would be unable to consider the full meaning of the delegation provision").

Under California law, there must be both procedural and substantive unconscionability in order for an agreement to be rendered invalid. That being said, there is "sliding scale" such that "greater substantive unconscionability may compensate for lesser procedural unconscionability," and vice-versa. *Chavarria v. Ralph's Grocery Co.*, 733 F.3d 916, 922 (9th Cir. 2013) (internal citation omitted).

- Procedural unconscionability concerns "the level of oppression and surprise involved in the agreement." *Chavarria*, 733 F.3d at 922. Oppression refers to the "inequality of bargaining power that results in no real negotiation and an absence of meaningful choice." *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1260 (9th Cir. 2017) (internal citation omitted). Surprise involves "the extent to which the contract clearly discloses its terms as well as the reasonable expectations of the weaker party." *Chavarria*, 733 F.3d at 922. This includes consideration of whether "the supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them." *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1280 (9th Cir. 2006).
- A substantively unconscionable agreement is "overly harsh, unduly oppressive, unreasonably favorable, or must shock the conscience." *Poublon*, 846 F.3d at 1261 (internal citations omitted). Agreements "that are unfairly one-sided are substantively unconscionable," as the "paramount consideration . . . is mutuality." *Nagrampa*, 469 F.3d at 1281 (internal citations omitted).

"[T]he party opposing arbitration bears the burden of proving . . . unconscionability." *Poublon*, 846 F.3d at 1260.

### a. Procedural Unconscionability

Plaintiffs argue that the delegation clause is procedurally unconscionable because (1) it is part of a contract of adhesion and (2) it is part of an arbitration agreement which was unfairly sprung on game players.

Plaintiffs' first argument is not persuasive. To be sure, in determining whether a delegation clause is unconscionable, the Ninth Circuit has evaluated whether the contract

containing the clause is a contract of adhesion.[4]  *See Lim*, 8 F.4th at 1000-01; *Mohamed*, 848 F.3d at 1211.  But the Ninth Circuit as well as this Court have found that "there is no contract of adhesion when an individual is given the opportunity to opt-out."  *James v. Comcast Corp.*, No. 16-cv-02218-EMC, 2016 WL 4269898, at *1-3 (N.D. Cal. Aug. 15, 2016) (finding that Comcast's mail notice containing the full text of the company's arbitration agreement, which stated that it would take effect unless the user opted out, contained a valid opt-out provision); *Circuit City Stores v. Ahmed*, 283 F.3d 1198, 1200 (9th Cir. 2002).  In *Mohamed v. Uber Techs., Inc.*, the Ninth Circuit held that the arbitration agreement was not adhesive even though opting-out could only be accomplished in person or by overnight delivery service.  848 F.3d at 1210-11.  This burden was immaterial to the Ninth Circuit since "the contract bound Uber to accept opt-outs from those drivers who followed the procedure it set forth."  *Id.* at 1211;

Here, the arbitration agreement in Avia's updated Terms contains an opt-out provision, so it is not a contract of adhesion. The opt-out provision in the December 2022 Terms is reproduced below[5]:

> e) Opt Out. You have the right to opt out of binding arbitration within 30 days of the date you first accepted these Terms by providing us with notice of your decision to opt-out via email at legal@aviagames.com or by certified mail addressed to28 E. 3rd Avenue, San Mateo, CA 94043 . In order to be effective, the opt-out notice must include your full name, mailing address, and email address. The notice must also clearly indicate your intent to opt out of binding arbitration. By opting out of binding arbitration, you are agreeing to resolve disputes in accordance with Section 14.

Qu Decl., Ex. 1 (Terms at 13).  This provision is less burdensome than its equivalent in *Mohamed*, as users can opt-out via email or certified mail.  *See* 848 F.3d at 1211; Qu Decl., Ex. 1 (Terms at 13).  The opt-out provision here is valid because it binds Avia Defendants "to accept opt-outs from those . . . who followed the procedure it set forth."

Plaintiffs' second argument essentially asserts unfair surprise.  Although unfair surprise is undoubtedly part of procedural unconscionability analyses, *see Lim*, 8 F.4th at 1001, Plaintiffs'

---

[4] A contract of adhesion is "imposed and drafted by the party of superior bargaining strength [that] relegates to the subscribing party only the opportunity to adhere to the contract or reject it."  *Lim*, 8 F.4th at 1000 (internal citations omitted).

[5] The opt-out provision in the July 2023 Terms is identical.  *See* Qu Decl., Ex. 3 (Terms at 13).

11

1 argument is problematic in that it largely focuses on the unfair surprise of the arbitration
2 agreement as a whole, not "the delegation provision specifically." *See Rent-A-Center*, *W., Inc.*,
3 561 U.S. at 72. There is a fair argument that if the arbitration clause is a surprise, so would the
4 delegation clause within it. However, it appears that courts examining the issue have thus far
5 focused only on whether the delegation clause itself is surprising. *See Lim*, 8 F.4th at 1001
6 (evaluating unfair surprise in the placement of the delegation clause within the agreement, notice
7 of the delegation clause within the agreement, and plaintiff's acknowledgement or lack thereof of
8 the delegation clause specifically); *see also Bielski*, 87 F.4th at 1014.

9        In any event, the Court finds that there is an element of unfair surprise with respect to the
10 delegation clause specifically. In *Lim*, the Ninth Circuit found unfair surprise with respect to a
11 delegation clause because (1) it was "presented . . . in the middle of 31 numbered paragraphs,
12 within more than nine pages of single-spaced, 10-point font," (2) "[n]othing in the text of the
13 agreement called Lim's attention to the delegation clause," and (3) "Lim was not required to sign
14 or initial that specific provision." 8 F.4th at 1001. In the case at bar, the delegation clause in the
15 December 2022 Terms is reproduced below[6]:

> Disputes that must be arbitrated include, without limitation, disputes arising out of or relating to interpretation or application of this arbitration provision, including the enforceability, revocability, or validity of the arbitration provision or any portion of the arbitration provision. The arbitrator will have the authority to grant any remedy or relief that would otherwise be available in court.

19 Qu Decl., Ex. 1 (Terms at 12).

20        This delegation clause is problematic for reasons similar to those identified by the Ninth
21 Circuit in *Lim*. The Avia Defendants presented the delegation clause in the middle of 16
22 numbered paragraphs, most with multiple numbered subparagraphs, within 14 pages of single-
23 spaced, 8-point font in barely readable, light gray text. *See Lim*, 8 F.4th at 1001; Qu Decl., Ex. 1
24 (Terms at 12). As the clause is not even numbered, let alone titled, there is nothing in the text to
25 call players' attention to the delegation clause. Finally, players are not required to sign or initial

---

[6] The delegation clause in the July 2023 Terms suffers from the same problems. *See* Qu Decl., Ex. 3 (Terms at 12).

that provision. As such, just as the *Lim* court found that "procedural unconscionability existed with respect to the delegation clause" due to "unfair surprise," the Court concludes the same here.[7]

      b.  <u>Substantive Unconscionability</u>

    Because there is some level of procedural unconscionability due to unfair surprise, the Court turns to the issue of whether the delegation clause is also substantively unconscionable. The Court may, as Plaintiffs argue, evaluate the substantive unconscionability of the delegation clause by looking to the broader arbitration agreement, which includes a bellwether-type[8] provision (as discussed *infra*). To be sure, *Rent-A-Center* specifies that the question here is whether the delegation clause specifically is substantively unconscionable and not the broader arbitration agreement. However, the Ninth Circuit has explained that a provision outside of the delegation clause that "make[s] *the fact of an arbitrator deciding arbitrability* unconscionable" would make a delegation clause substantively unconscionable. *Holley-Gallegly*, 74 F.4th at 1002 (emphasis in original). Parties may look to other provisions in the arbitration agreement because the delegation "provision itself may not provide enough information for the court to evaluate the challenge." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1012 (9th Cir. 2023). "[T]here may be unconscionable arbitration procedures, like a large filing fee or a distant site for arbitration . . . [that] could make arbitrating arbitrability unconscionable because to do so would be extremely burdensome and expensive." *Id.* As such, the Court is not "limited to a clause-bound interpretation" of the delegation clause to determine its unconscionability. *Id.*; *see also Heckman v. Live Nation Entertainment, Inc.*, No. CV 22-0047-GW-GJSx, 2023 WL 5505999, at *17 (C.D. Cal. Aug. 10, 2023) (finding that the following elements of the arbitration agreement were relevant "with respect to the delegation clause specifically, as each applie[d] to threshold issues of arbitrability": "(1) the mass arbitration protocol . . . (2) the lack of a right to discovery and other procedural limitations;

---

[7] The Avia Defendants' argument concerning the labeling of the arbitration provision is unpersuasive because it is not directed toward "the delegation provision specifically." *Rent-A-Center, W., Inc.*, 561 U.S. at 72 (2010).

[8] The agreement refers to "bellwether" in the provision, but, as discussed *infra*, it is unlike traditional bellwether provisions in that, if no resolution is reached on the claims following the first round of adjudication, the sequence of claims adjudication thereafter is subject to significant restrictions. The Court thus uses the term "bellwether" loosely.

13

(3) the arbitrator selection provisions; and (4) the limited right of appeal").

Here, Plaintiffs argue that delegation clause is unconscionable when the bellwether provision in the agreement is also taken into consideration. The bellwether provision in the December 2022 Terms is reproduced below[9]:

> 6. The AAA Supplementary Rules for Multiple Case Filings and the AAA Multiple Consumer Case Filing Fee Schedule will apply if twenty-five (25) or more similar claims are asserted against Aviagames or against you by the same or coordinated counsel or are otherwise coordinated. In addition to the application of the AAA Supplementary Rules for Multiple Case Filings and the AAA Multiple Consumer Case Filing Fee Schedule, you and Aviagames understand and agree that when twenty-five (25) or more similar claims are asserted against Aviagames or you by the same or coordinated counsel or are otherwise coordinated resolution of your or Aviagames' Claim might be delayed. For such coordinated actions, you and Aviagames also agree to the following coordinated bellwether process. Counsel for claimants and counsel for Aviagames shall each select ten (10) cases (per side) to proceed first in individual arbitration proceedings. The remaining cases shall be deemed filed for purposes of the statute of limitations but not for the purpose of assessing AAA fees. No AAA fees shall be assessed in connection with those cases until they are selected to proceed to individual arbitration proceedings as part of a bellwether process. If the parties are unable to resolve the remaining cases after the conclusion of the initial twenty (20) proceedings, each side shall select another ten (10) cases (per side) to proceed to individual arbitration proceedings as part of a second bellwether process. A single arbitrator shall preside over each case. Only one case may be assigned to each arbitrator as part of a bellwether process unless the parties agree otherwise. This bellwether process shall continue, consistent with the parameters identified above, until all the claims included in these coordinated filings, including your case, are adjudicated or otherwise resolved. The statute of limitations and any filing fee deadlines shall be tolled for claims subject to this bellwether process from the time the first cases are selected for a bellwether process until the time your or Aviagames' case is selected for a bellwether process, withdrawn, or otherwise resolved. A court shall have authority to enforce this paragraph and, if necessary, to enjoin the mass filing or prosecution of arbitration demands against Aviagames or you.

Qu Decl., Ex. 1 (Terms at 13).

According to Plaintiffs, delegating arbitrability to the arbitrator is substantively unconscionable because of the arbitration procedure set up by the bellwether provision, which essentially enables delay of proceedings (*i.e.*, because only twenty cases can be adjudicated at a time). In other words, adjudication by an arbitrator of the issue of arbitrability can be unduly delayed as a result of the bellwether provision. Plaintiffs also suggest that there might be a chilling effect on players' willingness to pursue their rights (including statutory rights) – *i.e.*, if adjudication of arbitrability alone can be delayed, then there is less incentive for a player to pursue their rights in arbitration.

In *MacClelland*, this Court found a similar bellwether unconscionable. The provision

---

[9] The bellwether provision in the July 2023 Terms is identical. *See* Qu Decl., Ex. 3 (Terms at 13).

14

specified:

> "If 25 or more customers initiate notices of dispute with [the defendant-company] raising similar claims, and counsel for the . . . customers bringing the claims are the same or coordinated for these customers, the claims shall proceed in arbitration in a coordinated proceeding. Counsel for the . . . customers and counsel for [the defendant-company] shall each select five cases to proceed first in arbitration in a bellwether proceeding. The remaining cases shall not be filed in arbitration until the first ten have been resolved. If the parties are unable to resolve the remaining cases after the conclusion of the bellwether proceeding, each side may select another five cases to proceed to arbitration for a second bellwether proceeding. This process may continue until the parties are able to resolve all of the claims, either through settlement or arbitration. A court will have authority to enforce this clause and, if necessary, to enjoin the mass filing of arbitration demands against [the defendant company]."

*MacClelland*, 609 F. Supp. 3d at 1040 (quoting the arbitration agreement). The Court noted that the bellwether provision "function[ed] to delay arbitration of cases until each preceding tranche of 10 cases is adjudicated." *Id.* Furthermore, because the counsel for the plaintiffs represented more than 2,700 customers, "it would take approximately 156 years to resolve the claims of all of Plaintiffs' counsel's clients." *Id.* The Court rejected the defendant's contention that the Court should consider only the 27 named plaintiffs in the case, and not the remaining clients represented by Plaintiffs' counsel (more than 2,600 individuals), particularly because "courts routinely consider the chilling effect [that arbitration clauses have] on non-parties who may yet seek to vindicate their rights." *Id.* at 1041.

However, unlike the plaintiffs in *McClelland*, here, Plaintiffs' firm has only signed engagement letters with 35 clients. Given this limited number of claims represented by the law firm representing the Plaintiffs, there would not be inordinate delay in adjudication, because all the affected claims could be adjudicated in two tranches. To be sure, Plaintiffs have provided evidence that a *different* law firm – Kind Law – represents more than 1,600 individuals who will seek arbitration against the Avia Defendants. *See* Docket No. 99. But the status of those claims and whether they are all similar (as to each other) such that they would be subject to Avia's bellwether provision is not clear from the submitted declaration which was conclusory and not specific.

15

That the record (wherein the only plaintiffs presently before the Court have not demonstrated a concrete harm from the putatively unconscionable bellwether provision, as currently applied to them) raises
several considerations:

> (1) Is unconscionability assessed at the time the agreement containing the delegation clause/bellwether provision was made or, instead, at the time the agreement containing the delegation clause/bellwether provision is sought to be enforced? In other words, should the provision be assessed only as applied to the plaintiffs before the court or should it be assessed on its face.
>
> (2) Relatedly, is unconscionability of the delegation clause/bellwether provision assessed from the perspective of Plaintiffs specifically or that of a reasonable player (*i.e.*, not just Plaintiffs but also those similarly situated)?

In *MacClelland*, the Court noted that, typically, "the validity of a contractual provision [is evaluated] as of the time of the contract is made – it is a prospective analysis which does not require proof that a particular plaintiff has already been adversely affected." 609 F. Supp. 3d 1024, 1041 (N.D. Cal. 2022). This statement has support from both state law statutory authority and case law authority. *See* Cal. Civ. Code § 1670.5(a) (providing that, "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable *at the time it was made* the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result") (emphasis added); *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000) (referencing § 1670.5(a) in discussing unconscionability of an arbitration agreement). This Court then went on to note that a contractual provision should be assessed not just from the perspective of the plaintiff but also other individuals who could be affected. In support, the Court cited *Armendariz*, where the California Supreme Court "considered the potential chilling effect that an arbitration clause would exert on employees seeking to file workplace discrimination claims." *Id.*; *see also Armendariz*, 24 Cal. 4th at 110 (noting that the risk that an employee would have "to bear large costs to vindicate

16

their statutory right against workplace discrimination" could have a "chill[ing] [effect on] the exercise of that right"); *cf. Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 663 (6th Cir. 2003) ("looking to the possible 'chilling effect' of [a] cost-splitting provision on similarly situated potential litigants, as opposed to its effect merely on the actual plaintiff in any given case," in deciding whether the provision is enforceable).

That being said, that does not mean that unconscionability should be assessed solely at the time the contract was made or on its face. As noted by one state appellate court: "Generally, unconscionability is determined 'at the time [the agreement] was made' [under § 1670.5(a)], yet courts have consistently assessed unconscionability for limitations on discovery as applied to a particular plaintiff." *Ramirez v. Charter Comms., Inc.*, 75 Cal. App. 5th 365, 384 (2022); *see also In re Zucker*, 75 Cal. App. 5th 1025, 1041-42 (2022) (recognizing that, "as a general matter, courts examine the unconscionability of contracts as of the time of execution[,] [b]ut as illustrated by case law evaluating the substantive unconscionability of arbitration agreements in cases brought under FEHA, in some circumstances it is appropriate to examine the unconscionability of contract provisions as of the time of enforcement" – *e.g.*, for discovery, "[w]hether such minimum standards of fairness exist is examined at the time of enforcement of the agreement, not execution of the agreement, and is analyzed based on the specific discovery needs of the plaintiff's case").

The Court orders the parties to submit supplemental briefing on this issue. (Some of these issues were touched upon in supplemental briefs previously submitted. However, the authorities above may inform and develop the parties' views.) Briefs not exceeding 10 pages each shall be cross-filed by the parties no later than May 31, 2024. The parties may submit additional supplemental evidence in support of their briefs. Should the Kind law firm desire, it may file an amicus brief within said time limit.

### III.    CONCLUSION

For the foregoing reasons, the Court defers ruling on the Avia Defendants' motion to compel arbitration. Although Plaintiffs validly assented to the Terms which include an arbitration agreement and gateway issues of arbitrability are delegated to the arbitrator, further briefing on the issue of whether the delegation clause is unenforceable based on unconscionability is warranted.

17

As stated above, briefs shall be filed by May 31, 2024.

The Court also vacates (temporarily) the June 24, 2024, hearing on the three motions to dismiss which have been filed by the Avia Defendants; ACME, LLC; and Galaxy Digital Capital Management, L.P.  A hearing on the Avia Defendants' motion to dismiss should clearly be deferred because the Court has not yet adjudicated their motion to compel arbitration.  Although ACME and Galaxy have only moved to dismiss (they have no basis to move to compel arbitration), it makes sense to defer hearing on their motions as well because their motions, like the Avia Defendants' motion, include an argument that the RICO claim pled against all Defendants is not viable.  Given these circumstances, it makes sense to defer a ruling on the merits of the 12(b)(6) motions, at least for the time being.

This order disposes of Docket No. 73.

**IT IS SO ORDERED**.

Dated: May 21, 2024

_____
EDWARD M. CHEN
United States District Judge