United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW PANDOLFI, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>AVIAGAMES, INC., et al.,<br><br>　　　　Defendants. | Case No. 23-cv-05971-EMC<br><br>**ORDER DENYING AVIA DEFENDANTS' MOTION TO COMPEL ARBITRATION**<br><br>Docket No. 73 |

Plaintiffs Andrew Pandolfi and Mandi Shawcroft have filed suit against AviaGames, Inc. ("Avia") and its co-founders (collectively, the "Avia Defendants"), as well as two companies that invested in Avia. The Avia Defendants have moved to compel arbitration pursuant to the Federal Arbitration Act. Previously, the Court addressed some of the issues raised in the motion to compel but deferred a final ruling so that the parties could provide supplemental briefing. Having considered that supplemental briefing, as well as all other briefing and documents related to the motion to compel, the Court hereby **DENIES** the Avia Defendants' motion.

## I.　　FACTUAL & PROCEDURAL BACKGROUND

A.　　First Amended Complaint

In the operative first amended complaint ("FAC"), Plaintiffs allege as follows.

Avia is a gaming company that launched in 2017. *See* FAC ¶ 30. Ms. Chen and Ms. Wang are Avia's co-founders. They are also currently employees: Ms. Chen is the CEO, and Ms. Wang a VP of Strategy & Business Development. *See* FAC ¶¶ 14-15.

Avia's games – which include Bingo Clash, Solitaire, Pool Clash, Match n Flip, 21 Gold, and Tile Blitz – can be accessed through mobile browsers or through downloaded standalone applications. *See* FAC ¶¶ 30-31. The games can be played for cash. *See* FAC ¶¶ 35, 43, 67.

Avia claims that it does not have any financial interest in the outcome of cash games or any stake in who wins or loses. *See* FAC ¶¶ 37, 69.

Avia represents to players and prospective players that its games give players the ability to compete against other players (*i.e.*, human opponents and not bots) – in particular, other players of equal skill levels. *See* FAC ¶¶ 34, 42. Avia also represents that "players '[c]ompete in real time against other players' and that they '[c]ompete using only [their] strategy and skill.'" FAC ¶ 35. In other words, Avia's games are ones of skill and not ones of chance. *See* FAC ¶¶ 39, 66 (alleging that games of chance mean that a player's skill does not impact the game's outcome). Such representations and/or similar representations "are visible to each user who downloads Avia's games" and/or on Avia's website (*e.g.*, in the FAQ section). FAC ¶¶ 34-38, 48. *See, e.g.*, FAC ¶ 44 ("Players downloading the games see [such] statements as game descriptions when they access the relevant app store, such as the Apple's AppStore or Samsung's Galaxy Store").

Avia's representations are allegedly false:

- Players do not compete against live human opponents but rather against bots – specifically, historical playthroughs which can include a video recording of a match played previously by another player. *See* FAC ¶ 53. "Using bots helps Avia maintain player liquidity. Avia needs players for the real players to play against. If there are not enough real players and the players need to wait to get the results of their match, they are less likely to keep playing." FAC ¶ 63.
- Avia can manipulate matches by matching a player against a bot of a similar skill level or a bot that has a higher skill rating or score. *See* FAC ¶¶ 54, 71.
- Avia does have a financial interest in its games because, if a historical playthrough wins a match, Avia does not pay a cash prize to anyone and keeps the entry fee paid by the live player. *See* FAC ¶ 53.

Based on, *inter alia*, the above allegations, Plaintiffs assert the following claims: (1) violation of California Business & Professions Code § 17200; (2) violation of the California Consumer Legal Remedies Act ("CLRA"); and (3) violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO").

### B. Terms of Service

Avia requires individuals to agree to its Terms of Service ("Terms") as a condition of playing an Avia game. *See* Qu Decl. ¶ 6. Avia periodically updates its Terms. *See* Qu Decl. ¶¶ 6, 8. The relevant Terms for purposes of the case at bar are the December 2022 Terms and the July 2023 Terms. Both the 2022 and 2023 versions contain an arbitration agreement. Under that agreement, "[a]ll disputes, claims or controversies arising out of or relating to these Terms, any Services, or the relationship between you and Aviagames . . . includ[ing] claims that accrued before you entered into this Agreement" shall be resolved by binding arbitration. Qu Decl., Ex. 1 (Terms § 15(a)). The arbitration agreement also contains a delegation clause – *i.e.*, a clause that specifies that an arbitrator (and not a court) decides certain gateway issues related to arbitrability. Specifically, the delegation clause provides that all "disputes arising out of or relating to interpretation or application of this arbitration provision, including the enforceability, revocability, or validity of the arbitration provision or any portion of the arbitration provision" are to be decided by an arbitrator. Qu Decl., Ex. 1 (Terms § 15(c)). The Avia Defendants moved to compel arbitration based on the arbitration agreement in the December 2022 and July 2023 Terms.

### C. Prior Order

On May 21, 2024, the Court issued an order addressing some of the issues raised in the Avia Defendants' motion. Specifically, the Court held that each Plaintiff and Avia had entered into an agreement to arbitrate. *See* Docket No. 113 (Order at 5-7). Although Plaintiffs challenged the arbitration agreement on the basis that it was unconscionable, the arbitration agreement clearly and unmistakably delegated that gateway issue of arbitrability to the arbitrator in the first instance. The only way for the Court to decide the issue of unconscionability would be if the delegation clause itself were unconscionable, in which case it could not be enforced. *See* Docket No. 113 (Order at 7-9).

The Court found that there was some procedural unconscionability with respect to the delegation clause. *See* Docket No. 113 (Order at 12). As for substantive unconscionability, the issue was whether it would be unconscionable for an arbitrator to decide arbitrability issues. According to Plaintiffs, it would be unconscionable to delegate arbitrability to the arbitrator

3

1   because of the arbitration agreement contained a bellwether provision. *See* Docket No. 113 (Order

2   at 13-14); *see also Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1002 (9th Cir. 2023)

3   (explaining that a provision outside of a delegation clause may be considered in deciding whether

4   a delegation clause is substantively unconscionable); *Bielski v. Coinbase, Inc.*, 87 F.4th 1003,

5   1012 (9th Cir. 2023) (noting that a delegation clause "itself may not provide enough information

6   for the court to evaluate the challenge"). The bellwether provision states in relevant part as

7   follows:

> The AAA Supplementary Rules for Multiple Case Filings and the AAA Multiple Consumer Case Filing Fee Schedule will apply if twenty-five (25) or more similar claims are asserted against Aviagames or against you by the same or coordinated counsel or are otherwise coordinated. In addition to the application of the AAA Supplementary Rules for Multiple Case Filings and the AAA Multiple Consumer Case Filing Fee Schedule, you and Aviagames understand and agree that when twenty-five (25) or more similar claims are asserted against Aviagames or you by the same or coordinated counsel or are otherwise coordinated resolution of your or Aviagames' Claim might be delayed. For such coordinated actions, you and Avia games also agree to the following coordinated bellwether process. Counsel for claimants and counsel for Aviagames shall each select ten (10) cases (per side) to proceed first in individual arbitration proceedings. The remaining cases shall be deemed filed for purposes of the statute of limtiations but not for the purpose of assessing AAA fees. No AAA fees shall be assessed in connection with those cases until they are selected to proceed to individual arbitration proceedings as part of bellwether process. If the parties are unable to resolve the remaining cases after the conclusion of the initial twenty (20) proceedings, each side shall select another ten (10) cases (per side) to proceed to individual arbitration proceedings as part of a second bellwether process. A single arbitrator shall preside over each case. Only one case may be assigned to each arbitrator as part of a bellwether process unless the parties agree otherwise. The bellwether process shall continue, consistent with the parameters identified above, until all the claims included in these coordinated filings, including your case, are adjudicated or otherwise resolved. . . .

23  Qu Decl., Ex. 1 (Terms § 15(c)(6)).

24   Plaintiffs argued that the bellwether provision makes delegation of arbitrability to the

25  arbitrator unconscionable because "adjudication by an arbitrator of the issue of arbitrability can be

26  unduly delayed as a result of the bellwether provision." Docket No. 113 (Order at 14). Plaintiffs

27  also asserted that there could be a "chilling effect on players' willingness to pursue their rights

28  (including statutory rights) . . . if adjudication of arbitrability alone can be delayed." Docket No.

4

113 (Order at 14).

The Court asked for supplemental briefing on the substantive unconscionability of the delegation clause when taken together with the bellwether provision. *See* Docket No. 113 (Order at 17) (acknowledging that this was a second request for supplemental briefing). The Court then held a hearing after the supplemental briefing was filed. The Court now issues its order on the motion to compel arbitration.

## II.     DISCUSSION

A.     Unconscionability of Delegation Clause

Plaintiffs bear the burden of proving that the delegation clause is unconscionable. *See Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1000 (9th Cir. 2021); *Aggarwal v. Coinbase*, 685 F. Supp. 3d 867, 880 (N.D. Cal. 2023); *cf. Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1002 (9th Cir. 2023) (stating that, "if a party cites provisions outside of the delegation clause in making an unconscionability challenge, it must explain how those provisions make the fact of an arbitrator deciding arbitrability unconscionable") (emphasis added). As noted above, in its prior order, the Court found that there was some procedural unconscionability with respect to the clause. *See* Docket No. 113 (Order at 12) (noting that "there is an element of unfair surprise" because the clause is "in the middle of 16 numbered paragraphs, most with multiple numbered subparagraphs, within 14 pages of single-spaced, 8-point font in barely readable, light gray text"; adding that, "[a]s the clause is not even numbered, let alone titled, there is nothing in the text to call players' attention to the delegation clause"). Thus, the Court's focus here is on whether the delegation clause is substantively unconscionable. As stated above, the basic question for the Court is whether delegation of arbitrability issues to the arbitrator is substantively unconscionable.

As an initial matter, the Court considers whether unconscionability here should be assessed at the time the delegation clause/bellwether provision was made or, instead, at the time the agreement containing the delegation clause/bellwether provision was sought to be enforced. *See* Docket No. 113 (Order at 16). On the one hand, a provision in the California Civil Code suggests that unconscionability should be assessed at the time of contract formation. Section 1670.5(a) provides that, "[i]f the court as a matter of law finds the contract or any clause of the contract to

have been unconscionable *at the time it was made* the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Cal. Civ. Code § 1670.5(a) (emphasis added). As Plaintiffs note, consistent with § 1670.5(a), cost provisions and statute-of-limitations provisions contained in arbitration clauses are typically assessed at the time of contract formation. *See, e.g.*, *Armendariz v. Found. Health Pscyhcare Servs., Inc.*, 24 Cal. 4th 83, 107-13 (2000) (discussing a cost provision); *Wherry v. Award, Inc.*, 192 Cal. App. 4th 1242, 1249 (2011) (discussing a statute-of-limitations provision). On the other hand, California case law recognizes that, although usually "unconscionability is determined 'at the time [the agreement] was made' [under § 1670.5(a)], . . . courts have consistently assessed unconscionability for limitations on discovery as applied to a particular plaintiff." *Ramirez v. Charter Comms., Inc.*, 75 Cal. App. 5th 365, 384 (2022). In other words, some courts have implicitly found exceptions to the general rule laid out in § 1670.5(a), though none have closely analyzed the statute in so ruling.

For purposes of the case at bar, the Court need not definitively rule whether the delegation clause/bellwether provision is more like, *e.g.*, a cost or statute-of-limitations provision that should be assessed at the time of contract formation or instead more like a discovery provision that should be assessed at the time of enforcement. Under either approach, the Court finds the delegation clause/bellwether provision substantively unconscionable.

1. Time of Contract Formation

At the time of contract formation, the delegation clause taken together with the bellwether provision has a chilling effect on players. *See MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1041 (N.D. Cal. 2022) (considering chilling effect, in the context of a bellwether provision, on persons in addition to plaintiffs). Such an *a priori* chilling effect informs unconscionability. *See Armendariz*, 24 Cal. 4th at 110 (noting that the risk that an employee would have "to bear large costs to vindicate their statutory right against workplace discrimination" could have a "chill[ing] [effect on] the exercise of that right"); *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 663 (6th Cir. 2003) ("looking to the possible 'chilling effect' of [a] cost-splitting provision on

6

similarly situated potential litigants, as opposed to its effect merely on the actual plaintiff in any given case," in deciding whether the provision is enforceable).[1]

At the time of contract formation, it is predictable that a player could have a dispute with Avia based on a company policy that applies across-the-board to *all* players. If the policy applies across-the-board to all players, then a player who arbitrates her claim will likely be subject to the bellwether provision: (1) there will be other players who have the same kind of claims and, thus, (2) as discussed *infra*, there will likely be coordination of all arbitrating players' claims in arbitration, regardless of who the players' lawyers are. *See* Qu Decl., Ex. 1 (Terms § 15(c)(6)) (providing that bellwether provision is triggered where "twenty-five (25) or more similar claims are asserted against Aviagames or you by the same or coordinated counsel *or are otherwise coordinated*") (emphasis added). Moreover, the practical reality is that claims based on a company-wide policy affecting consumers will often be brought by law firms that represent a multitude of claimants. *See*, *e.g.*, *MacClelland*, 609 F. Supp. 3d at 1040 (noting that there were 27 plaintiffs in the case and that plaintiffs' counsel also represented more than 2,600 other customers of defendant); 2d Tripolitsiotis Decl. ¶ 4 (testifying that Plaintiffs' counsel represents 51 individuals, including Plaintiffs); 2d Kind Decl. ¶ 3 (testifying that firm represents more than 4,100 individuals who have the same kind of claims that Plaintiffs bring here). Because the bellwether provision allows for arbitration of only twenty cases at a time – and with the default of only one case being assigned to each arbitrator,[2] *see* Qu Decl., Ex. 1 (Terms § 15(c)(6)) – there

---

[1] Assessing the effect of a provision at the time of contract formation implicates an analysis akin to assessing the facial (as opposed to an as-applied) validity of a law. At the time of formation, there are no known fact-specific circumstances to apply. Consideration of chilling effect is often entailed in a facial challenge. *See Arce v. Douglas*, 793 F.3d 968, 984 (9th Cir. 2015) (noting that "a law may be invalidated under the First Amendment overbreadth doctrine if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep'[;] [t]he doctrine exists out of concern that the threat of enforcement of an overbroad law may chill constitutionally protected speech").

[2] *Compare* AAA Mass Arbitration Supplementary Rules, Introduction, available at https://www.adr.org/sites/default/files/Mass-Arbitration-Supplementary-Rules.pdf (last visited 7/15/2024) (encouraging parties to processes that make resolution of mass arbitration "more efficient, such as . . . [a]n agreement to assign multiple cases to a single arbitrator, making the scheduling of conferences and hearings more efficient").

1 would likely be delay in resolution of the players' claims. Indeed, there would be delay just to

2 obtain a resolution of the gateway issue of whether a claim is arbitrable in the first instance. *See*

3 Docket No. 113 (Order at 14) (considering whether "adjudication by an arbitrator of the issue of

4 arbitrability can be unduly delayed as a result of the bellwether provision"). That prospect of

5 delay – on the limited gateway issue alone – likely has a chilling effect on players, deterring them

6 from vindicating their rights. Accordingly, the Court finds that delegation of arbitrability issues to

7 an arbitrator is unconscionable based on the facts of this case.[3]

8       To be sure, at the time of contract formation, a player could anticipate having different

9 kinds of claims against Avia – *i.e.*, claims not based on a blanket policy adopted by the company

10 but rather claims that are specific and individual to the player herself (*e.g.*, a failure to provide a

11 promised refund). But even if a player could anticipate having claims that would *not* trigger the

12 bellwether provision, it is still predictable that the player would also have claims that *would*

13 trigger the provision.

14       The Avia Defendants cite to *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S.

15 79 (2000), arguing that it is too speculative, at the time of contract formation, to say whether the

16 delegation clause/bellwether provision has a chilling effect. The Court does not agree. In *Green*

17 *Tree*, the plaintiff argued that an arbitration agreement should be deemed unenforceable because it

18 was *silent* on the issue of arbitration costs and therefore created a risk that the plaintiff would be

19 required to pay prohibitive costs if she were to pursue her rights and thus "force[d] her to forgo

20 any claims she [might] have." *Id.* at 82, 89, 90. The Supreme Court rejected this argument,

21 stating as follows:

22 > It may well be that the existence of large arbitration costs could preclude a litigant such as [the plaintiff] from effectively vindicating her federal statutory rights in the arbitral forum[,] [b]ut the record does not show that [she] will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter. As the Court of Appeals recognized, "we lack . . . information about how claimants fare under [the defendant's] arbitration clause." The record reveals only the arbitration agreement's silence on the subject, and *that fact alone* is plainly insufficient to render it

---

[3] The Court emphasizes here that its analysis of the bellwether provision here should not be viewed as a general condemnation of case management strategies for mass arbitrations.

> unenforceable. The "risk that [the plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.

*Id.* at 90-91 (emphasis added). *Green Tree* is not applicable here because the arbitration agreement in the case at bar is not silent on the contested matter (*i.e.*, the delegation clause/bellwether provision). Moreover, the likelihood of the bellwether provision applying is enhanced by the broad ability of the arbitrator to find cases coordinated and subject to mass arbitration.[4]

In any event, even if *Green Tree* were to raise any concerns, the Avia Defendants do not dispute that the Court would still evaluate the alleged unconscionability of the delegation clause/bellwether provision at the time of enforcement.

### 2. Time of Enforcement

The Court finds that the delegation clause, when taken with the bellwether provision, is substantively unconscionable not only at the time of contract formation but also at the time of contract enforcement.

The time of enforcement here is roughly the spring of 2024. The Avia Defendants moved to compel arbitration in early February 2024, a hearing was held on the motion in late March 2024, and a second hearing was held in mid-July 2024. At this point the proceedings, the delegation clause/bellwether provision does not simply raise the prospect of delay; there is actual delay (indeed, significant delay) should the delegation clause/bellwether provision be enforced.

In April 2024 (shortly after the first hearing on the motion to compel arbitration), Plaintiffs and 33 other individuals were represented by the same counsel and asserting the same kind of claim (*i.e.*, false representations that the Avia games were games of skill and matched players

---

[4] Under the AAA's Mass Arbitration Supplementary Rule 6, a Process Arbitrator may decide "[w]hich Demands for Arbitration should be included as part of the mass arbitration filing" and "[w]hether subsequently filed cases are part of the same mass arbitration." MA-6(c)(iv), (ix). "Mass Arbitrations" are defined in MA-1(b) as 25 or more "similar Demands for Arbitration . . . filed against or on behalf of the same party or related parties" and "where representation of all parties is consistent or coordinated across all cases." MA-1(b). The arbitrator looks to whether the dispute before her is fact specific and must be made on an individual basis, or whether the dispute is not fact specific and does not need to be made on an individual basis. MA-6(d). This suggests that claims challenging a company practice or policy is likely to be coordinated into mass arbitration and hence subject to the bellwether provision.

9

against other live human opponents, not bots).  *See* Docket No. 99-1 (Tripolitsiotis Decl. ¶ 3).  Although not entirely clear, it also appeared that an additional 1,600+ individuals were asserting the same kind of claim, although represented by a different law firm, Kind Law.  *See* Docket No. 99-4 (Kind Decl. ¶ 3).  Approximately two months later, Plaintiffs' counsel now represented 51 individuals asserting the same kind of claim, *see* Docket No. 119-1 (Tripolitsiotis Decl. ¶ 4), and the Kind firm more than 4,100 persons.  *See* Docket No. 120-1 (Kind Decl. ¶ 3).

      Although Plaintiffs' counsel and the Kind firm do not, as a facial matter, appear to have coordinated efforts, *see* Qu Decl., Ex. 1 (Terms § 15(c)(6)) (providing that bellwether provision is triggered where "twenty-five (25) or more similar claims are asserted against Aviagames or you by the same *or coordinated* counsel or are otherwise coordinated") (emphasis added), the bellwether provision is triggered not only by twenty-five or more similar claims being brought the same or coordinated counsel but also by the cases "otherwise [being] coordinated."  *Id.*  At the hearing, the Avia Defendants conceded that coordination could be sought by any party or could be effected sua sponte by the arbitrator.  The Avia Defendants also conceded that the only standard for coordination seemed to be that the claims at issue be similar.  Therefore, it is more than likely that, if the claims being pursued by Plaintiffs and others represented by Plaintiffs' counsel were to be arbitrated, they would be coordinated with the claims being pursued by the Kind firm's clients.  The instant case thus becomes largely indistinguishable from *MacClelland*: because of the bellwether provision which allows only twenty cases at a time to be arbitrated, claimants – numbering in the thousands – will have to "wait months, more likely years before they can even submit a demand for arbitration," let alone have the issue of arbitrability decided.  *MacClelland*, 609 F. Supp. 3d at 1042 (considering the unconscionability of a similar bellwether provision with respect to 27 plaintiffs, plus more than 2,600 other individuals also represented by the same counsel; "[d]elaying the ability of one to vindicate a legal claim by years, possibly 156 years, 'conflict[s] with one of the basis principles of our legal system – justice delayed is justice denied'") (emphasis omitted).  Consistent with *MacClelland*, therefore, the Court finds that the delegation clause is substantively unconscionable because, when taken with the bellwether provision, it would result in delayed resolution of even the limited issue of arbitrability.

1  Resolution of the issue by the arbitrator would likely take years.

2  The Avia Defendants protest that a decision on arbitrability would not in fact be delayed. They point out that, under the arbitration agreement, "[t]he AAA Supplementary Rules for Multiple Case Filings and the AAA Multiple Consumer Case Filing Fee Schedule will apply if twenty-five (25) or more similar claims are asserted against Aviagames or against you by the same or coordinated counsel or are otherwise coordinated." Qu Decl., Ex. 1 (Terms § 15(c)(6)). According to the Avia Defendants, those Supplementary Rules – now known as the Mass Arbitration Supplementary Rules, *see* https://www.adr.org/mass-arbitration (last visited 7/15/2024) – provide that there will be "early resolution of threshold issues like arbitrability through the Process Arbitrator, who is authorized to make group-wide decisions regarding arbitrability at the outset, regardless of the number of claimants." Docket No. 121 (Defs.' 2d Supp. Br. at 10); *see also* Docket No. 114 (Defs' Supp. Br. at 1-2).

The Supplementary Rules discuss Process Arbitrators in Mass Arbitration Rule 6 ("MA-6").[5] MA-6 provides in relevant part that a Process Arbitrator "may" be appointed by the AAA International Center for Dispute Resolution ("ICDR") "in its sole discretion." MA-6(a) (emphasis added). The rule also outlines the authority held by a Process Arbitrator, as opposed to a Merits Arbitrator – *e.g.*, to address whether filing requirements have been met, any disputes over arbitration fees and costs, which demands for arbitration should be included as part of the mass arbitration filing, whether previously-issued rulings by the Process Arbitrator are binding on subsequent cases, and so forth. *See* MA-6(c). The Court has reviewed the content of the rule. Contrary to what the Avia Defendants assert, the rule does not suggest that a dispute over whether an arbitration agreement is unconscionable is a decision that can be made by a Process Arbitrator (assuming one is appointed in the first place) instead of a Merits Arbitrator. The issue of arbitrability is not administrative or ministerial in nature, but more substantive in nature. Accordingly, the Avia Defendants' contention that delay on arbitrability issues can be avoided

---

[5] For a copy of the Supplemental Rules, see https://www.adr.org/sites/default/files/Mass-Arbitration-Supplementary-Rules.pdf (last visited 7/15/2024).

1  through use of a Process Arbitrator is not compelling.[6]

2  The Avia Defendants also argue that there will be no delay on adjudication of arbitrability
3  issues because any arbitrator appointed would be "required to observe the AAA Consumer Due
4  Process Protocol Statement of Principles,"[7] and "Principle 8 of the Due Process Protocol expressly
5  requires that 'proceedings should occur within a reasonable time, without undue delay.'"  Docket
6  No. 104 (Defs.' Supp. Br. at 9); *see also* Qu Decl., Ex. 1 (Terms § 15(c)) (providing that, "[i]f you
7  are a consumer, then then-current version of the AAA's Consumer Arbitration Rules will apply").
8  There are several problems with this position.  First, a general principle does not override the
9  more specific bellwether provision in the parties' arbitration agreement absent a clear intent to
10 otherwise provide – there is no such intent here.  Second, the general principle is somewhat vague
11 in nature and thus would not be a sufficient safety valve to counter any delay.  *Cf. Baxter v.*
12 *Genworth N. Am. Corp.*, 16 Cal. App. 5th 713, 727, 729-30 (2017) (finding discovery limitations
13 unfair notwithstanding that arbitrator could grant additional discovery "for good and sufficient
14 cause shown" in order "to ensure that a party has a fair opportunity to present a case"; indicating
15 that this general provision was not an adequate safety valve because it was more stringent than a
16 simple showing of need and was vague in nature); *see also Heckman v. Live Nation Entm't, Inc.*,
17 686 F. Supp. 3d 939, 961-62 (C.D. Cal. 2023) (addressing rules providing that bellwether cases
18 will act as precedent on subsequent cases; even if arbitrator had discretion here, the rules gave no
19 guidance as to how that discretion should be exercised and potential catchall language that
20 arbitrator should act to ensure fundamental fairness and equity was not a sufficient safety valve).

21 Finally, the Avia Defendants contend that, even if the Court is troubled by the delegation
22 clause when taken in conjunction with the bellwether provision, there is an easy solution –
23 namely, severance of the bellwether provision.  *See* Docket No. 121 (Defs.' 2d Supp. Br. at 10)

---

[6] To the extent a Process Arbitrator has authority to find their rulings binding on subsequent cases, there may also be some due process concerns.

[7] The AAA Consumer Due Process Protocol is available at https://go.adr.org/consumer-arbitration#:~:text=Key%20Provisions%20of%20the%20Due%20Process%20Protocol%3A%20Consumers,Location%20of%20the%20proceeding%20must%20be%20reasonably%20accessible (last visited 7/15/2024).

1  (arguing that "the proper remedy is to sever the bellwether provision and leave the delegation
2  clause intact"). The Court rejects this argument. Notably, in *Hale v. Brinker International, Inc.*,
3  No. 21-cv-09978-VC, 2022 U.S. Dist. LEXIS 108488 (N.D. Cal. June 17, 2022), Judge Chhabria
4  was presented with a similar issue. There, the defendant argued that a cost-splitting provision,
5  even if unconscionable, could easily be severed from the remainder of the arbitration agreement.
6  Judge Chhabria was not convinced, emphasizing that, "[e]ven though the cost-splitting provision
7  is the only substantively unconscionable provision of the agreement, it remains consequential"
8  because "[c]ost- and fee-shifting provisions can create a chilling effect, discouraging employees
9  from vindicating their rights for fear that failure will prove cripplingly expensive"; "[w]ere courts
10 to excise those provisions and enforce arbitration agreements anyway, employers would have no
11 incentive not to chill claims by including cost-shifting provisions in arbitration agreements." *Id.* at
12 *3-4. The Court agrees with Judge Chhabria. The Avia Defendants are not entitled to rely on
13 severance as a fix when they profited from inclusion of the bellwether provision in the first
14 instance, *i.e.*, because it may have had a chilling effect that deterred players from ever pursuing
15 their rights in the arbitral forum available to them. Severance does not cure the problematic
16 chilling effect of the unconscionable bellwether provision.
17    The Court therefore finds that the delegation clause is both procedurally and substantively
18 unconscionable, both at the time of contract formation and contract enforcement. That being the
19 case, the delegation clause is invalid and cannot be given effect.
20 B.    Unconscionability of Arbitration Agreement
21    Because the delegation clause is not enforceable, the Court (and not the arbitrator) decides
22 the gateway issue of whether the broader arbitration agreement is unconscionable and therefore
23 unenforceable. Under California law, there must be both procedural and substantive
24 unconscionability in order for an agreement to be rendered invalid, although there is a "sliding
25 scale" such that "greater substantive unconscionability may compensate for lesser procedural
26 unconscionability," and vice-versa. *Chavarria v. Ralph's Grocery Store*, 733 F.3d 916, 922 (9th
27 Cir. 2013) (citing *Armendariz*, 24 Cal. 4th at 114).
28

1. Procedural Unconscionability

In the instant case, there is some procedural unconscionability in the arbitration agreement. For instance, there is some unfair surprise because Plaintiffs entered into the arbitration agreements with Avia by agreeing to updated Terms presented to them via pop-up boxes in the game apps. The pop-up boxes informed Plaintiffs of updated Terms but did explain that changes to the Terms include changes to the arbitration agreement specifically – such as adding a delegation clause and establishing a bellwether process.[8]

The Avia Defendants suggest that there is no unfair surprise because, if a player were to actually look at the updated Terms, the first paragraph mentions an arbitration agreement:

> BY REGISTERING AN ACCOUNT, PARTICIPATING IN ANY TOURNAMENT OR COMPETITION, CLICKING TO ACCEPT OR AGREE TO THESE TERMS OF SERVICE, OR USING THE SERVICES IN ANY WAY, YOU AGREE AND ACCEPT TO BE BOUND BY THESE TERMS. IF YOU DO NOT AGREE TO THESE TERMS, INCLUDING THE MANDATORY ARBITRATON PROVISION AND CLASS ACTION WAIVER IN SECTION 15, DO NOT ACCESS OR USE OUR PRODUCTS OR SERVICES.

Qu Decl., Ex. 1 (Terms at 1). But this ignores the point that players still were not given notice of the fact that changes – significant changes – had been made to the arbitration agreement. The Court agrees with the decision in *Heckman* that there is a "situation of unfair surprise" where a defendant's "customers receive[] no notice of [a] significant change to the [Terms of Use]." *Heckman*, 686 F. Supp. 3d at 953 (agreeing with plaintiffs' contention that "Defendants' imposition of such a significant change in the [Terms] [*e.g.*, from individual, bilateral arbitration to mass arbitration] without giving any notice to customers is one reason . . . that the agreement is procedurally unconscionable"; adding that, "because it would seem trivially easy to provide customers with such notice, Defendants' failure to do so suggests a degree of intentionality and/or oppression").

---

[8] As the Court noted in its prior order, the above does not negate a finding of contract formation – that the parties had an agreement to arbitrate. It does, however, bear on unfair surprise which is part of the procedural unconscionability analysis. *See* Docket No. 113 (Order at 7); *Heckman*, 686 F. Supp. 3d at 953 (indicating that contract formation is a matter different from unfair surprise/procedural unconscionability).

14

To the extent the Avia Defendants suggest there still is no element of unfair surprise because players were pointed to the section on arbitration and could have read through the section to get details on the terms of the arbitration agreement, the Court does not agree. The terms of the arbitration agreement are presented in small, light grey font and span about three pages of single-spaced text. Although some language is displayed in "ALLCAPS," that method of emphasis is not especially effective given the use of the light grey font. Furthermore, there is no bolding or underlining to call out any terms, including the terms that were newly added (of particular note, the delegation clause and bellwether provision). Given these circumstances, the position of the Avia Defendants that there is *no* element of unfair surprise lacks merit. *Cf. Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, 485 F. Supp. 3d 1168, 1185-86 (N.D. Cal. 2020) (noting that arbitration agreement used 9-point font and that "'[a] layperson trying to navigate this block text, printed in tiny font would not have an easy journey'"). There is sufficient procedural unconscionability to trigger assessment of substantive unconscionability.

    2.    <u>Substantive Unconscionability</u>

Because there is at least some procedural unconscionability, the Court considers next the matter of substantive unconscionability. Plaintiffs argue that there are five provisions in the arbitration agreement that are substantively unconscionable: (1) the delegation clause; (2) the bellwether provision; (3) the jury waiver provision; (4) the statute-of-limitations provision; and (5) the public injunctive relief provision.

The Court has already found the delegation clause substantively unconscionable. It also finds here that the bellwether provision is substantively unconscionable for reasons similar to those articulated above. If the delegation clause is substantively unconscionable when coupled with the bellwether provision (because of the chilling effect at the time of contract formation and/or the actual delay at the time of contract enforcement), the bellwether provision is clearly substantively unconscionable by itself.

Furthermore, there is another troubling aspect to the bellwether provision. The bellwether provision is triggered – causing delay – when twenty-five or more claims are asserted against Avia by the *same or coordinated* counsel. *See* Qu Decl., Ex. 1 (Terms § 15(c)(6)). As Plaintiffs argue,

15

1    to avoid the bellwether provision, players would have to find different counsel, which affects the
2    right to counsel of their choice or indeed, the ability to find any counsel at all: where the
3    individual claims are small (as consumer claims often are), it may be difficult to find an attorney
4    who represents only a single or small number of similarly situated clients. *See* Fed. R. Civ. P.
5    23(b)(3), 1966 Advisory Committee Notes (recognizing with respect to the interest of individuals
6    in conducting separate lawsuits, the "amounts at stake for individuals may be so small that
7    separate suites would be impracticable").

8          Finally, the Court finds the statute-of-limitations provision substantively unconscionable.
9    Under that provision, a player must initiate an arbitration "within one year after the cause of action
10   accrues; otherwise, such cause of action or claim is permanently barred." Qu Decl., Ex. 1 (Terms
11   § 15(d)). The provision is substantively unconscionable as it significantly shortens the limitations
12   period for Plaintiffs' statutory claims – four years for the § 17200 claim, three years for the CLRA
13   claim, and four years for the RICO claim. *See also Jackson v. S.A.W. Ent. Ltd.*, 629 F. Supp. 2d
14   1018, 1028 (N.D. Cal. 2009) (stating that "[c]ontractual agreements to shorten the statute of
15   limitations period are generally disfavored because they derogate statutory intent"; adding that
16   whether a shortened limitations period is permissible turns on whether "'the period fixed [is] so
17   unreasonable [so] as to show imposition or undue advantage in some way'"). This Court and
18   others have found contractual limitations periods of six months substantively unconscionable
19   when compared to statutory limitations periods of several years. *See id.* at 1029. That the
20   arbitration agreement here has a limitations period somewhat larger (one year) is not enough to
21   render it valid and enforceable. *See, e.g.*, *Longboy v. Pinnacle Prop. Mgmt. Servs., LLC*, No. 23-
22   cv-01248-AMO, 2024 U.S. Dist. LEXIS 31557, at *20-21 (N.D. Cal. Feb. 23, 2024) (finding
23   provision with limitations period of one year substantively unconscionable given that plaintiff's
24   claims had statutory limitations periods of three to four years); *De Leon v. Pinnacle Prop. Mgmt.*
25   *Servs., LLC*, 72 Cal. App. 5th 476, 486-87 (2021) (holding that limitations period of one year was
26   substantively unconscionable given that "many of plaintiff's claims have longer statute of
27   limitations," *i.e.*, three to four years). It is also problematic that the arbitration agreement's
28   shortened limitations period appears to apply only to players, and not Avia. *See* Qu Decl., Ex. 1

(Terms § 15(d)) ("Disputes *you* may have arising out of or relating to these Terms or the Services must be commenced within one year after the cause of action accrues . . . .") (emphasis added).

Although the provisions above are substantively unconscionable, the Court rejects Plaintiffs' assertion that jury waiver provision and public injunctive relief provision are also substantively unconscionable. As to the jury waiver provision, Plaintiffs cite to *Durruthy v. Charter Communications, LLC*, No. 20-CV-1374-W-MSB, 2020 U.S. Dist. LEXIS 219894 (S.D. Cal. Nov. 23, 2020), for the proposition that "arbitration agreements are substantively unconscionable if they 'require[] plaintiffs to waive in advance their right to a jury trial for any dispute for which arbitration is not allowed by law.'" *Id.* at *35-36. But nothing in the arbitration agreement here indicates that players are required to waive their right to a jury trial for a dispute *for which arbitration is not permitted*. The agreement's statement that "YOU ARE . . . WAIVING THE RIGHT TO A TRIAL BY JURY," Qu Decl., Ex. 1 (Terms § 15), taken in context, simply reflects that a player is agreeing *to arbitration* and to that extent is waiving a jury trial.

As for the public injunctive relief provision, Plaintiffs criticize language used in an older version of the Avia Terms. *See* Qu Decl., Exs. 4-5 (Terms from February and September 2022). Those older Terms included a provision stating that "[t]he arbitrator may award declaratory or injunctive relief *only in favor of the individual party seeking relief* and only to the extent necessary to provide relief warranted by *that party's individual claim*." Qu Decl., Ex. 4 (§ 15.5 of the February 2022 Terms) (emphasis added). Plaintiffs point out that "the California Supreme Court [has] refused to enforce a mandatory arbitration provision that precluded the arbitrator from issuing a public injunction." Opp'n at 23 (citing *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017). But *McGill* has no bearing here because the older Terms are not at issue; the updated Terms include a provision that allows for public injunctive relief. *See* Qu Decl., Ex. 1 (Terms § 15(f)) ("[I]f any part of this Section 15 is found to prohibit an individual claim seeking public injunctive relief, that provision will have no effect to the extent such relief is allowed to be sought out of arbitration, and the remainder of this Section 15 will be enforceable.").

17

3.     Severance

Based on the analysis above, the Court has determined there is some procedural unconscionability associated with the arbitration agreement, as well as significant substantive unconscionability based on the delegation clause, the bellwether provision, and the statute-of-limitations provision. The only issue remaining is whether the Court should sever the substantively unconscionable terms in which case arbitration could still go forward, albeit without those terms.

One of the factors in determining whether severance is appropriate is "whether the arbitration agreement contained multiple substantively unconscionable provisions such that it indicates a systematic effort to impose arbitration not simply as an alternative to litigation, but as an inferior forum." *Yeomans*, 485 F. Supp. 3d at 1189-90 (citing *Armendariz*, 24 Cal. 4th at 124-25). Above, the Court declined to sever the bellwether provision in the context of evaluating the unconscionability of the delegation clause; it likewise declines to sever the bellwether provision and the statute-of-limitations provision from the remainder of the arbitration agreement here. These provisions are designed to chill, *i.e.*, to deter players from even pursuing rights in the alternative (arbitral) forum in the first place. The arbitral forum therefore has been structurally and systematically designed to be an inferior forum, and the Court will not sever to save the agreement to arbitrate. *See Subcontracting Concepts (CT), LLC v. De Melo*, 34 Cal. App. 5th 201, 215 (2019) (noting that "the fact that an 'arbitration agreement contains more than one unlawful provision' may 'indicate a systematic effort to impose arbitration on an employee . . . as an inferior forum that works to the employer's advantage' and may justify a conclusion 'that the arbitration agreement is permeated by an unlawful purpose'"). The agreement to arbitrate is unconscionable and thus not enforceable.

### III.    CONCLUSION

For the foregoing reasons, the Avia Defendants' motion to compel arbitration is denied. The Court sets a hearing on the three motions to dismiss filed by the Avia Defendants, ACME, and Galaxy for September 18, 2024, at 1:30 p.m.

This order disposes of Docket No. 73.

**IT IS SO ORDERED**.

Dated: July 26, 2024

_____
EDWARD M. CHEN
United States District Judge

19