1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7   ANDREW PANDOLFI, et al.,

Case No.  23-cv-05971-EMC

8                    Plaintiffs,

9           v.

**AMENDED ORDER DENYING AVIA DEFENDANTS' MOTION TO COMPEL ARBITRATION**

10   AVIAGAMES, INC., et al.,

11                    Defendants.

Docket No. 73

12
13

14          Plaintiffs Andrew Pandolfi and Mandi Shawcroft have filed suit against AviaGames, Inc.

15   ("Avia") and its co-founders (collectively, the "Avia Defendants"), as well as two companies that

16   invested in Avia.  The Avia Defendants have moved to compel arbitration pursuant to the Federal

17   Arbitration Act.  Having considered the parties' briefs and accompanying submissions, as well as

18   all supplemental briefing, the Court hereby **DENIES** the Avia Defendants' motion.

19                  I.          **FACTUAL & PROCEDURAL BACKGROUND**

20   A.     First Amended Complaint

21          In the operative first amended complaint ("FAC"), Plaintiffs allege as follows.

22          Avia is a gaming company that launched in 2017.  *See* FAC ¶ 30.  Ms. Chen and Ms.

23   Wang are Avia's co-founders.  They are also currently employees: Ms. Chen is the CEO, and Ms.

24   Wang a VP of Strategy & Business Development.  *See* FAC ¶¶ 14-15.

25          Avia's games – which include Bingo Clash, Solitaire, Pool Clash, Match n Flip, 21 Gold,

26   and Tile Blitz – can be accessed through mobile browsers or through downloaded standalone

27   applications.  *See* FAC ¶¶ 30-31.  The games can be played for cash.  *See* FAC ¶¶ 35, 43, 67.

28   Avia claims that it does not have any financial interest in the outcome of cash games or any stake

United States District Court
Northern District of California

1    in who wins or loses.  *See* FAC ¶¶ 37, 69.

2         Avia represents to players and prospective players that its games give players the ability to

3    compete against other players (*i.e.*, human opponents and not bots) – in particular, other players of

4    equal skill levels.  *See* FAC ¶¶ 34, 42.  Avia also represents that "players '[c]ompete in real time

5    against other players' and that they '[c]ompete using only [their] strategy and skill.'"  FAC ¶ 35.

6    In other words, Avia's games are ones of skill and not ones of chance.  *See* FAC ¶¶ 39, 66

7    (alleging that games of chance mean that a player's skill does not impact the game's outcome).

8    Such representations and/or similar representations "are visible to each user who downloads

9    Avia's games" and/or on Avia's website (*e.g.*, in the FAQ section).  FAC ¶¶ 34-38, 48.  *See, e.g.*,

10   FAC ¶ 44 ("Players downloading the games see [such] statements as game descriptions when they

11   access the relevant app store, such as the Apple's AppStore or Samsung's Galaxy Store").

12        Avia's representations are allegedly false:

- Players do not compete against live human opponents but rather against bots –
  specifically, historical playthroughs which can include a video recording of a match
  played previously by another player.  *See* FAC ¶ 53.  "Using bots helps Avia
  maintain player liquidity.  Avia needs players for the real players to play against.  If
  there are not enough real players and the players need to wait to get the results of
  their match, they are less likely to keep playing."  FAC ¶ 63.

- Avia can manipulate matches by matching a player against a bot of a similar skill
  level or a bot that has a higher skill rating or score.  *See* FAC ¶¶ 54, 71.

- Avia does have a financial interest in its games because, if a historical playthrough
  wins a match, Avia does not pay a cash prize to anyone and keeps the entry fee paid
  by the live player.  *See* FAC ¶ 53.

24        Based on, *inter alia*, the above allegations, Plaintiffs assert the following claims: (1)

25   violation of California Business & Professions Code § 17200; (2) violation of the California

26   Consumer Legal Remedies Act ("CLRA"); and (3) violation of the federal Racketeer Influenced

27   and Corrupt Organizations Act ("RICO").

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1 | B.     Terms of Service

2         Avia requires individuals to agree to its Terms of Service ("Terms") as a condition of

3   playing an Avia game.  *See* Qu Decl. ¶ 6.  Avia periodically updates its Terms.  *See* Qu Decl. ¶¶ 6,

4   8.  The relevant Terms for purposes of the case at bar are the December 2022 Terms and the July

5   2023 Terms.  Both the 2022 and 2023 versions contain an arbitration agreement.  Under that

6   agreement, "[a]ll disputes, claims or controversies arising out of or relating to these Terms, any

7   Services, or the relationship between you and Aviagames . . . includ[ing] claims that accrued

8   before you entered into this Agreement" shall be resolved by binding arbitration. Qu Decl., Ex. 1

9   (Terms § 15(a)).

10         The arbitration agreement also contains a delegation clause – *i.e.*, a clause that specifies

11   that an arbitrator (and not a court) decides certain gateway issues related to arbitrability.

12   Specifically, the delegation clause provides that all "disputes arising out of or relating to

13   interpretation or application of this arbitration provision, including the enforceability, revocability,

14   or validity of the arbitration provision or any portion of the arbitration provision" are to be decided

15   by an arbitrator.  Qu Decl., Ex. 1 (Terms § 15(c)).

16         The Avia Defendants have moved to compel arbitration based on the arbitration agreement

17   in the December 2022 and July 2023 Terms.

18 | C.     Prior Order

19         On May 21, 2024, the Court issued an order addressing some of the issues raised in the

20   Avia Defendants' motion.  Specifically, the Court held that each Plaintiff and Avia had entered

21   into an agreement to arbitrate.  *See* Docket No. 113 (Order at 5-7).  Although Plaintiffs challenged

22   the arbitration agreement on the basis that it was unconscionable, the arbitration agreement clearly

23   and unmistakably delegated that gateway issue of arbitrability to the arbitrator in the first instance.

24   The only way for the Court to decide the issue of unconscionability would be if the delegation

25   clause itself were unconscionable, in which case it could not be enforced.  *See* Docket No. 113

26   (Order at 7-9).

27         The Court found that there was some procedural unconscionability with respect to the

28   delegation clause.  *See* Docket No. 113 (Order at 12).  As for substantive unconscionability, the

1    issue was whether it would be unconscionable to delegate to an arbitrator adjudication of

2    arbitrability issues.

3         According to Plaintiffs, it would be unconscionable to delegate arbitrability to the

4    arbitrator because the arbitration agreement contained a bellwether provision. *See* Docket No. 113

5    (Order at 13-14); *see also Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1002 (9th Cir.

6    2023) (explaining that a provision outside of a delegation clause may be considered in deciding

7    whether a delegation clause is substantively unconscionable); *Bielski v. Coinbase, Inc.*, 87 F.4th

8    1003, 1012 (9th Cir. 2023) (noting that a delegation clause "itself may not provide enough

9    information for the court to evaluate the challenge"). The bellwether provision states in relevant

10   part as follows:

> The AAA Supplementary Rules for Multiple Case Filings and the
> AAA Multiple Consumer Case Filing Fee Schedule will apply if
> twenty-five (25) or more similar claims are asserted against
> Aviagames or against you by the same or coordinated counsel or are
> otherwise coordinated. In addition to the application of the AAA
> Supplementary Rules for Multiple Case Filings and the AAA
> Multiple Consumer Case Filing Fee Schedule, you and Aviagames
> understand and agree that **when twenty-five (25) or more similar
> claims are asserted against Aviagames or you by the same or
> coordinated counsel or are otherwise coordinated resolution of
> your or Aviagames' Claim might be delayed**. For such
> coordinated actions, you and Avia games also agree to the following
> coordinated bellwether process. **Counsel for claimants and
> counsel for Aviagames shall each select ten (10) cases (per side)
> to proceed first in individual arbitration proceedings.** The
> remaining cases shall be deemed filed for purposes of the statute of
> limitations but not for the purpose of assessing AAA fees. No AAA
> fees shall be assessed in connection with those cases until they are
> selected to proceed to individual arbitration proceedings as part of
> bellwether process. **If the parties are unable to resolve the
> remaining cases after the conclusion of the initial twenty (20)
> proceedings, each side shall select another ten (10) cases (per
> side) to proceed to individual arbitration proceedings as part of
> a second bellwether process.** A single arbitrator shall preside over
> each case. **Only one case may be assigned to each arbitrator as
> part of a bellwether process unless the parties agree otherwise.
> The bellwether process shall continue, consistent with the
> parameters identified above, until all the claims included in
> these coordinated filings, including your case, are adjudicated or
> otherwise resolved. . . .**

27   Qu Decl., Ex. 1 (Terms § 15(c)(6)) (emphasis added).

28         In a different case, this Court found a similar bellwether provision substantively

unconscionable because it effectively delayed adjudication of claims brought by consumers, condemning some to waiting as long as 150 years in order to have their claims heard.  *See MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1041 (N.D. Cal. 2022).  The instant case differs somewhat from *MacClelland* in that, here, the initial question is whether a delegation clause in an arbitration agreement (as opposed to the arbitration agreement itself) – that is also governed by a bellwether provision – is substantively unconscionable.

According to Plaintiffs, the bellwether provision makes delegation of arbitrability to the arbitrator unconscionable because "adjudication by an arbitrator of the issue of arbitrability can be unduly delayed as a result of the bellwether provision."  Docket No. 113 (Order at 14).  Plaintiffs also assert that there could be a "chilling effect on players' willingness to pursue their rights (including statutory rights) . . . if adjudication of arbitrability alone can be delayed."  Docket No. 113 (Order at 14).  In short, the net effect of delaying and effectively undermining the arbitration – the prescribed forum for dispute resolution – still obtains.

The Court asked for supplemental briefing on the substantive unconscionability of the delegation clause when taken together with the bellwether provision.  *See* Docket No. 113 (Order at 17) (acknowledging that this was a second request for supplemental briefing).  The Court then held a hearing after the supplemental briefing was filed.  On July 26, 2024, the Court issued an order denying the Avia Defendants' motion to compel arbitration.  *See* Docket No. 128 (order).  Three days later, the Court asked the parties to file further supplemental briefing because of a recently issued California Supreme Court decision that addressed unconscionability.  *See* Docket No. 129 (order) (citing *Ramirez v. Charter Comms., Inc.*, 16 Cal. 5th 478 (2024) (filed on July 15, 2024)).  The Court expressly noted that its prior order denying the motion to compel arbitration was not a final order because it was seeking supplemental briefing.  *See* Docket No. 136 (order).

Having now considered the most recent round of supplemental briefs, as well as the other documents previously filed, the Court amends its prior order.  The Avia Defendants' motion to compel arbitration is **DENIED** for the reasons discussed below.

United States District Court
Northern District of California

5

United States District Court
Northern District of California

# II.    DISCUSSION

A.    Unconscionability of Delegation Clause

Plaintiffs bear the burden of proving that the delegation clause is unconscionable, both procedurally and substantively.  *See Ramirez*, 16 Cal. 5th at 492; *see also Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1000 (9th Cir. 2021); *Aggarwal v. Coinbase*, 685 F. Supp. 3d 867, 880 (N.D. Cal. 2023); *cf. Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1002 (9th Cir. 2023) (stating that, "if a party cites provisions outside of the delegation clause in making an unconscionability challenge, it must explain how those provisions make the fact of an arbitrator deciding arbitrability unconscionable") (emphasis added).  "Courts apply a sliding scale analysis under which 'the more substantively oppressive [a] term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.'"  *Ramirez*, 16 Cal. 5th at 493.

1.    Procedural Unconscionability

As noted above, in its prior order, the Court found that there was some procedural unconscionability with respect to the delegation clause.  *See Ramirez*, 16 Cal. 5th at 492 (noting that "[p]rocedural unconscionability 'addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power'"); Docket No. 113 (Order at 12) (noting that "there is an element of unfair surprise" in the consumer contract because the clause is "in the middle of 16 numbered paragraphs, most with multiple numbered subparagraphs, within 14 pages of single-spaced, 8-point font in barely readable, light gray text"; adding that, "[a]s the clause is not even numbered, let alone titled, there is nothing in the text to call players' attention to the delegation clause").  There was at least enough procedural unconscionability in the instant case to warrant an inquiry into substantive unconscionability.  *Cf. Ramirez*, 16 Cal. 5th at 494 (stating that, if a court finds *no* element of procedural unconscionability in a contract, this means that "'no matter how one-sided the contract terms, a court will not disturb the contract because of its confidence that the contract was negotiated or chosen freely, that the party subject to a seemingly one-sided term is presumed to have obtained some advantage from conceding the term or that, if one party negotiated poorly, it is not the

1    court's place to rectify these kinds of errors or asymmetries'").

2          The Avia Defendants contend that the California Supreme Court's decision in *Ramirez*

3    should lead the Court to reassess procedural unconscionability.  The Court is not convinced.  That

4    courts must be "'particularly attuned'" to procedural unconscionability in the employment context,

5    *Ramirez*, 16 Cal. 5th at 478, does not mean that there cannot be procedural unconscionability in

6    the consumer context.

7          The Avia Defendants also ask for an opportunity to supplement the record to show how the

8    delegation clause actually appears to a player of an Avia game.  According to the Avia

9    Defendants, this will demonstrate that there is, in fact, no element of unfair surprise.  *See* Docket

10   No. 135 (Defs.' Supp. Br. at 8) ("The Terms included as exhibits to Avia Defendants' motion to

11   compel arbitration, Dkt. 73-1, accurately reflect the complete text of Avia's Terms but do not

12   accurately reflect how those Terms appear on Avia's mobile application, which is where users

13   agree to them.  There, the Terms appear in high-contrast white-on-blue text, in a font size

14   comparable to that found in text messages or mobile web browsers.").  That request is denied.  The

15   Avia Defendants had an opportunity to provide that information when it filed its motion to

16   compel.  That they failed to do so is not a reason to reopen the record.  In any event, even if

17   accepting that there was white-on-blue text, and in larger font, the delegation clause was still

18   embedded "in the middle of 16 numbered paragraphs, most with multiple numbered

19   subparagraphs, within [what was equivalent to] 14 [single-space] pages."  Docket No. 113 (Order

20   at 12).  The provision is obscure and surprising.  Nothing in *Ramirez* alters the materiality of this

21   finding.

22          2.    Substantive Unconscionability

23          Having found some degree of procedural unconscionability, the Court now turns to

24   substantive unconscionability.  As stated above, the basic question for the Court is whether

25   delegation of arbitrability issues to the arbitrator is substantively unconscionable.

26          a.    At the time of contract formation – the potential chilling effect

27          As an initial matter, the Court considers whether unconscionability here should be assessed

28   at the time the delegation clause/bellwether provision was made or, instead, at the time the

United States District Court
Northern District of California

1   agreement containing the delegation clause/bellwether provision was sought to be enforced. *See*

2   Docket No. 113 (Order at 16).  On the one hand, a provision in the California Civil Code suggests

3   that unconscionability should be assessed at the time of contract formation.  Section 1670.5(a)

4   provides that, "[i]f the court as a matter of law finds the contract or any clause of the contract to

5   have been unconscionable *at the time it was made* the court may refuse to enforce the contract, or

6   it may enforce the remainder of the contract without the unconscionable clause, or it may so limit

7   the application of any unconscionable clause as to avoid any unconscionable result."  Cal. Civ.

8   Code § 1670.5(a) (emphasis added).  As Plaintiffs note, consistent with § 1670.5(a), cost

9   provisions and statute-of-limitations provisions contained in arbitration clauses are typically

10  assessed at the time of contract formation.  *See, e.g.*, *Armendariz v. Found. Health Psychcare*

11  *Servs., Inc.*, 24 Cal. 4th 83, 107-13 (2000) (discussing a cost provision); *Wherry v. Award, Inc.*,

12  192 Cal. App. 4th 1242, 1249 (2011) (discussing a statute-of-limitations provision).  On the other

13  hand, several state appellate courts have held that, where an arbitration agreement is being

14  evaluated for unconscionability based on limitations to discovery, unconscionability is evaluated

15  "'as applied to a particular plaintiff'" – *i.e.*, "postcontract formation circumstances" are

16  considered.  *Ramirez*, 16 Cal. 5th at 505.  This line of authority suggested that there could be

17  exceptions to § 1670.5(a).

18         In *Ramirez*, however, the California Supreme Court expressly considered the latter line of

19  cases and disapproved of their approach.  It stated:

20              The assessment of whether a discovery clause is unconscionable
               should focus on general factors that can be examined *without* relying
21              on subsequent developments.  Those factors include the types of
               claims covered by the agreement, the amount of discovery allowed,
22              the degree to which that amount may differ from the amount
               available in conventional litigation, any asymmetries between the
23              parties with regard to discovery, and the arbitrator's authority to
               order additional discovery.
24

25  *Id.* at 506 (emphasis added).

26         In light of the above holding from *Ramirez*, the Court concludes that the delegation

27  clause/bellwether provision should be assessed at the time of formation only, and not at the time of

28  enforcement.

United States District Court
Northern District of California

At the time of contract formation, the delegation clause taken together with the bellwether provision has a chilling effect on players.  *See MacClelland*, 609 F. Supp. 3d at 1041 (considering chilling effect, in the context of a bellwether provision, on persons in addition to plaintiffs).  Such an *a priori* chilling effect informs unconscionability.  *See Ramirez*, 16 Cal. 5th at 508-09 (evaluating provision under which a party resisting arbitration would be required pay to the other party all fees and costs incurred in compelling arbitration; taking note that, under this provision, a party moving to compel arbitration could potentially get fees and costs if a court were to find unconscionability but then sever the unconscionable terms – the "possibility" of this "outcome could chill an employee's right to challenge the enforceability of an arbitration agreement"); *Armendariz*, 24 Cal. 4th at 110 (noting that the risk that an employee would have "to bear large costs to vindicate their statutory right against workplace discrimination" could have a "chill[ing] [effect on] the exercise of that right"); *see also Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 663 (6th Cir. 2003) ("looking to the possible 'chilling effect' of [a] cost-splitting provision on similarly situated potential litigants, as opposed to its effect merely on the actual plaintiff in any given case," in deciding whether the provision is enforceable).[1]

At the time of contract formation, it is predictable that a player could have a dispute with Avia based on a company policy that applies across-the-board to *all* players, as occurred here, and will be caught up by the bellwether provision.  *Cf. Ramirez*, 16 Cal. 5th at 506 (indicating that, if a discovery limitation in an arbitration agreement is being analyzed, a factor to consider in determining whether the limitation is unconscionable is "the types of claims covered by the [arbitration] agreement").  If the policy applies across-the-board to all players, then a player who arbitrates her claim will likely be subject to the bellwether provision because: (1) there will be

---

[1] Assessing the effect of a provision at the time of contract formation implicates an analysis akin to assessing the facial (as opposed to an as-applied) validity of a law.  At the time of formation, there are no known fact-specific circumstances to apply.  Consideration of chilling effect is often entailed in a facial challenge in other contexts.  *See Arce v. Douglas*, 793 F.3d 968, 984 (9th Cir. 2015) (noting that "a law may be invalidated under the First Amendment overbreadth doctrine if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep'[;] [t]he doctrine exists out of concern that the threat of enforcement of an overbroad law may chill constitutionally protected speech").

United States District Court
Northern District of California

other players who have the same kind of claims and, thus, (2) as discussed *infra*, there will likely be coordination of all arbitrating players' claims in arbitration, regardless of who the players' lawyers are.  *See* Qu Decl., Ex. 1 (Terms § 15(c)(6)) (providing that bellwether provision is triggered where "twenty-five (25) or more similar claims are asserted against Aviagames or you by the same or coordinated counsel *or are otherwise coordinated*")[2] (emphasis added).  Moreover, the practical reality is that claims based on a company-wide policy affecting consumers will often be brought by law firms that represent a multitude of claimants, especially when the dollar amounts are small.  *See*, *e.g.*, *MacClelland*, 609 F. Supp. 3d at 1040 (noting that there were 27 plaintiffs in the case and that plaintiffs' counsel also represented more than 2,600 other customers of defendant); 2d Tripolitsiotis Decl. ¶ 4 (testifying that Plaintiffs' counsel represents 51 individuals, including Plaintiffs); 2d Kind Decl. ¶ 3 (testifying that firm represents more than 4,100 individuals who have the same kind of claims that Plaintiffs bring here); *cf. Willis v. City of Seattle*, 943 F.3d 882, 890-91 (9th Cir. 2019) (noting that class actions provide "a 'means of vindicating the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'" and, in recent years, have "often been initiated to vindicate large numbers of small-dollar consumer claims").  Because the bellwether provision allows for arbitration of only twenty cases at a time – *and* with the default of only one case being assigned to each arbitrator,[3] *see* Qu Decl., Ex. 1 (Terms § 15(c)(6)) – there would likely be delay in resolution of the players' claims.  This would include a delay just to obtain a resolution of the gateway issue

---

[2] The Avia Defendants have suggested that whether cases are coordinated in arbitration (for purposes of the bellwether provision) turns on whether the claims are similar and "critical[ly]" whether the claims involve coordinated plaintiffs' counsel.  Docket No. 135 (Defs. Supp. Br. at 4 n.4).  But the bellwether provision clearly states on its face that it is triggered where "twenty-five (25) or more similar claims are asserted against Aviagames or you by the same or coordinated counsel *or are otherwise coordinated*."  Qu Decl., Ex. 1 (Terms § 15(c)(6)) (emphasis added).  It is hard to imagine that there would not be an interest – on the part of an arbitrator at least – to coordinate if similar consumer-type claims are being brought simply because counsel for the plaintiffs are different or not coordinated.

[3] *Compare* AAA Mass Arbitration Supplementary Rules, Introduction, available at https://www.adr.org/sites/default/files/Mass-Arbitration-Supplementary-Rules.pdf (last visited 7/15/2024) (encouraging parties to processes that make resolution of mass arbitration "more efficient, such as . . . [a]n agreement to assign multiple cases to a single arbitrator, making the scheduling of conferences and hearings more efficient").

1   of whether a claim is arbitrable in the first instance.  *See* Docket No. 113 (Order at 14)

2   (considering whether "adjudication by an arbitrator of the issue of arbitrability can be unduly

3   delayed as a result of the bellwether provision").  That prospect of delay – on the limited gateway

4   issue alone – likely has a chilling effect on players, deterring them from vindicating their rights.

5   Each claimant will have to await determination of the forum in which it may prosecute their claim

6   before proceeding with the claim.  Accordingly, the Court finds that delegation of arbitrability

7   issues to an arbitrator unconscionably delays adjudication of claims based on the facts of this

8   case.[4]

9               b.       Sweep of the bellwether provision – coordination

10          To be sure, at the time of contract formation, a player could anticipate having different

11   kinds of claims against Avia – *i.e.*, claims not based on a blanket policy adopted by the company

12   but rather claims that are specific and individual to the player herself (*e.g.*, a failure to provide a

13   promised refund).  But even if a player could anticipate having claims that would *not* trigger the

14   bellwether provision, it is still predictable that the player would also have claims that *would*

15   trigger the provision.  The sweep of the bellwether provision is broad, applying not only to an

16   attorney who represents a large number of consumers asserting similar claims, but also to

17   independent counsel who represent other unrelated consumers whose claims are similar and are

18   not fact specific and not made on an individual basis; all are subject coordination within the ambit

19   of the bellwether provision.  *See* Qu Decl., Ex. 1 (Terms § 15(c)(6)); *see also* MA-1(b) (defining

20   "Mass Arbitrations" as 25 or more similar Demands for Arbitration . . . filed against or on behalf

21   of the same party or related parties" and "where representation of all parties is consistent or

22   coordinated across all cases").  It is likely that, in arbitration, the claims of Plaintiffs herein and

23   the similar claims brought by the individuals represented by the Kind Law firm would be

24   coordinated under the terms of the arbitration agreement and MA-1(b).

25   / / /

26

27   _____

    [4] The Court emphasizes that its analysis of the bellwether provision here should not be viewed as a
28   general condemnation of case management strategies for mass arbitrations.  Nor does the Court's
    decision here preclude parties in arbitration from meeting and conferring and agreeing to certain
    case management strategies so as to handle mass arbitrations that are not unconscionable.

United States District Court
Northern District of California

c.      Asymmetry

It is also worth noting here that the bellwether provision effectively has a built-in asymmetry, and with no apparent justification.  *Cf. Ramirez*, 16 Cal. 5th at 506 (in considering whether a limitation on discovery in an arbitration agreement is unconscionable, stating that one factor is whether there are "any asymmetries between the parties with respect to discovery"); *id.* at 495 (evaluating whether an arbitration agreement was unconscionable because "it compelled arbitration of claims more likely to be brought by an employee and excluded claims more likely to be brought by [the employer]").  While it is predictable that a player will have claims that will trigger the bellwether provision, it is far from clear that Avia would ever have claims that would trigger the provision.  That is, under what circumstances would twenty-five or more similar claims be asserted by Avia against a player that would warrant coordination?  *See* Qu Decl., Ex. 1 (Terms § 15(c)(6)) (providing that "you and Aviagames understand and agree that when twenty-five (25) or more similar claims are asserted against Aviagames or you by the same or coordinated counsel or are otherwise coordinated resolution of your or Aviagames' Claim might be delayed[;][f]or such coordinated actions, you and Avia games also agree to the following coordinated bellwether process"); *see also Ramirez*, 16 Cal. 5th at 498 (noting that the employer's guidelines, which *excluded* certain kinds of claims from arbitration, classified some of those claims as claims that could be brought by either the employer and the employee, but, in fact, the claims were "more likely to be employer-initiated").

d.      Avia Defendants' counter-arguments

The Avia Defendants have offered several arguments to support their position that the delegation clause/bellwether provision is not unconscionable, but none is persuasive.

For example, the Avia Defendants cite to *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000), arguing that it is too speculative, at the time of contract formation, to say whether the delegation clause/bellwether provision has a chilling effect.  The Court does not agree.  In *Green Tree*, the plaintiff argued that an arbitration agreement should be deemed unenforceable because it was *silent* on the issue of arbitration costs and therefore created a risk that the plaintiff would be required to pay prohibitive costs if she were to pursue her rights and

1    thus "force[d] her to forgo any claims she [might] have."  *Id.* at 82, 89, 90.  The Supreme Court

2    rejected this argument, stating as follows:

> It may well be that the existence of large arbitration costs could
> preclude a litigant such as [the plaintiff] from effectively vindicating
> her federal statutory rights in the arbitral forum[,] [b]ut the record
> does not show that [she] will bear such costs if she goes to
> arbitration.  Indeed, it contains hardly any information on the matter.
> As the Court of Appeals recognized, "we lack . . . information about
> how claimants fare under [the defendant's] arbitration clause."  The
> record reveals only the arbitration agreement's silence on the
> subject, and *that fact alone* is plainly insufficient to render it
> unenforceable.  The "risk that [the plaintiff] will be saddled with
> prohibitive costs is too speculative to justify the invalidation of an
> arbitration agreement.

*Id.* at 90-91 (emphasis added).  *Green Tree* is not applicable here because the arbitration

agreement in the case at bar is not silent on the contested matter (*i.e.*, the delegation

clause/bellwether provision).

          The Avia Defendants also argue that a decision on arbitrability would not in fact be

delayed as a result of the delegation clause/bellwether provision because there are other arbitration

rules that will govern as well.  They point out that, under the arbitration agreement, "[t]he AAA

Supplementary Rules for Multiple Case Filings and the AAA Multiple Consumer Case Filing Fee

Schedule will apply if twenty-five (25) or more similar claims are asserted against Aviagames or

against you by the same or coordinated counsel or are otherwise coordinated."  Qu Decl., Ex. 1

(Terms § 15(c)(6)).  According to the Avia Defendants, those Supplementary Rules – now known

as the Mass Arbitration Supplementary Rules, *see* https://www.adr.org/mass-arbitration (last

visited 7/15/2024) – provide that there will be "early resolution of threshold issues like

arbitrability through the Process Arbitrator, who is authorized to make group-wide decisions

regarding arbitrability at the outset, regardless of the number of claimants."  Docket No. 121

(Defs.' 2d Supp. Br. at 10); *see also* Docket No. 114 (Defs' Supp. Br. at 1-2); *cf. Ramirez*, 16 Cal.

5th at 506 (stating that a factor to consider in deciding whether an arbitration agreement that

contains limitations on discovery is unconscionable is whether the arbitrator has authority to order

additional discovery).

          The Supplementary Rules discuss Process Arbitrators in Mass Arbitration Rule 6 ("MA-

United States District Court
Northern District of California

6").  MA-6 provides in relevant part that a Process Arbitrator "may" be appointed by the AAA International Center for Dispute Resolution ("ICDR") "in its sole discretion."  MA-6(a) (emphasis added).  The rule also outlines the authority held by a Process Arbitrator, as opposed to a Merits Arbitrator – *e.g.*, to address whether filing requirements have been met, any disputes over arbitration fees and costs, which demands for arbitration should be included as part of the mass arbitration filing, whether previously-issued rulings by the Process Arbitrator are binding on subsequent cases, and so forth.  *See* MA-6(c).  The Court has reviewed the content of the rule.  Contrary to what the Avia Defendants assert, the rule does not suggest that a dispute over whether an arbitration agreement (including a delegation provision) is unconscionable is a decision that can be made by a Process Arbitrator (assuming one is appointed in the first place) instead of a Merits Arbitrator.  The issue of arbitrability is not administrative or ministerial in nature, but more substantive in nature.  Accordingly, the Avia Defendants' contention that delay on arbitrability issues can be avoided through use of a Process Arbitrator is unconvincing.

The Avia Defendants protest that the Court has misinterpreted the scope of the Process Arbitrator's authority – *i.e.*, the Process Arbitrator could in fact rule on arbitrability issues because (1) the AAA Supplementary Rules on Mass Arbitration provide that "[t]he Process Arbitrator shall have the power to rule on the Process Arbitrator's own jurisdiction," MA-6(f), and (2) the Ninth Circuit has held that, where arbitration rules give "the arbitral tribunal the authority to decide its own jurisdiction, [they] vest the arbitrator with the apparent authority to decide questions of arbitrability."  *Oracle Am., Inc. v. Myriad Grp. AG*, 724 F.3d 1069, 1074 (9th Cir. 2013).  But *Oracle* did not involve a situation in which there was a Process Arbitrator separate from a Merits Arbitrator and importantly does not address the meaning of the AAA Supplementary Rules which is the issue here.  That the AAA Supplementary Rules give a Process Arbitrator the authority to rule on its own jurisdiction begs the question of what *is* the Process Arbitrator's jurisdiction in the first instance.  As indicated above, nothing in the AAA Supplementary Rules suggests that the Process Arbitrator has a role in deciding matters beyond those that are administrative or ministerial in nature, and gateway issues of arbitrability are clearly more consequential in nature.  (Hence, the presumption that ordinarily courts, and not arbitrators, decide gateway issues of

14

arbitrability.  *See Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011).)  The issue of arbitrability is a core merits determination and is hardly a ministerial decision that one would expect the Process Arbitrator to decide.  Accordingly, the Court finds no merit to the Avia Defendants' reliance on the Process Arbitrator.

Finally, it is worth noting that, if the Avia Defendants were correct, *i.e.*, the Process Arbitrator has the power to adjudicate gateway issues of arbitrability, then there would be serious due process concerns.  The AAA Supplementary Rules provide that "[r]ulings by the Process Arbitrator will be final and binding upon the parties and Merits Arbitrator(s) with respect to *subsequently filed cases* that the AAA determines to be part of the same Multiple Case Filing." MA-6(k) (emphasis added).  That would mean consumers in later-filed arbitrations would be bound by the first decision on arbitrability – a key and highly consequential decision – without ever being given notice or an opportunity to be heard on the matter.

The Avia Defendants argue next that there will be no delay on adjudication of arbitrability issues because any arbitrator appointed would be "required to observe the AAA Consumer Due Process Protocol Statement of Principles,"[5] and "Principle 8 of the Due Process Protocol expressly requires that 'proceedings should occur within a reasonable time, without undue delay.'"  Docket No. 104 (Defs.' Supp. Br. at 9); *see also* Qu Decl., Ex. 1 (Terms § 15(c)) (providing that, "[i]f you are a consumer, then then-current version of the AAA's Consumer Arbitration Rules will apply").  But a general principle does not override the more specific bellwether provision in the parties' arbitration agreement absent a clear intent to otherwise provide.  There is no such clear intent here.

Finally, the Avia Defendants contend that, even if the Court is troubled by the delegation clause when taken in conjunction with the bellwether provision, there is an easy solution – namely, severance of the bellwether provision.  *See* Docket No. 121 (Defs.' 2d Supp. Br. at 10) (arguing that "the proper remedy is to sever the bellwether provision and leave the delegation clause intact").  The Court rejects this argument.  As an initial matter, the Court notes that the

---

[5] The AAA Consumer Due Process Protocol is available at https://go.adr.org/consumer-arbitration#:~:text=Key%20Provisions%20of%20the%20Due%20Process%20Protocol%3A%20Consumers,Location%20of%20the%20proceeding%20must%20be%20reasonably%20accessible (last visited 7/15/2024).

United States District Court
Northern District of California

delegation clause – and the bellwether provision – are not the only terms that Plaintiffs claim are substantively unconscionable.  It would be artificial for the Court to isolate the former provisions from the latter in making a decision on severance; severance should be judged on assessment of the full context of all unconscionable provisions.  The Court's analysis on severance when considering all substantively unconscionable terms is provided below.

That being said, even if it would be appropriate for the Court to consider only the delegation clause and bellwether provision alone, it would not sever.  *Hale v. Brinker International, Inc.*, No. 21-cv-09978-VC, 2022 U.S. Dist. LEXIS 108488 (N.D. Cal. June 17, 2022), is instructive.  There, the defendant argued that a cost-splitting provision, even if unconscionable, could easily be severed from the remainder of the arbitration agreement.  Judge Chhabria was not convinced, emphasizing that, "[e]ven though the cost-splitting provision is the *only* substantively unconscionable provision of the agreement, it remains consequential" because "[c]ost- and fee-shifting provisions can create a chilling effect, discouraging employees from vindicating their rights for fear that failure will prove cripplingly expensive"; "[w]ere courts to excise those provisions and enforce arbitration agreements anyway, employers would have no incentive not to chill claims by including cost-shifting provisions in arbitration agreements."  *Id.* at *3-4 (emphasis added).

The Court agrees with Judge Chhabria.  The Avia Defendants are not entitled to rely on severance as a fix when they profited from inclusion of the bellwether provision in the first instance, *i.e.*, because it may have had a chilling effect that deterred players from ever pursuing their rights in the arbitral forum available to them.  Severance does not cure the problematic chilling effect of the unconscionable bellwether provision.  *Cf. Ramirez*, 16 Cal. 5th at 514, 516 (indicating that "the overarching inquiry is whether the interests of justice . . . would be furthered by severance"; adding that "a court is not *required* to sever or restrict an unconscionable term if an agreement has only a single such term") (internal quotation marks omitted; emphasis in original).  The Avia Defendants attempt to downplay the significance of the delegation clause, arguing that it is a collateral matter since it "only addresses which tribunal will resolve threshold questions of arbitrability."  Docket No. 135 (Defs.' Supp. Br. at 2).  But who decides gateway issues of

arbitrability is highly consequential and normally expected to be a question for the court as demonstrated by the presumption  that a court, and not an arbitrator, decides the question of arbitrability.  *See Momot*, 652 F.3d at 987.

The Court therefore finds that the delegation clause unconscionable, both procedurally and substantively.  Even if the procedural unconscionability is considered modest, the substantive unconscionability is significant, and therefore the clause is unenforceable whether the provision is taken in isolation (with the bellwether provision) or in conjunction with other terms in the arbitration agreement that are substantively unconscionable.

B.      Unconscionability of Arbitration Agreement

Because the delegation clause is not enforceable, the Court (and not the arbitrator) decides the gateway issue of whether the broader arbitration agreement is unconscionable and therefore unenforceable.  As noted above, under California law, there must be both procedural and substantive unconscionability in order for an agreement to be rendered invalid, although there is a "sliding scale" such that "greater substantive unconscionability may compensate for lesser procedural unconscionability," and vice-versa.  *Chavarria v. Ralph's Grocery Store*, 733 F.3d 916, 922 (9th Cir. 2013) (citing *Armendariz*, 24 Cal. 4th at 114).

1.      Procedural Unconscionability

In the instant case, there is some procedural unconscionability in the arbitration agreement. For instance, there is some unfair surprise because Plaintiffs entered into the arbitration agreements with Avia by agreeing to updated Terms presented to them via pop-up boxes in the game apps.  The pop-up boxes informed Plaintiffs of updated Terms but did explain that changes to the Terms include changes to the arbitration agreement specifically – such as adding a delegation clause and establishing a bellwether process.[6]

The Avia Defendants suggest that there is no unfair surprise because, if a player were to

---

[6] As the Court noted in its prior order, the above does not negate a finding of contract formation – that the parties had an agreement to arbitrate.  It does, however, bear on unfair surprise which is part of the procedural unconscionability analysis.  *See* Docket No. 113 (Order at 7); *Heckman*, 686 F. Supp. 3d at 953 (indicating that contract formation is a matter different from unfair surprise/procedural unconscionability).

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

actually look at the updated Terms, the first paragraph mentions an arbitration agreement:

> BY REGISTERING AN ACCOUNT, PARTICIPATING IN ANY TOURNAMENT OR COMPETITION, CLICKING TO ACCEPT OR AGREE TO THESE TERMS OF SERVICE, OR USING THE SERVICES IN ANY WAY, YOU AGREE AND ACCEPT TO BE BOUND BY THESE TERMS.  IF YOU DO NOT AGREE TO THESE TERMS, INCLUDING THE MANDATORY ARBITRATON PROVISION AND CLASS ACTION WAIVER IN SECTION 15, DO NOT ACCESS OR USE OUR PRODUCTS OR SERVICES.

Qu Decl., Ex. 1 (Terms at 1).  But this ignores the point that players still were not given notice of the fact that changes – significant changes – had been made to the arbitration agreement.  The Court agrees with the decision in *Heckman* that there is a "situation of unfair surprise" where a defendant's "customers receive[] no notice of [a] significant change to the [Terms of Use]." *Heckman*, 686 F. Supp. 3d at 953 (agreeing with plaintiffs' contention that "Defendants' imposition of such a significant change in the [Terms] [*e.g.*, from individual, bilateral arbitration to mass arbitration] without giving any notice to customers is one reason . . . that the agreement is procedurally unconscionable"; adding that, "because it would seem trivially easy to provide customers with such notice, Defendants' failure to do so suggests a degree of intentionality and/or oppression").

To the extent the Avia Defendants suggest there still is no element of unfair surprise because players were pointed to the section on arbitration and could have read through the section to get details on the terms of the arbitration agreement, the Court does not agree.  The terms of the arbitration agreement are presented in small, light grey font and span about three pages of single-spaced text.  Although some language is displayed in "ALLCAPS," that method of emphasis is not especially effective given the use of the light grey font.  Furthermore, there is no bolding or underlining to call out any terms, including the terms that were newly added (of particular note, the delegation clause and bellwether provision).  Given these circumstances, the position of the Avia Defendants that there is *no* element of unfair surprise lacks merit.  *Cf. Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, 485 F. Supp. 3d 1168, 1185-86 (N.D. Cal. 2020) (noting that arbitration agreement used 9-point font and that "'[a] layperson trying to navigate this block text, printed in tiny font would not have an easy journey'").  There is sufficient procedural unconscionability to

18

1     trigger assessment of substantive unconscionability.[7]

2              2.        Substantive Unconscionability

3              Because there is at least some procedural unconscionability, the Court considers next the

4     matter of substantive unconscionability.  Plaintiffs argue that there are five provisions in the

5     arbitration agreement that are substantively unconscionable: (1) the delegation clause; (2) the

6     bellwether provision; (3) the jury waiver provision; (4) the statute-of-limitations provision; and (5)

7     the public injunctive relief provision.

8              The Court has already found the delegation clause substantively unconscionable.  It also

9     finds here that the bellwether provision is substantively unconscionable for reasons similar to

10    those articulated above.  If the delegation clause is substantively unconscionable when coupled

11    with the bellwether provision (because of the chilling effect at the time of contract formation), the

12    bellwether provision is clearly substantively unconscionable by itself.

13             Furthermore, there is another troubling aspect to the bellwether provision.  The bellwether

14    provision is triggered – causing delay – when twenty-five or more claims are asserted against Avia

15    by the *same or coordinated* counsel.  *See* Qu Decl., Ex. 1 (Terms § 15(c)(6)).  As Plaintiffs argue,

16    to avoid the bellwether provision, players would have to find different counsel, which affects the

17    right to counsel of their choice or indeed, the ability to find any counsel at all:  where the

18    individual claims are small (as consumer claims often are), it may be difficult to find an attorney

19    who represents only a single or small number of similarly situated clients.  *See* Fed. R. Civ. P.

20    23(b)(3), 1966 Advisory Committee Notes (recognizing with respect to the interest of individuals

21    in conducting separate lawsuits, the "amounts at stake for individuals may be so small that

22    separate suites would be impracticable").

23             Finally, the Court finds the statute-of-limitations provision substantively unconscionable.

---

[7] As above, the Court recognizes the Avia Defendants' belated contention that its Terms actually "appear in high-contrast white-on-blue text, in a font size comparable to that found in text messages or mobile web browsers."  Docket No. 135 (Defs.' Supp. Br. at 8).  The Court does not give the Avia Defendants leave to supplement the record to establish such.  Furthermore, even if the Court permitted supplementation, there would still be some procedural unconscionability given the length of the arbitration agreement embedded in the Terms and the failure to use any means to call out the newly added provisions to the arbitration agreement.

Under that provision, a player must initiate an arbitration "within one year after the cause of action accrues; otherwise, such cause of action or claim is permanently barred." Qu Decl., Ex. 1 (Terms § 15(d)). The provision is substantively unconscionable as it significantly shortens the limitations period for Plaintiffs' statutory claims – four years for the § 17200 claim, three years for the CLRA claim, and four years for the RICO claim. *See also Jackson v. S.A.W. Ent. Ltd.*, 629 F. Supp. 2d 1018, 1028 (N.D. Cal. 2009) (stating that "[c]ontractual agreements to shorten the statute of limitations period are generally disfavored because they derogate statutory intent"; adding that whether a shortened limitations period is permissible turns on whether "'the period fixed [is] so unreasonable [so] as to show imposition or undue advantage in some way'"). This Court and others have found contractual limitations periods of six months substantively unconscionable when compared to statutory limitations periods of several years. *See id.* at 1029. That the arbitration agreement here has a limitations period somewhat larger (one year) is not enough to render it valid and enforceable. *See, e.g.*, *Longboy v. Pinnacle Prop. Mgmt. Servs., LLC*, No. 23-cv-01248-AMO, 2024 U.S. Dist. LEXIS 31557, at *20-21 (N.D. Cal. Feb. 23, 2024) (finding provision with limitations period of one year substantively unconscionable given that plaintiff's claims had statutory limitations periods of three to four years); *Ramirez*, 16 Cal. 5th at 500-02 (finding one-year statute-of-limitations provision unreasonable where plaintiff could have had as many as three years to file suit in court); *De Leon v. Pinnacle Prop. Mgmt. Servs., LLC*, 72 Cal. App. 5th 476, 486-87 (2021) (holding that limitations period of one year was substantively unconscionable given that "many of plaintiff's claims have longer statute of limitations," *i.e.*, three to four years). It is also problematic that the arbitration agreement's shortened limitations period appears to apply only to players, and not Avia. *See* Qu Decl., Ex. 1 (Terms § 15(d)) ("Disputes *you* may have arising out of or relating to these Terms or the Services must be commenced within one year after the cause of action accrues . . . .")[8] (emphasis added).

---

[8] The Avia Defendants disagree with the Court, arguing that "'disputes [a user] may have' with Avia necessarily include claims by Avia against a user." Docket No. 135 (Defs. Supp. Br. at 5 n.5). The Court is skeptical of the argument. The Avia Defendants look at the phrase "[d]isputes you may have" in isolation, without considering the broader sentence. The implication of the entire provision is that *you* must commence arbitration within a year – and *you* would only commence arbitration for your own claim, not Avia's. The provision could easily have stated that

1    Although the provisions above are substantively unconscionable, the Court rejects

2    Plaintiffs' assertion that jury waiver provision and public injunctive relief provision are also

3    substantively unconscionable.  As to the jury waiver provision, Plaintiffs cite to *Durruthy v.*

4    *Charter Communications, LLC*, No. 20-CV-1374-W-MSB, 2020 U.S. Dist. LEXIS 219894 (S.D.

5    Cal. Nov. 23, 2020), for the proposition that "arbitration agreements are substantively

6    unconscionable if they 'require[] plaintiffs to waive in advance their right to a jury trial for any

7    dispute for which arbitration is not allowed by law.'"  *Id.* at *35-36.  But nothing in the arbitration

8    agreement here indicates that players are required to waive their right to a jury trial for a dispute

9    *for which arbitration is not permitted*.  The agreement's statement that "YOU ARE . . .

10   WAIVING THE RIGHT TO A TRIAL BY JURY," Qu Decl., Ex. 1 (Terms § 15), taken in

11   context, simply reflects that a player is agreeing *to arbitration* and to that extent is waiving a jury

12   trial.

13   As for the public injunctive relief provision, Plaintiffs criticize language used in an older

14   version of the Avia Terms.  *See* Qu Decl., Exs. 4-5 (Terms from February and September 2022).

15   Those older Terms included a provision stating that "[t]he arbitrator may award declaratory or

16   injunctive relief *only in favor of the individual party seeking relief* and only to the extent necessary

17   to provide relief warranted by *that party's individual claim*."  Qu Decl., Ex. 4 (§ 15.5 of the

18   February 2022 Terms) (emphasis added).  Plaintiffs point out that "the California Supreme Court

19   [has] refused to enforce a mandatory arbitration provision that precluded the arbitrator from

20   issuing a public injunction."  Opp'n at 23 (citing *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017).

21   But *McGill* has no bearing here because the older Terms are not at issue; the updated Terms

22   include a provision that allows for public injunctive relief.  *See* Qu Decl., Ex. 1 (Terms § 15(f))

23   ("[I]f any part of this Section 15 is found to prohibit an individual claim seeking public injunctive

24   relief, that provision will have no effect to the extent such relief is allowed to be sought out of

25   arbitration, and the remainder of this Section 15 will be enforceable.").

26

27   _____

28   disputes *between the parties* must be commenced within a year, but it did not.  In any event, even
     if the limitations provision was mutual rather than one-sided, that would not detract from the fact
     that the limitations period was unreasonably shortened to one year.

United States District Court
Northern District of California

1

3.     <u>Severance</u>

2       Based on the analysis above, the Court has determined there is some procedural

3   unconscionability associated with the arbitration agreement, as well as significant substantive

4   unconscionability based on the delegation clause, the bellwether provision, and the statute-of-

5   limitations provision.  The only issue remaining is whether the Court should sever the

6   substantively unconscionable terms in which case arbitration could still go forward, albeit without

7   those terms.

8       In *Ramirez*, the California Supreme Court essentially reaffirmed the approach taken with

9   respect to severance as stated in *Armendariz*:

10          "If the central purpose of the contract is tainted with illegality, then
            the contract as a whole cannot be enforced.  If the illegality is
11          collateral to the main purpose of the contract, and the illegal
            provision can be extirpated from the contract by means of severance
12          or restriction, then such severance and restriction are appropriate."

13  *Ramirez*, 16 Cal. 5th at 515.  The Court also indicated that, where there are multiple

14  unconscionable provisions, that could indicate "'a systematic effort to impose arbitration . . . not

15  simply as an alternative to litigation, but as an inferior forum that works to the [defendant's]

16  advantage.'"  *Id.*; *see also id.* at 517 (noting that "the greater the number  of unconscionable

17  provisions a contract contains the less likely it is that severance will be the appropriate remedy");

18  *accord Ronderos v. USF Reddaway, Inc.*, No. 21-55685, 2024 U.S. App. LEXIS 21226, at *34-35,

19  38 (9th Cir. Aug. 22, 2024) (citing *Armendariz* for the proposition that a trial court does not abuse

20  its discretion in concluding that an arbitration agreement is permeated by an unlawful purpose

21  when the agreement contains multiple unlawful provisions; holding that the case before it "falls

22  well within the range of cases in which a trial court has the discretion to conclude *either* that an

23  agreement is permeated by illegality . . . *or* that the illegality is merely collateral to the

24  agreement's main purpose") (emphasis in original).  It added, however, that the number of

25  unconscionable provisions was simply a factor to consider; it is not necessarily essential or

26  dispositive.  *See Ramirez*, 16 Cal. 5th at 516 (favoring a qualitative, and not a quantitative,

27  approach).

28      The Court discussed above why it would not be appropriate to sever the bellwether

provision in the context of evaluating the unconscionability of the delegation clause.  It likewise declines to sever the bellwether and the statute-of-limitations provisions from the remainder of the arbitration agreement here.  Contrary to what the Avia Defendants argue, these provisions are not merely collateral to the main purpose of the arbitration agreement.[9]  Rather, these provisions are designed to structurally and systematically make arbitration an inferior forum.  They also operate to chill players from even pursuing rights, knowing they would likely be funneled into an arbitration process that could take years, possibly decades, to complete.  The Court will not sever the offending provisions from the arbitration agreement.  *See Subcontracting Concepts (CT), LLC v. De Melo*, 34 Cal. App. 5th 201, 215 (2019) (noting that offending provisions "may 'indicate a systematic effort to impose arbitration on an employee . . . as an inferior forum that works to the employer's advantage' and may justify a conclusion 'that the arbitration agreement is permeated by an unlawful purpose'").  The agreement to arbitrate is unconscionable and thus not enforceable.

### III.    CONCLUSION

For the foregoing reasons, the Avia Defendants' motion to compel arbitration is denied.  The Court also reschedules the hearing date for the three motions to dismiss filed by the Avia Defendants, ACME, and Galaxy.  The motions to dismiss shall now be heard on November 6, 2024, at 3:00 p.m.

This order disposes of Docket No. 73.

**IT IS SO ORDERED**.

Dated: September 4, 2024

_____
EDWARD M. CHEN
United States District Judge

---

[9] The Avia Defendants suggest that the Court should look to the main purpose of the Terms, and not to the main purpose of the arbitration agreement contained therein.  *See* Docket No. 135 (Defs.' Supp. Br. at 2) (arguing that the main purpose of the Terms is to "provid[e] important information about Avia's services such as eligibility requirements, rules of conduct in gameplay, and appropriate use of the platform, in addition to establishing dispute resolution procedures").  They have not cited any authority to support this approach.

United States District Court
Northern District of California