UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW PANDOLFI, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>AVIAGAMES, INC., et al.,<br><br>    Defendants. | Case No. 23-cv-05971-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO STAY; AND GRANTING IN PART AND DEFERRING IN PART INVESTOR DEFENDANTS' MOTIONS TO DISMISS**<br><br>Docket Nos. 107, 109, 140 |

Plaintiffs Andrew Pandolfi and Mandi Shawcroft have filed a class action against (1) AviaGames, Inc. ("Avia"), (2) its co-founders (Vickie Yanjuan Chen and Ping Wang), and (3) two of its investors (ACME, LLC and Galaxy Digital Capital Management, L.P.). All persons and entities sued shall hereinafter be collectively be referred to as "Defendants." Avia and its co-founders (also current employees) shall be referred to collectively as the "Avia Defendants." ACME and Galaxy shall be referred to collectively as the "Investor Defendants." Currently pending before the Court are (1) a motion to stay filed by all Defendants and (2) motions to dismiss by the Investor Defendants.[1] Having considered the parties' briefs as well as the oral argument of counsel, the Court hereby **GRANTS** the motion to stay and largely **DEFERS** ruling on each Investor Defendant's motion to dismiss.

---

[1] The Avia Defendants have also filed a motion to dismiss, *see* Docket No. 110 (motion), but Plaintiffs and the Avia Defendants essentially stipulated to a stay of that motion pending the Avia Defendants' appeal of this Court's order denying their motion to compel arbitration. *See* Docket No. 152 (order).

# I. FACTUAL & PROCEDURAL BACKGROUND

A. Operative Complaint

In the operative first amended complaint ("FAC"), Plaintiffs allege as follows.

Avia is a gaming company that launched in 2017. *See* FAC ¶ 30. Ms. Chen and Ms. Wang are Avia's co-founders. They are also currently employees: Ms. Chen is the CEO, and Ms. Wang a VP of Strategy & Business Development. *See* FAC ¶¶ 14-15.

Avia's games – which include Bingo Clash, Solitaire, Pool Clash, Match n Flip, 21 Gold, and Tile Blitz – can be accessed through mobile browsers or through downloaded standalone applications. *See* FAC ¶¶ 30-31. The games can be played for cash or for tickets redeemable for prizes. *See* FAC ¶¶ 35, 43, 67. Avia claims that it does not have any financial interest in the outcome of cash games or any stake in who wins or loses. *See* FAC ¶¶ 37, 69.

ACME and Galaxy are both venture capital investment firms that invested in Avia.[2] In addition, ACME has a partner (Hany Nada) who is an Avia Board member and another partner (Alex Fayette) who is an Avia Board observer. *See* FAC ¶¶ 16-17. Like ACME, Galaxy also has a partner (Ryan You) who is an Avia Board observer. *See* FAC ¶ 78,

Avia represents to players and prospective players that its games give players the ability to compete against other players (*i.e.*, human opponents and not bots) – in particular, other players of equal skill levels. *See* FAC ¶¶ 34, 42. Avia also represents that "players '[c]ompete in real time against other players' and that they '[c]ompete using only [their] strategy and skill.'" FAC ¶ 35. In other words, Avia's games are ones of skill and not ones of chance. *See* FAC ¶¶ 39, 66 (alleging that games of chance mean that a player's skill does not impact the game's outcome). Such representations and/or similar representations "are visible to each user who downloads Avia's games" (for instance, from Apple's App Store) and/or on Avia's website (*e.g.*, in the FAQ section). FAC ¶¶ 34-38, 44, 48. In addition, Avia's games are designed to suggest that players are playing against other live human opponents in real time – *e.g.*, "[a]t the beginning of each

---

[2] In its motion, ACME claims that it "has never held any equity stake in Avia." Mot. at 4. ACME states: "In its initial investment, [it] purchased $10 million in debt (through convertible promissory notes), as part of a $40 million fundraising round by Avia." Mot. at 3-4.

standalone game, players are asked to wait until the app finds them purported 'opponents' for the game." FAC ¶ 45.

According to Plaintiffs, Avia's representations are, in fact, false:

- Players do not compete against live human opponents but rather against bots – specifically, historical playthroughs which can include a video recording of a match played previously by another player. *See* FAC ¶ 53. ("Using bots helps Avia maintain player liquidity. Avia needs players for the real players to play against. If there are not enough real players and the players need to wait to get the results of their match, they are less likely to keep playing." FAC ¶ 63.)
- Avia can manipulate matches by matching a player against a bot of a similar skill level or a bot that has a higher skill rating or score. *See* FAC ¶¶ 54, 71.
- Avia does in fact have a financial interest in its games because, if a historical playthrough wins a match, Avia does not pay a cash prize to anyone and keeps the entry fee paid by the live player. *See* FAC ¶ 53.

According to Plaintiffs, the Investor Defendants have "expertise in the gaming industry" and "fuel[ed] Avia's fraudulent gaming scheme" by echoing Avia's false representations that it offered skill-based games. FAC ¶¶ 77-78. *See, e.g.*, FAC ¶ 40 (quoting from ACME's website describing its portfolio; characterizing Avia as a "'real-money mobile skill gaming app'"); FAC ¶ 41 (quoting from Galaxy's website; describing Avia as a platform that "'guarantees players a fair, high-quality gaming experience' and that 'uses a complex algorithm to assess and match each player's ability in order to create a fair gaming environment'"). The Investor Defendants were "interested in attracting more players to Avia's games because a larger player base boosts the value of their equity. More players means more deposits and better player liquidity." FAC ¶ 77; *see also* FAC ¶ 119 ("A higher deposit pool and a broader player base translated into higher sales and profits for Avia and the RICO Defendants.").

It was not until December 2023, after the instant case was filed, that Avia disclosed to players (via updated Terms of Service) that it uses historical playthroughs and that it keeps the winnings for itself when historical playthroughs win. *See* FAC ¶ 56.

Based on, *inter alia*, the above allegations, Plaintiffs seek to represent a Rule 23(b)(3) class consisting of the following: "All persons who have lost money playing any Avia game from at least 2017 until Defendants' unlawful conduct and its harmful effects stop." FAC ¶ 90. Plaintiffs have asserted the following claims on behalf of the class:

(1) Violation of California Business & Professions Code § 17200 (against Avia only).

(2) Violation of the Consumer Legal Remedies Act ("CLRA") (against Avia only).
  *See* Cal. Civ. Code § 1750 *et seq.*

(3) Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").
  *See* 18 U.S.C. § 1962(c) and (d) (against all Defendants except Avia).

The Court notes that Plaintiffs' allegations in the FAC are based, in part, on information uncovered in an unrelated patent infringement suit, *Skillz Platform Inc. v. Aviagames, Inc.*, No. C-21-2436 BLF (N.D. Cal.). That case went to trial and resulted in a jury verdict in favor of the plaintiff, but subsequently the parties settled and the case was closed back in April 2024. According to Plaintiffs, the use of bots was exposed during the *Skillz* proceedings.[3] *See* Opp'n at 1 (" A recent patent trial made public, for the first time, internal Avia documents and correspondence that exposed the fraud perpetuated on Avia's users."); Opp'n at 10 ("Avia's bot use was first disclosed in a patent action brought against Avia by another mobile gaming company, Skillz. . . . The exhibits admitted during the lawsuit have proven that Avia uses bots, conceals them from its users, and keeps the money when a player loses to a bot.").

B. Procedural History

After Plaintiffs filed suit, the Avia Defendants moved to compel arbitration. *See* Docket No. 78 (motion). In addition, all Defendants filed motions to dismiss Plaintiffs' FAC pursuant to Federal Rule of Civil Procedure 12(b)(6). Galaxy also moved to dismiss pursuant to Rule 12(b)(2) (*i.e.*, lack of personal jurisdiction). *See* Docket Nos. 107, 109-10 (motions). The Court deferred a

---

[3] Two of the parties – ACME and Plaintiffs – have filed requests for judicial notice ("RJNs"), *see* Docket No. 108 (ACME); Docket No. 112 (Plaintiffs), in which some of the documents at issue are those from the *Skillz* lawsuit. ACME and Plaintiffs – as well as Avia – have some disagreements as to what is properly subject to judicial notice from *Skillz*. As a practical matter, the Court need not get into these disputes because resolution of the substantive issues does not turn on these disputes.

1    hearing on the motions to dismiss so that it could address the motion to compel arbitration first.
2    *See* Docket No. 113 (Order at 18). Following several rounds of briefing, the Court denied the
3    arbitration motion and thus set the motions to dismiss for hearing. *See* Docket No. 137 (Order at
4    23).

5          The Avia Defendants then initiated an interlocutory appeal of the Court's order denying
6    their arbitration motion. *See* 9 U.S.C. § 16(a); Docket No. 139 (notice). On the same day, all
7    Defendants moved for a stay of proceedings before this Court pending the appeal. *See* Docket No.
8    140 (motion). Defendants argued that a stay was required based on a Supreme Court decision,
9    *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023). Alternatively, they argued that the Court should
10   impose a discretionary stay.

11         Subsequently, Plaintiffs agreed that proceedings against the Avia Defendants should be
12   stayed under *Coinbase*, and thus the hearing on the Avia Defendants' motion to dismiss was
13   vacated. *See* Docket No. 152 (order). Plaintiffs, however, maintained that there was no reason to
14   halt proceedings entirely against the Investor Defendants, and thus the Court now has pending
15   before it (1) a motion to stay proceedings against the Investor Defendants – a motion supported by
16   all Defendants – and (2) a motion to dismiss filed by each Investor Defendant.

## II.    MOTION TO STAY

18   As noted above, Defendants contend that proceedings against the Investor Defendants
19   should be stayed pursuant to *Coinbase*. Alternatively, they argue that there should be a
20   discretionary stay.

21   A.    *Coinbase* Stay

22         The Court rejects Defendants' position that a stay of the claims against the Investor
23   Defendants – who are not subject to an arbitration clause – is required by *Coinbase*. In *Coinbase*,
24   the plaintiff filed a class action against Coinbase, asserting that the company failed to replace
25   funds fraudulently taken from its users' accounts. *See Coinbase*, 599 U.S. at 739. Coinbase had a
26   user agreement that contained an arbitration provision. Coinbase moved to compel arbitration
27   based on that provision, but the district court denied the motion. Coinbase then filed an

5

interlocutory appeal of the denial, which was its right under 9 U.S.C. § 16(a).[4] *See id.* (noting that § 16(a) "authorizes an interlocutory appeal from the denial of a motion to compel arbitration"). The issue for the Supreme Court was whether Coinbase was also entitled to a stay of the district court proceedings pending its interlocutory appeal. The Court held that Coinbase was so entitled.

> Section 16(a) does not say whether the district court proceedings must be stayed. But Congress enacted §16(a) against a clear background principle prescribed by this Court's precedents [including *Griggs*]: *An appeal, including an interlocutory appeal, "divests the district court of its control over those aspects of the case involved in the appeal."*
>
> The *Griggs* principle resolves this case. Because the question on appeal is whether the case belongs in arbitration or instead in the district court, the entire case is essentially "*involved in the appeal*." As Judge Easterbrook cogently explained, when a party appeals the denial of a motion to compel arbitration, whether "the litigation may go forward in the district court is precisely what the court of appeals must decide." Stated otherwise, the question of whether "the case should be litigated in the district court . . . is the mirror image of the question presented on appeal." Here, as elsewhere, it "makes no sense for trial to go forward while the court of appeals cogitates on whether there should be one."

*Id.* at 740-41 (emphasis added).

The Court added that it was a matter of "common sense" to stay proceedings:

> Absent an automatic stay of district court proceedings, Congress's decision in §16(a) to afford a right to an interlocutory appeal would be largely nullified. If the district court could move forward with pre-trial and trial proceedings while the appeal on arbitrability was ongoing, then many of the asserted benefits of arbitration

---

[4] Section 16(a) provides in relevant part that

> [a]n appeal may be taken from –
>
> (1)   an order –
>
>       (A)   refusing a stay of any action under section 3 of this title,
>
>       (B)   denying a petition under section 4 of this title to order arbitration to proceed,
>
>       (C)   denying an application under section 206 of this title to compel arbitration . . . .

9 U.S.C. § 16(a).

6

> (efficiency, less expense, less intrusive discovery, and the like) would be irretrievably lost – even if the court of appeals later concluded that the case actually had belonged in arbitration all along.  Absent a stay, parties also could be forced to settle to avoid the district court proceedings (including discovery and trial) that they contracted to avoid through arbitration.  That potential for coercion is especially pronounced in class actions, where the possibility of colossal liability can lead to what Judge Friendly called "blackmail settlements."
>
> . . . .
>
> From the Judiciary's institutional perspective, moreover, allowing a case to proceed simultaneously in the district court and the court of appeals creates the possibility that the district court will waste scarce judicial resources – which could be devoted to other pressing criminal or civil matters – on a dispute that will ultimately head to arbitration in any event.

*Id.* at 743.

In the instant case, Defendants are essentially asking for an extension of *Coinbase*. *Coinbase* did not address the specific situation where there is (as here) more than one defendant in the case and only some (not all) have possible arbitration rights.

Defendants' position that the Investor Defendants should get a stay under *Coinbase*, even though the Investor Defendants do not have any arbitration rights, is not persuasive. *Coinbase* mainly turned on two points: (1) an appeal divests the district court of anything covered by the appeal and (2) in the context of an appeal of an order denying a motion to compel arbitration, it makes particular sense to stay because allowing district court proceedings to continue pending appeal would effectively deprive the appealing party of the benefits of arbitration.  In the instant case, with respect to (1), the Court is not automatically deprived of jurisdiction with respect to the claims against the Investor Defendants by virtue of the appeal of the arbitration ruling by the Avia Defendants.  The appeal covers the RICO claim *against the individual defendants*, not the RICO claim against the Investor Defendants.  It is true that the RICO claim is a single claim based on the same underlying facts.  But that does not mean that the entire RICO claim, including that asserted against the non-arbitrating Investor Defendants, is the subject of an appeal.  *See In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, MDL No. 3040, 2024 U.S. Dist. LEXIS 35288, at *7 (E.D. Mich. Feb. 28, 2024) (in MDL, where defendant appealed order denying motion to compel arbitration as to 18 plaintiffs, declining to stay proceedings as to 51 other plaintiffs; "there are no

7

1   good grounds to delay the progress of the litigation on the claims of the 51 distinct parties whose
2   claims are not implicated in any way by either the motion to compel arbitration or the defendant's
3   pending appeal of the ruling denying that motion")[5]; *cf. May v. Sheahan*, 226 F.3d 876, 880 n.2
4   (7th Cir. 2000) (stating that a "district court has authority to proceed forward with portions of the
5   case not related to the claims on appeal such as claims against other defendants or claims against
6   the public official that cannot be (or simply are not) appealed"; but adding that "a district court
7   might find it best to stay an entire case pending the resolution of [an interlocutory qualified
8   immunity] appeal"); *Mitchell v. Perkins*, 2020 U.S. Dist. LEXIS 26583, at *4 (M.D. Fla. Feb. 14,
9   2020) (noting that "'a complete stay of discovery pending an interlocutory appeal in qualified
10  immunity cases is not automatic'[;] [i]n some cases, 'a more limited stay' may be appropriate,
11  such as in a multi-party action where there are other defendants and/or claims that are unrelated to
12  the issues presented in the interlocutory appeal"). As for (2), allowing court proceedings to
13  continue against the Investor Defendants does not deny them of any benefits of arbitration because
14  they have no arbitration rights.

15  To the extent the claims against the two sets of defendants may be related – for instance,
16  the Avia Defendants contend they may be deprived of the opportunity to participate in Court
17  proceedings if those proceedings continue, and the Investor Defendants argue they will be
18  prejudiced by not being able to take discovery (at the very least, "party" discovery) from the Avia
19  Defendants in the Court proceedings – that is a matter that informs a *discretionary* stay, not a stay
20  under *Coinbase*. *See May*, 226 F.3d at 880 n.2.

21  B.  Discretionary Stay

22  Defendants argue that, even if a stay is not required under *Coinbase*, the Court should still
23  exercise its discretion to stay.

24  As an initial matter, the Court notes that the parties do not agree on the exact legal standard

---

[5] In their reply brief, Defendants argue that *Chrysler* is distinguishable because, here, the core of the case (the claims against the Avia Defendants) is on appeal and may be compelled to arbitration whereas, in *Chrysler*, the appeal involved only a minority of the plaintiffs. Although Defendants' point is not without some merit, it also ignores that, in *Chrysler*, the minority of the plaintiffs presumably had the same basic claims as the majority – *i.e.*, based on the same factual predicate. Thus, the "core" of the case was split up between the minority and the majority.

that should be applied in evaluating the issue of whether to stay.

- Because Defendants are – for the time being – simply asking for a stay *pending the appeal* of the arbitration order, should the Court apply the standard applicable to stays pending appeal, which is governed by *Nken v. Holder*, 556 U.S. 418 (2009)? *See id.* at 434 (identifying the following factors: "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies'").

- Or because, ultimately, Defendants are contemplating a stay *pending arbitration* (*i.e.*, if the Ninth Circuit rules that the Avia Defendants' motion to compel arbitration should have been granted), should the Court apply the standard which has its roots in *Landis v. North American Co.*, 299 U.S. 248 (1936)?[6] *See Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (providing that, where a stay is sought based on independent proceedings, a court must weigh "the competing interests which will be affected by the granting or refusal to grant a stay," including (1) "the possible damage which may result from the granting of a stay," (2) "the hardship or inequity which a party may suffer in being required to go forward," and (3) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay").

The two standards, of course, have some overlap – *i.e.*, the equities. However, the *Nken* standard focuses in part on the likelihood of success whereas the *Landis* standard considers to a large degree judicial efficiencies.

---

[6] *See, e.g.*, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 & n.23 (1983) (noting that, under the FAA, "an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement"; but, "[i]n some cases, . . . it may be advisable to stay litigation among the nonarbitrating parties pending the outcome of the arbitration," and "[t]hat decision is one left to the district court . . . as a matter of its discretion to control its docket" under *Landis*).

9

Although technically, Defendants are asking for a stay pending appeal only, it makes more sense to apply the *Landis* standard. Clearly, Defendants' ultimate goal is for the Avia Defendants to prevail on appeal and obtain a stay of all proceedings before this Court (including against the Investor Defendants) pending the arbitration of the claims against the Avia Defendants.[7]

Applying *Landis*, the Court exercises its discretion to stay proceedings against the Investor Defendants. Plaintiffs have failed to articulate any real harm if a stay were to be imposed. There would, of course, be a delay of proceedings against the Investor Defendants, but, as the case is already stayed against the alleged primary wrongdoers – *i.e.*, the Avia Defendants – that delay is not that significant.

Furthermore, there would be harm to both the Avia Defendants and the Investor Defendants if the Court were to continue with the litigation against the Investor Defendants only. As to the Avia Defendants, if the case were to continue against the Investor Defendants (*i.e.*, while the Avia Defendants are on appeal), there may be issues that are decided by this Court – whether legal or factual – that, while not necessarily binding, could affect the Avia Defendants and without their opportunity to be heard in a timely fashion. For instance, the same basic factual predicate underlies all claims pled by Plaintiffs against both the Avia Defendants and the Investor Defendants – *i.e.*, that Avia uses bots. Also, the RICO claim is asserted against two of the Avia Defendants (the individual defendants) and the Investor Defendants. Notably, in their 12(b)(6) motions, the Investor Defendants make arguments challenging the RICO claim that are similar to those made by the Avia Defendants in their own 12(b)(6) motion (which has been stayed because of the appeal).

Moreover, the Avia Defendants would not have the opportunity to participate in discovery before this Court. And if the Ninth Circuit were to rule against the Avia Defendants on the appeal and deny arbitration, then at least some discovery would have to be redone – *e.g.*, depositions would have to be retaken so that the Avia Defendants could participate. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 685-86 (2009) (noting that qualified immunity is intended to free officials from the

---

[7] Of course, cases addressing stays pending appeal may still be considered to the extent they address equities; as noted above, equities are also a consideration under the *Landis* standard.

concerns of litigation, including the avoidance of disruptive discovery, and "[i]t is no answer to these concerns to say that discovery for petitioners can be deferred while pretrial proceedings continue for other defendants" because it is "likely that, when discovery as to the other parties proceeds, it would prove necessary for petitioners and their counsel to participate in the process to ensure the case does not develop in a misleading or slanted way that causes prejudice to their position").

Like the Avia Defendants, the Investor Defendants would also be harmed without a stay, although the nature of the harm is different. For the Investor Defendants, the harm stems from the fact that they would have to litigate without the guarantees that it could get any discovery from the Avia Defendants. Even if the Investor Defendants could obtain discovery from the Avia Defendants despite this case being stayed as to the Avia Defendants, such discovery would be limited to third-party discovery since the Avia Defendants would not be treated as a participating party before this Court. The Investor Defendants could not employ, *e.g.*, interrogatories and requests for admission.

Finally, judicial efficiency weighs in favor of a stay. As noted above, if the Court were to proceed with the litigation against the Investor Defendants, then, if the Avia Defendants were to lose on their appeal, it would have to direct discovery to be re-done. And the merits issues decided without the participation of the Avia Defendants might have to be relitigated.

The Court acknowledges that, in *California Crane School, Inc. v. Google LLC*, 621 F. Supp. 3d 1024 (N.D. Cal. 2022), the district court declined to issue a discretionary stay in a case that bears some similarities to the instant case. *California Crane* was an antitrust suit. The plaintiff alleged that Google and Apple had entered into an anticompetitive agreement not to compete in the internet search business. *See id.* at 1027. The plaintiff asserted the same claims against both companies, and the claims arose out of the same underlying facts. *See id.* at 1028. The district court granted Google's motion to compel arbitration (based on an arbitration provision in Google's terms of service), and then turned to the issue of whether the claims against Apple should be stayed pending the arbitration against Google. The court declined to stay the proceedings against Apple, even though, as Apple pointed out, there would be a risk of

11

inconsistent rulings if it were to proceed with the litigation against Apple while Google pursued its appeal. *See id.* at 1033-34 (stating that, "in a case like this, . . . redundancy seems inevitable"). *California Crane*, however, is distinguishable because, there, neither party argued the equities. *See id.* (noting that "[n]either party has identified concrete prejudice (beyond simple delay) that would result from either staying or declining to stay this case, so the Court's decision is premised on concerns of efficiency and judicial economy"). More important, in *California Crane*, the district court recognized that a stay is generally appropriate where the arbitrable claims predominate; this is essentially the situation here given that the main alleged wrongdoers are the Avia Defendants. Thus, *California Crane* is not persuasive to the instant case.

### III.     RULE 12 MOTIONS TO DISMISS

Because the Court is granting the motion to stay, it does not rule on the Investor Defendants' 12(b)(6) motions. Nor does it rule definitively on Galaxy's 12(b)(2) motion because Plaintiffs have argued that, even if traditional specific jurisdiction is lacking over the company, there is still RICO personal jurisdiction. For the Court to address RICO personal jurisdiction, it would have to delve into the validity of the RICO claim as pled. *See Monterey Bay Military Hous., LLC v. Ambac Assur. Corp.*, No. 17-cv-04992-BLF, 2018 U.S. Dist. LEXIS 119331, at *14 (N.D. Cal. July 17, 2018) ("Unless and until a viable RICO claim is stated, [18 U.S.C.] § 1965(b)[8] cannot provide a basis for this Court's exercise of personal jurisdiction over Defendants."). The Court does not address the viability of the RICO claim against Galaxy since that implicates issues also raised by the Avia Defendants (for whom there is a stay pending appeal of the arbitration order). The Court, however, does hold that there is not traditional specific jurisdiction over Galaxy. That issue is discussed below.

---

[8] RICO provides that,

> [i]n any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965(b).

### A. Legal Standard

Under Rule 12(b)(2), a court must dismiss an action where it does not have personal jurisdiction over a defendant. *See* Fed. R. Civ. P. 12(b)(2). "[T]he plaintiff bears the burden of establishing that jurisdiction is proper." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). However, "[w]here, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Id.* In addition, "[u]ncontroverted allegations in the complaint must be taken as true, and factual disputes are construed in the plaintiff's favor." *Freestream Aircraft (Berm.) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 602 (9th Cir. 2018).

In the case at bar, Plaintiffs do not contend that there is general jurisdiction over Galaxy. Thus, the only issue is whether Plaintiffs have established a prima facie case of specific jurisdiction.

### B. Test for Specific Jurisdiction

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014).

The Ninth Circuit

> use[s] a three-prong test for analyzing claims of specific jurisdiction. First, "[t]he non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws." Second, the claim must arise out of or relate to the defendant's forum-related activities. Finally, the exercise of jurisdiction must be reasonable. The plaintiff must satisfy the first two prongs of this test. "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable."

*Global Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020).

13

C. Purposeful Direction

In the instant case, Galaxy largely focuses on the first prong of the specific jurisdiction test. The first prong "encompasses two separate concepts: 'purposeful availment' and 'purposeful direction.'" *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1090 (9th Cir. 2023). The concepts are distinct but, "[a]t bottom, both . . . ask whether defendants have voluntarily derived some benefit from their interstate activities such that they will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Id.* (internal quotation marks omitted).

Under Ninth Circuit law, this Court considers "the type of claim at issue to determine the applicable analytical approach. [Courts] generally use the purposeful availment analysis in suits sounding in contract and for unintentional tort claims." *Id.* The purposeful direction analysis is employed in suits involving intentional torts. *See id.* at 1090-91.

Here, the only claim that Plaintiffs assert against Galaxy is the RICO claim. That is clearly a claim for an intentional tort. Therefore, the Court applies a purposeful direction analysis. *See Marani v. Cramer*, No. 19-cv-05538-YGR (DMR), 2024 U.S. Dist. LEXIS 66317, at *12 (N.D. Cal. Feb. 2, 2024) (applying a purposeful direction analysis where plaintiff asserted, *inter alia*, claims for RICO and RICO conspiracy based on wire fraud).

In determining whether there has been purposeful direction by a defendant, a court uses the three-part effects test traceable to the Supreme Court decision *Calder v. Jones*, 465 U.S. 783 (1984). *See Herbal Brands*, 72 F.4th at 1091.

> That test "focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." The *Calder* effects test asks "whether the defendant: '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'"

*Id.*

In the instant case, the critical issue is whether Galaxy expressly aimed its conduct at California. In their opposition, Plaintiffs argue there was express aiming at California because (1) "Galaxy invested in a California company, knowing it was based in California"; (2) one of

14

Galaxy's partners, Ryan You, was an observer on Avia's Board and he is based in California; and (3) Galaxy implicitly knew that "Avia had many users based in California" (*i.e.*, based on "Avia's business and user base"). Opp'n at 66; *see also* FAC ¶ 27. According to Plaintiffs, they "do not base their jurisdictional allegations simply on Galaxy's ownership or proprietary interest [in Avia] but identify instances of how Galaxy and its representatives participated in Avia's activities." Opp'n at 66-67.

Plaintiffs' position is problematic. On (1), Plaintiffs have essentially conceded (as indicated above) that mere investment by Galaxy in Avia is not enough to establish express aiming. *See Low v. SDI Vendome*, No. CV 02-5983 AHM (CWx), 2003 U.S. Dist. LEXIS 27603, *31-32 (C.D. Cal. Jan. 7, 2003) (in a fraud case, agreeing with the individual defendant that "this Court does not have jurisdiction over him because mere investment in a company doing business in California does not confer jurisdiction upon an investor"; but noting that the plaintiff alleged that the individual defendant caused a company to be created for the purpose of furthering a conspiracy and further had contacts with plaintiff in California).[9]

---

[9] Plaintiffs may not rely on the acts of the Avia Defendants in California to establish personal jurisdiction over Galaxy, even if the two were allegedly conspirators. *See Wescott v. Reisner*, No. 17-cv-06271-EMC, 2018 U.S. Dist. LEXIS 92320, at *9-10 (N.D. Cal. June 1, 2018) (noting that the Ninth Circuit has not squarely addressed the "conspiracy theory of personal jurisdiction" but that the theory has been "'criticized by commentators,'" that district courts in the circuit have "refused to exercise personal jurisdiction over defendants based solely on the actions of their co-conspirators," and that "California courts applying both California and federal due process have held that personal jurisdiction does not lie over an out-of-state defendant merely because of the residence or acts of a co-conspirator[;] [r]ather, [w]here conspiracy is alleged, an exercise of personal jurisdiction must be based on forum-related acts that were personally committed by each nonresident defendant, and acts of an alleged co-conspirator cannot be imputed to establish jurisdiction over the third party defendant") (internal quotation marks omitted); *Aldini AG v. Silvaco, Inc.*, No. 21-cv-06423-JST, 2023 U.S. Dist. LEXIS 98686, at *16 (N.D. Cal. Mar. 27, 2023) (noting that, although some courts have held to the contrary, "neither the Ninth Circuit nor California has recognized the validity of the conspiracy theory of jurisdiction" and, "[i]n the absence of binding authority to the contrary, . . . reject[ing] the conspiracy theory of jurisdiction, which appears to strain the boundaries imposed by the due process clause"). *But see Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86-87 (2d Cir. 2018) (setting forth "the appropriate test for alleging a conspiracy theory of jurisdiction: the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state"); *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013) (same); *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1069 (10th Cir. 2007) (stating that "[t]he existence of a conspiracy and acts of a co-conspirator within the forum may, in some cases, subject another co-conspirator to the forum's jurisdiction"). As noted below, if facts are uncovered which establish a viable RICO claim against Galaxy, that may suffice to establish

15

1    As for (3), even if Galaxy knew that Avia had many users in California, that does not
2    answer the question of whether Galaxy, as distinct from Avia, engaged in conduct that was
3    expressly aimed at California consumers. *See* note 9, *supra*.
4    Finally, for (2), that Mr. You was an Avia Board observer says little about whether he
5    engaged in conduct that was targeted at California. That fact alone does not establish that Mr.
6    You was aware of the alleged misrepresentations by Avia, supported the misconduct, and took
7    steps to further it. Absent more specific allegations, Plaintiffs' assertions to the contrary are
8    speculative. *Cf. Twombly*, 550 U.S. at 556-57 (in antitrust conspiracy case, noting that there must
9    be "allegations plausibly suggesting (not merely consistent with) agreement").
10    The allegations in the FAC are also deficient. Plaintiffs allege that "RICO Investors [*i.e.*,
11    both Galaxy and ACME] were involved in the operations of Avia, i.e., a California-based
12    company, through their board participation and/or observance and spread misinformation
13    regarding the nature of its business to, *inter alia*, California consumers." FAC ¶ 27. But these
14    allegations are conclusory. As noted above, the fact that Mr. You was a Board observer, without
15    more, fails to establish Galaxy's knowledge of, support of, and participation in Avia's alleged
16    wrongful conduct. As for the allegation that Galaxy has spread misinformation to California
17    consumers, that seems to be based on other allegations that, on a portfolio section of its website,
18    Galaxy has "portray[ed] Avia as a platform that 'guarantees players a fair, high-quality gaming
19    experience' and that 'uses a complex algorithm to assess and match each player's ability in order
20    to create a fair gaming environment,'" FAC ¶ 41; *see also* FAC ¶¶ 120, 173; *cf.* FAC ¶ 134
21    (alleging that the Investor Defendants "transmit[ted] . . . marketing and other materials through the
22    internet media indicating that Avia's games are games of skill where players compete in time
23    against real human players"). But that says little about what Galaxy knew. Moreover, Plaintiffs
24    fail to explain how Galaxy's portfolio section on its website is directed to consumers at all,
25    including Avia consumers. In other words, why would a potential or actual player of Avia's
26    games look at the comments made by one of Avia's investors in describing its portfolio of
27
28    specific jurisdiction over it.

1   investments? There are insufficient allegations to plausibly establish Galaxy itself engaged in

2   conduct which intentionally misled players.

3   Accordingly, the Court agree with Galaxy that Plaintiffs have not made a prima facie

4   showing of traditional specific jurisdiction based on the purposefully directed prong.

5   D.   Jurisdictional Discovery

6   Plaintiffs have asked for the opportunity to take jurisdictional discovery to establish that

7   there is specific jurisdiction over Galaxy. In the Ninth Circuit,

8-11   [j]urisdictional discovery "should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." But a mere 'hunch that [discovery] might yield jurisdictionally relevant facts,' or 'bare allegations in the face of specific denials' are insufficient reasons for a court to grant jurisdictional discovery.

12   *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 864-65 (9th Cir. 2022).

13   Although this is not an overly onerous standard, Plaintiffs have not satisfied it. Plaintiffs

14   assert that there should be discovery because a Galaxy partner, Mr. You, sat on the Avia Board:

15   "Discovery of that board member's Avia-related contacts and conduct in California is likely to

16   yield evidence of attendance at board (and other) meetings in California along with

17   communications and involvement with Avia employees in California." Opp'n at 69-70. But

18   contrary to what Plaintiffs suggest here, Mr. You was not – as alleged in the FAC – a member of

19   the Avia Board. Rather, he was only a Board observer. *See* FAC ¶ 27. Galaxy's circumstances

20   differ from ACME's, as Plaintiffs have alleged that ACME had a partner who was actually a

21   Board member (along with another partner who was a Board observer). *Cf.* FAC ¶ 174 ("Acme's

22   membership in the board of directors comes with voting power, hence the ability to influence [the]

23   board's decisions."). And even if, as a Board observer, Mr. You attended Board meetings in

24   California and communicated with Avia employees in California, that does not shed much light on

25   whether he knew about and engaged in any alleged misconduct targeting California. At best,

26   Plaintiffs have a hunch that there could be misconduct but that is insufficient under Ninth Circuit

27   law.

28   Furthermore, while jurisdictional discovery should be awarded where there is a reasonable

possibility it will bear fruit material to the establishment of personal jurisdiction, *see LNS*, 22 F.4th at 864-65; *see also Good Job Games Bilism Yazilim Ve Pazarlama A.S. v. SayGames, LLC*, No. 20-16123, 2021 U.S. App. LEXIS 36507, at *2 (9th Cir. Dec. 10, 2021) (remanding so that jurisdictional discovery could be taken; "[t]he question of jurisdiction in the Internet age is not well-settled," "the record is insufficiently developed to resolve personal jurisdiction," and "'further discovery . . . might well demonstrate facts sufficient to constitute a basis for jurisdiction'"), here, allowing such discovery must be viewed in the context of the pending appeal. Jurisdictional discovery which would focus on the extent of Avia's wrongful conduct, its scope, and Galaxy's possible role therein delves into the merits of the misrepresentation claim and thus squarely implicates the concerns which animate Defendants' request for a broader stay. As the Avia Defendants note, they would be prejudiced if they could not participate or weigh in on merits discovery. Likewise, the Investor Defendants would be prejudiced as they would not be able to get "party" discovery from the Avia Defendants.

The Court notes, however, that, although it is granting Galaxy's motion to dismiss for lack of personal jurisdiction and further denying Plaintiffs' request for jurisdictional discovery, it is not altogether closing the door to Plaintiffs' establishing the purposefully directed prong of specific personal jurisdiction. If Plaintiffs later learn of information showing knowledge and involvement by Galaxy, Plaintiffs may then move for reconsideration of this interlocutory order.

## IV.    CONCLUSION

For the foregoing reasons, the Court rejects Defendants' contention that proceedings in this case against the Investor Defendants should be stayed pending appeal based on *Coinbase*. However, the Court grants Defendants' motion for a discretionary stay. The Court does not rule on the Investor Defendants' 12(b)(6) motions seeking to dismiss the RICO claims in light of the stay; nor does the Court rule on Galaxy's 12(b)(2) motion which argues that RICO personal jurisdiction is lacking. However, the Court does find that Plaintiffs have failed to make a prima facie showing of traditional specific jurisdiction under the purposefully directed prong and denies Plaintiffs' request for jurisdictional discovery thereon. The Court defers ruling on whether the RICO claim may be sufficient to establish personal jurisdiction.

Accordingly, Defendants' motion to stay is granted, and the Court defers in large part ruling on the Investor Defendants' motions to dismiss. After the Ninth Circuit decides the Avia Defendants' appeal, the parties shall meet and confer and file a joint status report.

This order disposes of Docket No. 140 only. Docket Nos. 107 and 109 remain pending.

**IT IS SO ORDERED**.

Dated: December 3, 2024

_____
EDWARD M. CHEN
United States District Judge