UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW PANDOLFI, et al., | Case No. 23-cv-05971-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING INVESTOR DEFENDANTS' MOTIONS TO DISMISS; AND GRANTING IN PART AND DENYING IN PART AVIA DEFENDANTS' MOTION TO DISMISS** |
| AVIAGAMES, INC., et al., | |
| Defendants. | |
| | Docket Nos. 107, 109-10 |

Plaintiffs Andrew Pandolfi and Mandi Shawcroft have filed a class action against:

> (1) AviaGames, Inc. ("Avia");

> (2) Avia's co-founders (Vickie Yanjuan Chen and Ping Wang); and

> (3) two of Avia's investors (ACME, LLC and Galaxy Digital Capital Management,
> L.P.).

Avia and its co-founders (also current employees) shall hereinafter be referred to collectively as the "Avia Defendants." ACME and Galaxy shall hereinafter be referred to collectively as the "Investor Defendants."

Currently pending before the Court are motions to dismiss filed by the Avia Defendants and each of the Investor Defendants (for a total of three motions). Having considered the parties' briefs and accompanying submissions, the Court hereby **GRANTS** the Investor Defendants' motions to dismiss and **GRANTS** in part and **DENIES** in part the Avia Defendants' motion to dismiss.

/ / /

/ / /

## I.   FACTUAL & PROCEDURAL BACKGROUND

In the operative first amended complaint ("FAC"), Plaintiffs allege as follows.

Avia is a gaming company that launched in 2017.  *See* FAC ¶ 30.  Ms. Chen and Ms. Wang are Avia's co-founders.  They are also currently employees: Ms. Chen is the CEO, and Ms. Wang a VP of Strategy & Business Development.  *See* FAC ¶¶ 14-15.

Avia's games – which include Bingo Clash, Solitaire, Pool Clash, Match n Flip, 21 Gold, and Tile Blitz – can be accessed through mobile browsers or through downloaded standalone applications.  *See* FAC ¶¶ 30-31.  The games can be played for cash or for tickets redeemable for prizes.  *See* FAC ¶¶ 35, 43, 67.  It appears that players pay an entry fee for the chance to win cash or tickets redeemable for prizes.  *See* FAC ¶ 67 (alleging that "[u]ncashed money or tickets [that are won] can be used as an 'entry fee' to play more games").  Avia claims that it does not have any financial interest in the outcome of cash games or any stake in who wins or loses.  *See* FAC ¶¶ 37, 69.

ACME and Galaxy are both venture capital investment firms that invested in Avia.[1] ACME has a partner (Hany Nada) who is an Avia Board Member and another partner (Alex Fayette) who is an Avia Board Observer.  *See* FAC ¶¶ 16-17.  Like ACME, Galaxy also has a partner (Ryan You) who is an Avia Board Observer.  *See* FAC ¶ 78.

Avia represents to players and prospective players that its games give players the ability to compete against other players of similar skill (*i.e.*, human opponents, not bots) and that "players '[c]ompete in real time against other players' . . . 'using only [their] strategy and skill.'"  FAC ¶¶ 34-35, 42.  In other words, Avia's games are ones of skill and not ones of chance.  *See* FAC ¶¶ 39, 66 (alleging that games of chance mean that a player's skill does not impact the game's outcome).  Such representations and/or similar representations "are visible to each user who downloads Avia's games" (for instance, from Apple's App Store) and/or on Avia's website (*e.g.*, in the FAQ section).  FAC ¶¶ 34-38, 44, 48.  In addition, Avia's games are designed to suggest that players are

---

[1] In its motion, ACME claims that it "has never held any equity stake in Avia."  Mot. at 4.  ACME states: "In its initial investment, [it] purchased $10 million in debt (through convertible promissory notes), as part of a $40 million fundraising round by Avia."  Mot. at 3-4.

playing against other live human opponents in real time – *e.g.*, "[a]t the beginning of each standalone game, players are asked to wait until the app finds them purported 'opponents' for the game."   FAC ¶ 45.

Avia's representations are, in fact, false:

- Players do not compete against live human opponents but rather compete against bots – specifically, historical playthroughs which can include a video recording of a match played previously by another player.  *See* FAC ¶ 53.  ("Using bots helps Avia maintain player liquidity.  Avia needs players for the real players to play against.  If there are not enough real players and the players need to wait to get the results of their match, they are less likely to keep playing."  FAC ¶ 63.)

- Avia can manipulate matches by matching a player against a bot of a similar skill level or a bot that has a higher skill rating or score.  *See* FAC ¶¶ 54, 71 (alleging that "Avia can dial the win rate of its bots").

- Avia does in fact have a financial interest in its games because, if a historical playthrough wins a match, Avia does not pay a cash prize to anyone and keeps the entry fee paid by the live player.  *See* FAC ¶ 53.

According to Plaintiffs, the Investor Defendants have "expertise in the gaming industry" and "fuel[ed] Avia's fraudulent gaming scheme" by echoing Avia's false representations that it offered skill-based games.  FAC ¶¶ 77-78.  *See, e.g.*, FAC ¶ 40 (quoting from ACME's website describing its portfolio; characterizing Avia as a "'real-money mobile skill gaming app'"); FAC ¶ 41 (quoting from Galaxy's website; describing Avia as a platform that "'guarantees players a fair, high-quality gaming experience' and that 'uses a complex algorithm to assess and match each player's ability in order to create a fair gaming environment'").  The Investor Defendants were "interested in attracting more players to Avia's games because a larger player base boosts the value of their equity.  More players means more deposits and better player liquidity."  FAC ¶ 77; *see also* FAC ¶ 119 ("A higher deposit pool and a broader player base translated into higher sales and profits for Avia and the RICO Defendants.").

/ / /

It was not until December 2023, after the instant case was filed, that Avia disclosed to players (via updated Terms of Service) that it uses historical playthroughs and that it keeps the winnings for itself when historical playthroughs win.  *See* FAC ¶ 56.

Based on, *inter alia*, the above allegations, Plaintiffs seek to represent a Rule 23(b)(3) class consisting of the following: "All persons who have lost money playing any Avia game from at least 2017 until Defendants' unlawful conduct and its harmful effects stop."  FAC ¶ 90.  Plaintiffs have asserted the following claims on behalf of the class:

(1) Violation of California Business & Professions Code § 17200 (against Avia only).

(2) Violation of the Consumer Legal Remedies Act ("CLRA") (against Avia only).
   *See* Cal. Civ. Code § 1750 *et seq.*

(3) Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").
   *See* 18 U.S.C. § 1962(c) and (d) (against all Defendants *except* Avia).

Plaintiffs' allegations in the FAC are based, in significant part, on information uncovered in an unrelated patent infringement suit, *Skillz Platform Inc. v. Aviagames, Inc.*, No. C-21-2436 BLF (N.D. Cal.).  According to Plaintiffs, the use of bots was exposed during the *Skillz* proceedings.  *See* Opp'n at 1 ("A recent patent trial made public, for the first time, internal Avia documents and correspondence that exposed the fraud perpetuated on Avia's users."); Opp'n at 10 ("Avia's bot use was first disclosed in a patent action brought against Avia by another mobile gaming company, Skillz. . . . The exhibits admitted during the lawsuit have proven that Avia uses bots, conceals them from its users, and keeps the money when a player loses to a bot.").  A trial was held in *Skillz* in February 2024, with a verdict in favor of the plaintiff.  Subsequently, the parties settled their dispute.  In the instant case, Plaintiffs filed their amended complaint in April 2024.  Thus, at the time of the filing of the amended complaint, Plaintiffs had the benefit of the full and complete *Skillz* proceedings.

## II.    LEGAL STANDARD

As noted above, pending before the Court are motions to dismiss filed by the Avia Defendants and each Investor Defendant (for a total of three motions).  All Defendants argue for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).  One of the Investor Defendants –

4

Galaxy – also asserts that the case against it should be dismissed based on lack of personal jurisdiction.[2]

A.    Rule 12(b)(2) Motion to Dismiss

Under Rule 12(b)(2), a court must dismiss an action where it does not have personal jurisdiction over a defendant. *See* Fed. R. Civ. P. 12(b)(2). "[T]he plaintiff bears the burden of establishing that jurisdiction is proper." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). However, "[w]here, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Id.* In addition, "[u]ncontroverted allegations in the complaint must be taken as true, and factual disputes are construed in the plaintiff's favor." *Freestream Aircraft (Berm.) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 602 (9th Cir. 2018).

B.    Rule 12(b)(6) Motion to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the

---

[2] Two of the parties – ACME and Plaintiffs – have filed requests for judicial notice ("RJNs") in conjunction with the pending motions. *See* Docket No. 108 (ACME); Docket No. 112 (Plaintiffs). Some of the documents at issue in the RJNs are those from the *Skillz* lawsuit. ACME and Plaintiffs – as well as Avia – have some disagreements as to what is properly subject to judicial notice from *Skillz*. As a practical matter, the Court need not get into these disputes because resolution of the substantive issues does not turn on these disputes.

United States District Court
Northern District of California

Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

### III.    PERSONAL JURISDICTION

In the case at bar, Galaxy (but not any other defendant) has moved to dismiss on the basis of lack of personal jurisdiction. *See* Docket No. 109 (Galaxy motion to dismiss). As indicated above, to avoid dismissal, Plaintiffs must make a prima facie showing that there is jurisdiction over Galaxy. Plaintiffs have argued that (1) there is specific jurisdiction over Galaxy and that (2) there is personal jurisdiction over Galaxy pursuant to a specific provision in RICO. The Court has already issued a decision rejecting Plaintiffs' contention that there is specific jurisdiction over Galaxy. *See Pandolfi v. AviaGames, Inc.*, No. 23-cv-05971-EMC, 2024 U.S. Dist. LEXIS 218673, at *28 (N.D. Cal. Dec. 3, 2024) ("agree[ing] with Galaxy that Plaintiffs have not made a prima facie showing of traditional specific jurisdiction based on the purposefully directed prong"). The Court also denied Plaintiffs jurisdictional discovery. *See id.* at *29 (recognizing that the standard for jurisdictional discovery is not "overly onerous" but still concluding that Plaintiffs failed to meet it). However, the Court did note that, if Plaintiffs were to "later learn of information showing knowledge and involvement by Galaxy, Plaintiffs may then move for reconsideration of this interlocutory order." *Id.* at *31.

Given the Court's ruling above, the only issue remaining is whether there is personal jurisdiction over Galaxy pursuant to the RICO provision. RICO provides that,

> [i]n any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965(b).

"Congress intended the 'ends of justice' provision to enable plaintiffs to bring all members of a nationwide RICO conspiracy before a court in a single trial." *Butcher's Union Local No. 498 v. SDC Invest., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986).

United States District Court
Northern District of California

"In order to establish personal jurisdiction under Section 1965(b), Plaintiffs must show: (1) the Court has personal jurisdiction over at least one of the participants in the action; (2) there is no other district in which a court will have personal jurisdiction over the alleged co-conspirators; and (3) the facts show a single nationwide RICO conspiracy exists."

*Doe v. Walmart Inc.*, No. 18-CV-02125-LHK, 2019 U.S. Dist. LEXIS 21975, at *15-16 (N.D. Cal. Feb. 8, 2019).

As discussed below, the RICO claim as pled by Plaintiffs is not viable. That being the case, there is no basis for asserting personal jurisdiction based upon RICO. *See Monterey Bay Military Hous., LLC v. Ambac Assur. Corp.*, No. 17-cv-04992-BLF, 2018 U.S. Dist. LEXIS 119331, at *14 (N.D. Cal. July 17, 2018) ("*Unless and until a viable RICO claim is stated*, § 1965(b) cannot provide a basis for this Court's exercise of personal jurisdiction over Defendants.") (emphasis added).

Galaxy is thus dismissed from the case at bar for lack of personal jurisdiction.

### IV.      RICO CLAIM

Plaintiffs have sued all Defendants, except for Avia, for a RICO violation. In their papers, Plaintiffs suggest that Avia is not a defendant in the RICO claim because it is merely a "vehicle of the [RICO] enterprise." Opp'n at 48. That characterization is arguably contrary to some of the allegations in the FAC which suggest that Avia was actually a participant in the RICO enterprise. *See, e.g.*, FAC ¶ 101 ("At all relevant times, Avia and the RICO Defendants operated as an association-in-fact enterprise formed for the purpose of tricking consumers into believing that they are playing against real players to increase the attractiveness of Avia's games, broaden the user base, and hence, extract more money, to ultimately "go public or be acquired as soon as possible."); FAC ¶ 99 ("From at least 2017, when Avia was founded, to the present, the affiliation between and among Avia and the RICO Defendants has constituted an association-in-fact enterprise."); FAC ¶ 116 ("At all relevant times, the [RICO] Enterprise: (a) had an existence separate and distinct from Avia and each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which Avia and the RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of natural persons and legal entities, including Avia, Ms.

United States District Court
Northern District of California

7

Chen, Ms. Wang, and the RICO Investors.").  For purposes of the pending motion, however, how exactly Avia fits into the RICO enterprise is not material.[3]

For the RICO claim, Plaintiffs allege as follows.

- There was an association-in-fact enterprise consisting of at least Avia's co-founders and the Investor Defendants.  *See* FAC ¶¶ 99, 101, 116.  Plaintiffs call the enterprise the "Robot Player Enterprise."

- This enterprise was established "in 2017 at the latest, when Ms. Chan and Ms. Wang co-founded Avia."  FAC ¶ 102.  The Investor Defendants joined the enterprise when they invested in Avia: Galaxy in 2020 and ACME in 2021.  *See* FAC ¶ 102.

- The enterprise was "formed for the [common] purpose of tricking consumers into believing that they are playing against real players to increase the attractiveness of Avia's games, broaden the user base, and, hence, extract more money, to ultimately 'go public or be acquired as soon as possible.'"  FAC ¶ 101; *see also* FAC ¶ 118 (alleging that Avia and the RICO Defendants had the "purpose of furthering the illegal scheme" and "increasing Avia's revenues and profits"); FAC ¶ 119 (alleging that "Avia and each RICO Defendant shared in the common purpose of tricking customers into believing that they are playing against real players to increase the attractiveness of the games").

- Avia and the RICO Defendants (*i.e.*, the co-founders and the Investor Defendants) engaged in the following predicate acts of racketeering: (1) illegal gambling in violation of 18 U.S.C. § 1955 as well as state law and (2) wire fraud in violation of 18 U.S.C. § 1343.  *See* FAC ¶¶ 106, 114, 132,171, 175.
  - With respect to (2), wire fraud, **Avia's** use of the wires included "(a) the transmission of marketing and other materials through the internet media

---

[3] To be clear, Plaintiffs could not have a RICO claim if Avia were both the enterprise and a defendant.  *See, e.g.*, *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984) (stating that, "[i]f Union Bank is the enterprise, it cannot also be the RICO defendant")

indicating that Avia's games are games of skill where players compete in [real] time against real human players; (b) the accessibility of the game applications through the Internet and the transmission of such games through such online applications; and (c) the receipt of the deposits from the players by means of the online transfers and related payment services." FAC ¶ 133.

o The use of the wires by the **RICO Defendants** (*i.e.*, the co-founders and the Investor Defendants) included "(a) the transmission of marketing and other materials through the internet media indicating that Avia's games are games of skill where players compete in time against real human players; and (b) the transfer of funds to Avia and from Avia through online wires." FAC ¶ 134.

Plaintiffs allege a violation of two provisions in RICO:

(1) 18 U.S.C. § 1962(c), which provides in relevant part that "[i]t shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity"; and

(2) 18 U.S.C. § 1962(d) which provides in relevant part that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

18 U.S.C. §§ 1962(c), (d).

For a § 1962(c) claim, the following elements must be pled and proved:

> a defendant must participate in (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity . . . . In addition, the conduct must be (5) the proximate cause of harm to the victim.

*Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). Furthermore, "[u]nder Section 1964(c), plaintiffs must . . . allege that they have been injured in their 'property or business' by reason of the alleged racketeering activities." *Planned Parenthood*

United States District Court
Northern District of California

9

*Fedn. of Am., Inc. v. Ctr. for Med. Progress*, 402 F. Supp. 3d 615, 647 (N.D. Cal. 2019); *see also* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .").

As for a § 1962(d) claim, a plaintiff's

> burden in proving a violation of the conspiracy offense . . . is to show that the defendant "knew about and agreed to facilitate" a substantive RICO violation.  So, conspiracy to violate subsection (c) requires proof that the defendant knew about and agreed to facilitate "the conduct of [an] enterprise's affairs through a pattern of racketeering activity."

*United States v. Leoner-Aguirre*, 939 F.3d 310, 316 (1st Cir. 2019); *see also United States v. Applins*, 637 F.3d 59, 81 (2d Cir. 2011) (stating that a defendant must have knowingly joined in a conspiracy the objective of which was to operate the enterprise through an identified pattern of racketeering activity).  "It is the mere agreement to violate RICO that § 1962(d) forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy." *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 774-75 (9th Cir. 2002).  Through § 1962(d), a plaintiff can "sue co-conspirators who might not *themselves* have violated one of the substantive provisions of § 1962." *Beck v. Prupis*, 529 U.S. 494, 507 (2000) (emphasis added); *see also Oki*, 298 F.3d at 775 (noting that, "[i]f a RICO conspiracy is demonstrated, 'all conspirators are liable for the acts of their co-conspirators'").

A.      Investor Defendants

The Court addresses first the RICO claim as asserted against the Investor Defendants (ACME and Galaxy).  The Investor Defendants move for dismissal of the RICO claim asserted against them on various grounds – *e.g.*:

- That Plaintiffs failed to plead that the Investor Defendants directed or had some part in directing the alleged Robot Player Enterprise (see the first element above for

United States District Court
Northern District of California

a § 1962(c) claim)[4];

- That Plaintiffs failed to plead that the Investor Defendants engaged in a pattern of racketeering activity (see the third and fourth elements above for a § 1962(c) claim); and

- That Plaintiffs failed to plead an injury suffered as a result of a § 1962(c) violation (see the fifth element above for a § 1962(c) claim).

Their primary claim, however, is that Plaintiffs have failed to allege that the Investor Defendants knew about (and agreed to) the secret use of bots to manipulate games contrary to representations made to the public. *See, e.g.*, Galaxy Mot. at 11-12. The knowledge element is required because, for the § 1962(c) claim, a RICO enterprise in which the defendant allegedly participated must have a common purpose. *See Eclectic*, 751 F.3d at 997 (stating that, "[t]o show the existence of an enterprise . . . , plaintiffs must plead that the enterprise has (A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose"); *see also* FAC ¶ 119 (alleging that "Avia and each RICO Defendant shared in the common purpose of tricking customers into believing that they are playing against real players to increase the attractiveness of the games"). Similarly, for the conspiracy claim (§ 1962(d)), the defendant must

---

[4] As noted above, § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The Supreme Court has noted:

> Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required. The "operation or management" test expresses this requirement in a formulation that is easy to apply.

*Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (emphasis in original); *see also id.* at 183 (stating that "one is not liable under [§ 1962(c)] unless one has participated in the operation or management of the enterprise itself").

11

United States District Court
Northern District of California

know about (and agree to facilitate) the RICO violation.

Plaintiffs' response is that knowledge about the secret use of bots can reasonably be inferred: specifically, the Investor Defendants' "due diligence [before investing in Avia], expertise [in gaming], public statements [about Avia], and positions on Avia's Board of Directors *collectively* make it more likely than not that [they] were aware of and participated in the enterprise." Opp'n at 3 (emphasis added). As discussed below, Plaintiffs' position lacks merit.

1.     ACME

Plaintiffs rely on the following allegations in support of their argument that knowledge on the part of ACME can reasonably be inferred.

- Before investing in Avia, ACME did its due diligence on the company, including Avia's technology. In a firm brochure dated April 2024, ACME states as follows in addressing its investment strategies: "ACME is focused on understanding, recognizing, and managing risk within its portfolio. ACME's due diligence and decision-making process is structured to understand and mitigate **key technical**, regulatory, execution and competitive **risks** among its portfolio investments." Docket No. 108 (ACME RJN, Ex. 1) (ACME Firm Brochure at 10) (emphasis added).

- For its investment, ACME got one of its partners (Hany Nada) appointed to Avia's Board of Directors and another partner (Alex Fayette) designated as a Board Observer. *See* FAC ¶ 16. The presence of Mr. Nada on the Board and Mr. Fayette as a Board Observer exposed them to Avia's inner workings.

- Mr. Nada was equipped to understand Avia's inner workings because of his expertise in gaming. He "built his investment experience in internet software and infrastructure." FAC ¶ 78. Mr. Nada became so knowledgeable about Avia that, in the *Skillz* case, Avia designated Mr. Nada as a "witness who would testify about the 'history' of Avia."[5] FAC ¶ 80; *see also Skillz*, No. C-21-2436 BLJ (Docket No.

---

[5] It appears that Mr. Nada never testified.

616-4) (listing Mr. Nada, "AviaGames' investor and board member" as a witness who would testify on direct for half an hour on "AviaGames history"). Mr. Nada also "held himself out to the investing public as knowledgeable of Avia's activities in public statements." Opp'n at 43. For example, in an article for Business Wire, Mr. Nada stated that Avia's co-founders "'have incredible gaming experience, are in tune with what consumers want and are creating compelling, interactive games that get people from a wide range of demographics engaged and coming back for more. They're making gaming what it should be: fun, competitive and engaging.'" FAC ¶ 120. He also stated that the two co-founders "'have created an inclusive gaming environment with a focus on long term player engagement.'" FAC ¶ 120.

- In the *Skillz* case, Ms. Chen was deposed and, when asked "about her personal discussions with Mr. Nada regarding the use and concealment of bots in Avia's games," she "asserted her Fifth Amendment right not to testify."[6] FAC ¶ 80.

Based on the allegations above, it is certainly *possible* that ACME knew about Avia's use of bots. Possibility, however, is not enough to withstand a 12(b)(6) challenge; Plaintiffs' allegations are not enough to cross the line into the realm of plausibility. For example, it is far from clear that doing due diligence by an investor into technical risks would reveal the details of the technical operations of Avia which secretly employed the use of bots. *Cf. Whitten v. Clarke*, 41 F.4th 1340, 1351 (11th Cir. 2012) (in a shareholder derivative suit, stating that, "[w]hile it is reasonable to assume *managers* are privy to the daily operations of a company, the same is not true for *Outside Directors*")[7] (emphasis added). It certainly seems questionable that due diligence would involve, *e.g.*, a review of the actual source code used in Avia's games (which would

---

[6] Ms. Chen asserted her Fifth Amendment rights when asked the following questions: "The board of directors of AviaGames is aware of AviaGames' use and concealment of robots in its cash games, correct?" and "Have you personally discussed with Hany Nada the use and concealment of bots at AviaGames?" *Skillz*, No. C-21-2436 BLF (Docket No. 642-12) (Chen Depo. at 22).

[7] Plaintiffs contend that the Investor Defendants are not true outsiders given that they are stakeholders in Avia. *See* Opp'n at 42. While Plaintiffs' position is not without any merit, the Investor Defendants' contention still has resonance: Even if the Investor Defendants are not true outsiders, they still are not insiders in the way that Avia management would be.

13

United States District Court
Northern District of California

presumably show whether or not bots were used).  Also, just because "Avia touted its processes for matching 'players' as a competitive advantage," that does not give rise to a reasonable inference that ACME (including any partner that was on Avia's board) was "likely aware of the technical *details* of how Avia's algorithm matches users to their opponents, including the use of bots" contrary to Avia's public representations.  FAC ¶ 123 (emphasis added).  Lacking are concrete factual allegations that would give rise to a reasonable inference of knowledge.

During the hearing on the motion to dismiss, the Court pressed Plaintiffs to articulate how either Investor Defendant would have had knowledge that Avia's games used bots.  In support, Plaintiffs cited to ¶ 61 of the FAC.  But that paragraph, if anything, indicates it would have been unlikely that the Investor Defendants knew about the use of bots.  Paragraph 61 of the FAC states as follows: "Given the 'secretive' nature of Avia's fraudulent enterprise, filings in the [*Skillz*] case . . . suggest[] that Avia might have defrauded financial advisors: 'evidence adduced in discovery [in *Skillz*] suggests Avia was providing false information to its Ernst & Young audit team when the auditors discovered bot accounts."  FAC ¶ 61.  Per ¶ 61, the enterprise was so secretive that even Avia's own financial advisors, Ernst & Young, were initially defrauded.  If the financial advisors – whose very job was to understand and oversee Avia's financial situation – were defrauded, it does not seem plausible that the Investor Defendants knew or even should have known about the bot enterprise.  At the hearing, Plaintiffs argued that Ernst & Young advisors did eventually learn about the use of bots, but, notably, this was only after the company conducted an audit of Avia.

As for Mr. Nada's presence on the Avia Board and Mr. Fayette's presence as a Board Observer, that would expose them to some inner workings of Avia but, given the high-level position, this is insufficient to show that they would have been exposed to technical details of Avia's operations.

Finally, that Ms. Chen asserted her Fifth Amendment rights during her deposition in *Skillz* is hardly revealing of anything.  If Ms. Chen answered the questions as phrased, that could have suggested that Ms. Chen actually *agreed* with the attorney taking the deposition that Avia did use and conceal the use of bots – a fact that implicated *her* rights.  In other words, it is not a

14

reasonable inference that the Avia Board members, including Mr. Nada, knew about the alleged use of bots simply because Ms. Chen was asserting her *own* constitutional rights.  Moreover, Plaintiffs do not challenge the representation by the Avia Defendants and ACME that Ms. Chen "withdrew her invocation in the *Skillz* patent case and sat for an eight-hour deposition in which she answered all questions posed."  Avia Mot. at 7; *see also* ACME Mot. at 6-7.

The Court therefore dismisses the RICO claim against ACME.  There are insufficient allegations that ACME knew about Avia's secret use of bots.

### 2.    Galaxy

Plaintiffs' case against Galaxy is even weaker.  For Galaxy, Plaintiffs claim knowledge based on the following allegations:

- It is reasonable to infer that Galaxy did due diligence into Avia before it invested into the company.  *See* Opp'n at 44.

- There is a Galaxy partner, Ryan You, who is an Avia Board Observer as a result of Galaxy's investment.  *See* FAC ¶ 27.  Based on his position, Mr. You has been exposed to Avia's inner workings.  (Unlike a Board Director, a Board Observer has no voting power.)

- Mr. You was equipped to understand Avia's inner working because of he has experience with the gaming industry: he is "a co-head of gaming at Galaxy" and he describes himself on his LinkedIn profile as an engineer by training and an investor in the gaming industry.  FAC ¶ 129.

- Galaxy made public statements about Avia indicating that it was knowledgeable about the company.  For example, on its website, Galaxy states that Avia "'guarantees players a fair, high-quality gaming experience'" and "'uses a complex algorithm to assess and match each player's ability in order to create a fair gaming environment.'"  FAC ¶ 41.

- In the *Skillz* case, Ms. Chen was deposed and, when asked about the knowledge of the Avia Board about the use and concealment of bots she declined to answer.

/ / /

United States District Court
Northern District of California

The above allegations are even more insubstantial than the ones against ACME. Accordingly, the Court also dismisses the RICO claim against Galaxy based on a failure to sufficiently allege knowledge of Avia's use of bots.

### 3.    Summary

Accordingly, the Court dismisses the RICO claim as pled against ACME and Galaxy. Plaintiffs have failed to allege that either Investor Defendant knew about the secret use of bots. And as there is no viable RICO claim against Galaxy, the Court also lacks personal jurisdiction over the company. Because, at the hearing, Plaintiffs did not offer any other basis by which it could reasonably be inferred that the Investor Defendants knew about the alleged secret use of bots, and thus presumably do not have more specific allegations to plead at this juncture, the Court does not, at this time, give Plaintiffs leave to amend.

### B.    Avia Co-Founders

As noted above, the remaining defendants sued for a RICO violation are Avia's two co-founders. Because the Court is dismissing the RICO claim against the Investor Defendants, then it must also dismiss the RICO claim against the Avia co-founders – *i.e.*, because the Court is rejecting the enterprise as identified by Plaintiffs in their FAC. Furthermore, consistent with the above, the Court does not, at this time, give Plaintiffs leave to amend. At the hearing, Plaintiffs did not suggest that they would want to, or even could, plead an enterprise in which the Investor Defendants were not involved. If Plaintiffs wish to amend to allege a different RICO enterprise, they must file a motion for leave.

### C.    Summary

For the foregoing reasons, the RICO claim is dismissed in its entirety.

### V.    CALIFORNIA PUBLIC POLICY BAR FOR STATE LAW CLAIMS

With the dismissal of the RICO claim, the only claims remaining are those asserted against Avia. Those claims are:

(1) Violation of California Business & Professions Code § 17200.

(2) Violation of the CLRA. *See* Cal. Civ. Code § 1750 *et seq.*

/ / /

16

As an initial matter, Avia argues that both of the state law claims should be dismissed based on California public policy. Avia contends:

> [E]ach of Plaintiffs' claims in the FAC rests on averments that Avia's undisclosed use of "bots" transformed its games into gambling operations. These allegations run afoul of California's longstanding prohibition on attempts to enlist the judiciary in the recovery of gambling losses.
>
> California has a "strong, long-standing public policy . . . against judicial resolution of civil claims arising out of lawful or unlawful gambling contracts or transactions." *Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462, 471 (1999). Absent "a statutory right to bring such claims, this policy applies both to actions for recovery of gambling losses and actions to enforce gambling debts." *Id.*

Avia Mot. at 8. Avia maintains that "California's bar on adjudicating gambling disputes applies even where plaintiffs claim to be 'victims of [d]efendants' fraud and unknowing participants in illegal gambling.'" Avia Mot. at 9 (quoting *Ochoa v. Zeroo Gravity Games LLC*, No. CV 22-5896-FW-ASx, 2023 U.S. Dist. LEXIS 91215, at *10 (C.D. Cal. May 24, 2023)).

The California public policy bar related to gambling was discussed at length in *Kelly,* a state appellate court decision. There, the plaintiffs were individuals who "pooled financial resources" to act as a "banker" for games of twenty-one played at an Indian casino. *Kelly*, 72 Cal. App. 4th at 467. As banker, the plaintiffs essentially provided financial backing to the dealer: "In exchange for paying all of the dealer's losses to the players of twenty-one, [the plaintiffs] received all of the dealer's winnings." *Id.* The plaintiffs paid the casino a fee for each hand played. *See id.*

In May 1994, while acting as banker during two games of twenty-one, the plaintiffs "suffered combined gambling losses in the total approximate sum of $120,000." *Id.* at 468. The plaintiffs alleged that they sustained these losses because the games had been rigged: specifically, marked decks had been used which enabled the players to beat the dealer. The plaintiffs brought suit against managers and employees of the casino for intentionally or negligently allowing the placement of the marked cards. *See id.* After surveying a number of cases, the *Kelly* court held that the plaintiffs' claims were barred as a matter of public policy. The court explained that "California has a strong, broad, and longstanding public policy against judicial resolution of civil disputes arising out of gambling contracts or transactions" – a policy that "can be traced back

17

virtually to the inception of statehood." *Id.* at 477. This policy applied not only to cases brought by plaintiffs seeking to *enforce gambling debts* but also to cases brought by plaintiffs seeking to *recover gambling losses*.[8] *See id.*; *see also id.* at 488. The *Kelly* court also underscored that the public policy bar applies regardless of whether the gambling at issue is lawful or illegal. *See id.* at 490. In other words, even if gambling is lawful, the public policy bar will preclude a suit to enforce gambling debts or a suit to recover gambling losses.

Kelly remains good law. And as explained by the court in *Tak Chun Gaming Promotion Co. Ltd. v. Long*, 96 Cal. App. 5th 1027 (2023) (citing *Kelly* approvingly), the public policy bar is animated by two general purposes:

> [T]he public policy against litigating gambling debts in the California courts was grounded in two rationales – namely, (1) that gambling itself was immoral and unlawful, such that the courts should not open their doors to vindicate rights grounded in immoral or unlawful contracts; and (2) that closing the courts to litigation over gambling debts "discourage[s]" the creation of such debts, which is good for public policy because gambling – whether unlawful or lawful – leads to the "ruin of [the gamblers'] families," and courts should not "'become a handmaid of [such] iniquity,'" for doing so would be "humiliating to the Courts."
>
> . . . [E]ither of these two rationales is sufficient on its own to support the public policy of denying a judicial forum in California for adjudicating gambling debts. This is why, from the very beginning, "California's public policy against judicial resolution of civil claims arising out of gambling contracts or transactions" has "applie[d] to all forms of gambling, whether legal or illegal." And it is why the "substantial[] ero[sion]" of the "public policy against" gambling has not eroded "California's deep-rooted policy against [the] enforcement of gambling debts." . . .

*Id.* at 1034-35 (emphasis omitted).

In their opposition, Plaintiffs do not dispute that *Kelly* is good law but argue that the California public policy barring judicial resolution of claims arising out of gambling transactions applies only where the plaintiff knowingly and voluntarily participating in gambling – and here, Plaintiffs did not knowingly and voluntarily participate in gambling because they believed

---

[8] Given that *Kelly* applied the public policy bar even where the losses resulted because the gambling was "rigged," Plaintiffs' new theory that the bar can be avoided here on the basis that Avia's conduct was "beyond gambling" (*i.e.*, because it manipulated the games) is problematic.

(incorrectly) that they were in fact engaging in games based on skill, not chance (*i.e.*, games of chance constitute gambling, but not games of skill).

In support of their position, Plaintiffs rely on *Wallace v. Opinham*, 73 Cal. App. 2d 25 (1946), one of the decisions discussed in the *Kelly* decision. In *Wallace*, the plaintiff engaged in a game of twenty-one which was specifically prohibited by a provision in the California Penal Code. The plaintiff claimed that he lost money to the defendant because the defendant had used a deck of marked cards and sought to recover his gambling losses. According to the plaintiff, "he was not *in pari delicto* with the defendant and . . . therefore [could] maintain the action to recovery the money of which he was defrauded." *Id.* at 25.

The court rejected the plaintiff's contention that he was not in pari delicto.

> The card game known and designated in the complaint as "Twenty-One" is specifically prohibited by section 330 of the Penal Code, regardless of where it is played. The plaintiff and defendant *voluntarily* engaged in that unlawful game, in the course of which plaintiff lost the money he now seeks to recover by this suit. The second count of the complaint is necessarily founded on plaintiff's participation in that unlawful and prohibited game. He could not prove the alleged fraud and deceit, by means of which he lost his bets, without evidence showing that the fraud was exercised incident to his participation in that game of cards which is prohibited by statute. It follows that the parties were in pari delicto with respect to their unlawful playing of that game. Where the parties *voluntarily* engage in a gambling game which is prohibited by law, in the absence of a statute authorizing a recovery of gambling losses, neither courts of law nor equity will aid or assist either party to enforce rights growing out of that illegal transaction. . . .
>
> "In substantially all jurisdictions gambling contracts are treated as unenforceable; and generally, in the absence of a statute providing for recovery or relief, the court will not, at law or in equity, . . . aid or assist either party to a gambling contract or transaction to enforce any right or claim against the other growing out of the contract or transaction, but will leave the parties where they have placed themselves and the court finds them. Even though a party to an illegal betting contract seeks alleged rights against a third person, the court will not aid him where he must rely on the illegal contract."

*Id.* at 26 (emphasis added and omitted).

The court also noted:

> No California statute authorizes a party to an illegal transaction which is prohibited by law to recover gambling losses, regardless of the fact that one of them may have been the victim of fraud or deceit

19

> with respect to some incident to that illegal transaction. It has been frequently decided that courts will not become the arbiters of incidental acts of participants in gambling games which are prohibited by law. All persons who are concerned in or who aid or abet the commission of either a crime or a misdemeanor, are deemed to be principals therein. Public policy prompts courts to decline to distinguish between degrees of turpitude of parties who engage in outlawed transactions. Otherwise courts might be compelled to decide which party cheated the most.

*Id.* at 27.

As indicated by the above, *Wallace* is not dispositive of the instant case. *Wallace* was concerned with the doctrine of in pari delicto; its holding was based on knowledge of *illegality* of conduct, and not knowledge of gambling per se – *i.e.*, if one is aware that they are participating in an *illegal* transaction, then they cannot complain about fraud in conjunction with that transaction. Notably, *Kelly* discussed the doctrine of in pari delicto separate from its analysis of the public policy bar related to gambling – underscoring that the public policy bar applies whether the gambling at issue was legal or illegal in nature. *See id.* at 466-67 (concluding that plaintiffs' suit was barred by "California's strong and long-standing public policy against judicial resolution of civil claims arising out of lawful or unlawful gambling contracts or transactions" and "on the *additional* ground the parties were in pari delicto" given that the game at issue was illegal under state law) (emphasis added).

That being said, the Court still finds *Wallace* instructive. *Wallace* explains that a party to an illegal transaction cannot complain about consequences that flow from that transaction only if the party knows about the illegality of the transaction. That construct has force in the instant case: why should a party to a gambling transaction be barred from complaining about the consequences that flow from that transaction if they did not know they were engaging in a gambling transaction in the first place – and in fact, were led to believe otherwise? *Cf. Couch v. Telescope, Inc.*, No. CV 07-3916 FMC (PLAx), 2007 U.S. Dist. LEXIS 104142, at *21 (C.D. Cal. Nov. 30, 2007) (noting that plaintiffs were not asking the Court to accept the legitimacy of a gaming activity by deciding a dispute arising out of the activity," but rather were "seek[ing] to stop the Games themselves[;] accordingly, the Court finds that the doctrine of in pari delicto does not bar Plaintiffs' claims"). Here, Plaintiffs allege not only did they not know about the illegality of the

20

games, they were not aware of the nature of the games which rendered them gambling.

In response, Avia asserts that the court in *Ochoa* rejected that proposition. In *Ochoa*, the plaintiffs expressly argued that, "while public policy forecloses a party to a gambling contract from recovering a gambling loss, it does not prohibit 'a party that has *unwittingly* fallen victim to an illegal gambling enterprise masquerading as an innocent and legal game' from asserting unfair competition claims." *Ochoa*, 2023 U.S. Dist. LEXIS 91215, at \*10 (emphasis added). Nevertheless, the *Ochoa* court sided with the defendant, holding that, "[n]otwithstanding [p]laintiffs' attempts to distinguish *Kelly* on the basis that they are victims of [d]efendants' fraud and unknowing participants in illegal gambling, [p]laintiffs' claims for monetary relief are in essence a claim to recover for gambling losses." *Id.*

*Ochoa*, however, is distinguishable from the case at bar based on the facts. There, the plaintiffs sued the defendants "for conduct arising out of casino-style slot games for mobile devices." *Id.* at \*1. Thus, the plaintiffs appeared to know that the conduct at issue involved gambling; they simply did not know (as alleged) that the gambling itself was illegal (*i.e.*, because California has a law prohibiting slot machines). *See id.* at \*8. The case at bar is different. As noted, Plaintiffs are alleging that they did not even know that they were engaging in any conduct that amounted to gambling (legal or illegal).

In any event, even if *Ochoa* might have a broader reach, along the lines suggested by Avia, it is not clear why gambling losses should dictate resolution if a player did not even know that they were engaging in conduct that constituted gambling. Not only does the doctrine of in pari delicto not apply under this alleged circumstance, but the public policy rationales against judicial enforcement of rights in gambling also do not apply. The two purposes underlying the public policy bar related to gambling are as follows: the doors of a court should not be opened to claims seeking to enforce gambling debts or to recover gambling losses because (1) gambling is immoral or unlawful and should not be facilitated by the courts and (2) the creation of gambling debts should be discouraged. Neither of these purposes is served in the instant case if the Court were to apply the public policy bar. As alleged, Avia led Plaintiffs to believe (incorrectly) that they were playing simply games of skill, *i.e.*, not gambling. While engaging in conduct which constitutes

21

gambling should be discouraged, such discouragement has no role where a party had no reason to believe it was engaging in gambling. And allowing a remedy here to consumers who were defrauded into engaging in gambling would enlist the courts in curtailing, not furthering, gambling.

To be sure, there is an argument that Plaintiffs have improperly lumped all of Avia's games together – *i.e.*, without considering whether a game could reasonably be seen as one of skill (not gambling) instead of one of chance (gambling), even without Avia's use of bots. In this regard, it is worth noting that one of the Avia games identified by Plaintiffs is 21 Gold which appears to be a game of blackjack. *See* FAC ¶ 115 (alleging that "the game of blackjack . . . is provided by Avia under the name '21 Gold' [and] is clearly prohibited by California law"). Blackjack is typically considered gambling (even if some skill is involved); thus, at least for this game, one could argue that a reasonable player could not claim to have unwittingly engaged in gambling and thus the bar on judicial enforcement might apply thereto.

Nevertheless, at this stage of the proceedings, there is not a basis to dismiss Plaintiffs' § 17200 and CLRA claims in their entirety because, at the very least, there seem to be multiple Avia games which, as a facial matter at least, do not seem to be akin to "traditional" gambling games.

Accordingly, the Court rejects Avia's contention that California's public policy bar related to gambling applies to Plaintiffs' § 17200 and CLRA claims (as pled). And because the bar does not apply, whether Plaintiffs are seeking "gambling losses" is not relevant.

## VI.    REMAINING ARGUMENTS ON STATE LAW CLAIMS

Because the Court holds that the public policy bar does not apply (based on the allegations in Plaintiffs' FAC), it must address three additional arguments raised by Avia with respect to the § 17200 and CLRA claims.

### A.    *Sonner*

First, the Avia Defendants argue that, for either of the claims, Plaintiffs are not entitled to any equitable relief (*e.g.*, injunctive relief or restitution) because they have failed to allege that they have no adequate remedy at law. The Avia Defendants argue that Plaintiffs do have an adequate remedy at law, specifically, damages pursuant to the CLRA. *See* FAC ¶ 164 (for the

22

CLRA claim, asking for, "on the top of injunctive relief, damages, including actual damages, but in no case less than $1,000 per person, and punitive damages as provided under Cal. Civil Code, §§ 1780 and 1782").

The Avia Defendants' argument is predicated on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). In *Sonner*, the plaintiff filed a putative class action, asserting that the defendant engaged in false advertising with respect to a dietary supplement beverage. The plaintiff sought injunctive relief and restitution for violations of § 17200 and the CLRA, plus damages for the CLRA violation. *See id.* at 837-38.

Less than two months before trial, the plaintiff sought to leave to amend her complaint, specifically, to drop the CLRA damages claim. The motivation was to get the district court to award the class $32 million as restitution instead of "having to persuade a jury to award this amount as damages." *Id.* at 838. The defendant opposed the motion to amend, arguing that, if the amendment were permitted, then the claims for restitution would have to be dismissed because there would be an adequate remedy at law – *i.e.*, damages – for the injury. The district court allowed the amendment but also warned the plaintiff that she was taking a chance by dropping the damages claim in light of the defendant's argument. *See id.*

The plaintiff amended and, as expected, the defendant moved to dismiss. The district court granted the motion, holding that the plaintiff "could not proceed on her equitable claims for restitution in lieu of a claim for damages. . . . [The plaintiff] failed to establish that she lacked an adequate legal remedy for the same past harm for which she sought equitable restitution." *Id.*

On appeal, the Ninth Circuit held that "a federal court must apply traditional equitable principles before awarding restitution under the UCL and CLRA. It has been a fundamental principle for well over a century that state law cannot expand or limit a federal court's equitable authority." *Id.* at 841. Thus, "even if a state authorizes its courts to provide equitable relief when an adequate legal remedy exists, such relief may be unavailable in federal court because equitable remedies are subject to traditional equitable principles unaffected by state law." *Id.* Accordingly, the plaintiff had to "establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL and CLRA." *Id.* at 844.

23

> Sonner [the plaintiff] fails to make such a showing.  Initially, the operative complaint does not allege that Sonner lacks an adequate legal remedy.  More importantly, Sonner concedes that she seeks the same sum in equitable restitution as "a full refund of the purchase price" – $32,000,000 – as she requested in damages to compensate her for the same past harm.  Sonner fails to explain how the same amount of money for the exact same harm is inadequate or incomplete, and nothing in the record supports that conclusion.

*Id.* (emphasis added).

The Ninth Circuit has since reaffirmed its holding in *Sonner*.  *See Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308 (9th Cir. 2022).  For example, in *Guzman*, the Ninth Circuit held that the plaintiff "could not bring his equitable UCL claim in federal court because he had an adequate legal remedy in his . . . CLRA claim" – even though the CLRA claim was time barred.  *Id.* at 1312 (stating that a "'[f]ailure to comply with a remedy at law does not make it inadequate so as to require the district court to exercise its equitable jurisdiction'"); *see also In re Apple Processor Litig.*, No. 22-16164, 2023 U.S. App. LEXIS 24257, at *5-6 (9th Cir. Sept. 13, 2023) (stating that "'*Sonner*'s holding applies to equitable UCL claims when there is a viable CLRA damages claim, regardless of' the facts"; "Plaintiffs were obligated to allege that they had no adequate legal remedy in order to state a claim for equitable relief, and they have 'fail[ed] to explain' how the money they seek through restitution is any different than the money they seek as damages").

### 1.     Injunctive Relief

In assessing how *Sonner* and *Guzman* play out in the case at bar, the Court first separates out the equitable relief sought by Plaintiffs: injunctive relief and restitution.  *See, e.g.*, FAC ¶ 149 (for the § 17200 claim, seeking "declaratory, equitable, and/or injunctive relief, including rescission and restitution, as well as requiring Avia to stop its unlawful conduct"); FAC ¶¶ 163-64 (for the CLRA claim, seeking "injunctive and equitable relief . . . , including restitution and disgorgement," as well as damages).

To the extent Plaintiffs seek injunctive relief, *see, e.g.*, FAC ¶ 156 (for CLRA claim, seeking, *inter alia*, "injunctive relief to prevent Avia from continuing to engage in these deceptive and illegal practices"), they have included in their FAC allegations as to why a legal remedy (damages) would be inadequate.

24

> Avia continues to violate the CLRA and continues to injure the public by misleading consumers about participating in games of skill against real, live players.  Accordingly, Plaintiffs seek injunctive relief to prevent Avia from continuing to engage in these deceptive and illegal practices.  Otherwise, Plaintiffs and the Class members may be irreparably harmed and/or denied effective and complete remedy if such an order is not granted.

FAC ¶ 156.  In the reply brief, Avia argues that this is just a "bare allegation" that "merely recites the legal standard," Reply at 6, but that position is not persuasive: what more should Plaintiffs have to plead?

In its reply brief, Avia also contends that, if Plaintiffs seek an injunction, then they need to plead an intent to purchase Avia's product in the future.  *See* Reply at 6; *see also Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 966-70 (9th Cir. 2018) (noting that "[k]nowledge that [an] advertisement or label was false in the past does not equate to knowledge that it will remain false in the future"; "the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to"); *Julian v. TTE Tech., Inc.*, No. 20-cv-02857-EMC, 2020 U.S. Dist. LEXIS 215039, at \*21 (N.D. Cal. Nov. 17, 2020) (stating that, under *Davidson*, "a plaintiff in a mislabeling case [has] the opportunity to seek injunctive relief" if she can "allege that she would like to purchase the defendant's product in the future").

Although Avia failed to raise this standing argument until its reply brief, the Court shall consider the argument since it relates to subject matter jurisdiction.  *See City of Oakland v. Lynch*, 798 F.3d 1159, 1163 (9th Cir. 2015) ("A suit brought by a plaintiff without Article III standing is not a case or controversy, and an Article III federal court therefore lacks subject matter jurisdiction over the suit.") (internal quotation marks omitted).  Because the FAC does not include factual allegations related to standing for the injunctive relief sought (which appears ill-defined), the Court dismisses the § 17200 and CLRA claims to the extent they seek such relief, but Plaintiffs have leave to amend.

### 2. Restitution

With respect to restitution – which presumably is a refund of the entry fees paid by players – Plaintiffs argue that *Sonner* is not a bar because, at the pleading stage, it is too early to tell

25

whether legal remedies will ultimately be inadequate.  Plaintiffs emphasize that *Sonner* was much further advanced in proceedings, *i.e.*, was not decided at the 12(b)(6) stage.  Plaintiffs also point out that a plaintiff may plead relief in the alternative.  *See Nacarino v. Chobani, LLC*, 668 F. Supp. 3d 88, 896 (N.D. Cal. 2022) (taking note of cases holding that *Sonner* did not impose strict requirements at the pleading stage for this reason).

There are two problems with Plaintiffs' position.  First, if Plaintiffs are suggesting that they would seek restitution as an alternative if their claims for damages do not pan out *on the merits*, they have not cited to authority holding that losing on the merits of a damages claim is what the Ninth Circuit meant as an inadequate legal remedy.  *See Nacarino v. Chobani, LLC*, No. 20-cv-07437-EMC, 2021 U.S. Dist. LEXIS 149153, at *37 (N.D. Cal. Aug. 9, 2021) (noting that plaintiff's "inability to obtain damages here results from her CLRA claim's failure on the merits; she has not demonstrated that there is an inherent limitation of the legal remedy that renders it inadequate"); *cf. Phillips v. Brooklyn Bedding LLC*, No. 23-cv-03781-RFL, 2024 U.S. Dist. LEXIS 72676, at *3 (N.D. Cal. Mar. 28, 2024) (stating that "*Guzman*'s 'emphasis on the relief that could possibly be afforded under a claim, as opposed to possible hurdles the plaintiff might face in achieving that relief, indicates that mere differences in proof between the claims does not make' a legal remedy inadequate").

Second, as this Court has noted in a different decision, *see Julian*, 2020 U.S. Dist. LEXIS 215039, at *10-12, a significant point in *Sonner* was whether there was a difference between the damages sought by the plaintiff and the restitution sought.  In other words, if there are no differences between the two, then how are damages an inadequate remedy?  Here, Plaintiffs seem to be seeking simply a refund of their entry fees, and so there would not any differences between damages and restitution.  To be sure, Plaintiffs contemplate statutory and punitive damages as well, *see* FAC ¶ 164 (for CLRA claim, asking for "damages, including actual damages, but in no case less than $1,000 per person, and punitive damages as provided under Cal. Civ. Code, §§ 1780 and 1782"[9]), but such damages would presumably be *more* than what a player could get as

---

[9] California Civil Code § 1780 provides in relevant part that

restitution (*i.e.*, a return of the entry fees paid); if so, damages would not be an inadequate remedy.

Accordingly, the Court agrees with Avia that *Sonner* precludes Plaintiffs' § 17200 and CLRA to the extent Plaintiffs seek restitution as relief.  Plaintiffs have leave to amend if they can, in good faith, plead why damages would be an inadequate remedy.

B.    Reliance on False Representations

To the extent Plaintiffs seek nonequitable relief, Avia argues that there is an independent bar to the § 17200 and CLRA claims – namely, that Plaintiffs have failed to allege that they specifically saw, and therefore relied on, any false representation about playing real live human players instead of bots.

Plaintiffs make several arguments in response:

(1) Even if Plaintiffs did not explicitly allege that they saw any false representation, it can reasonably be inferred from the FAC that they did – *e.g.*, because Plaintiffs have alleged that representations about real live human players "are visible to each user who downloads Avia's games" (for instance, from Apple's App Store), FAC ¶ 35, and because Avia's games are designed to suggest that players are playing against other live human opponents in real time (*e.g.*, "[a]t the beginning of each standalone game, players are asked to wait until the app finds them purported 'opponents' for the game").  FAC ¶ 45.  Furthermore, reliance may be presumed if false representations are made about material information.  *See Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977 (1997) (stating that "a

---

[a]ny consumer who suffers any damages as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person to recover or obtain any of the following:

(1)    Actual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000).

. . . .

(4)    Punitive damages.

Cal. Civ. Code § 1780(a)(1).

United States District Court
Northern District of California

presumption, or at least an inference of, reliance arises wherever there is a showing that a misrepresentation was material"). Here, it can be inferred that the information about real live human players is material since, *e.g.*, such information is included in the FAQ section on Avia's website. *See* FAC ¶ 38.

(2) Plaintiffs do not have to identify with specificity what exactly they saw because, as in the *Tobacco II Cases*, 46 Cal. 4th 298 (2009), Plaintiffs were exposed to a long-term advertising campaign. *See id.* at 328 (stating that, "where, as here, a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements").

(3) Where a plaintiff's theory is that the defendant *omitted* information, then reliance does not require that the plaintiff "see" a misrepresentation. Rather, "[r]eliance can be proved in a fraudulent omission case by establishing that 'had the omitted information been disclosed, [the plaintiff] would have been aware of it and behaved differently.'" *Boschma v. Home Loan Ctr., Inc.*, 198 Cal. App. 4th 230, 250-51 (2011). Here, Plaintiffs do have an omission theory – *i.e.*, that partial representations were made that were misleading. *Cf. LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997) (stating that one "'circumstance[] in which nondisclosure or concealment may constitute actionable fraud [is] when the defendant makes partial representations but also suppresses some material facts'").

Plaintiffs' best argument is their first one. Admittedly, Avia is correct that there is no express allegation that Plaintiffs ever saw any specific misrepresentation. Also, it is debatable whether one can reasonably infer that Plaintiffs saw any misrepresentations when they downloaded the games onto their mobile devices. Many people likely download applications without reading any information about the applications. However, Plaintiffs also make the allegation that the games are designed to suggest that players are playing against other live human opponents in real time – *e.g.*, "[a]t the beginning of each standalone game, players are asked to wait until the app finds them purported 'opponents' for the game." FAC ¶ 45. This is sufficient

28

for Plaintiffs to overcome Avia's 12(b)(6) challenge.

C.     CLRA Claim Only – Virtual Currency, Software, and/or Games/Gambling

Finally, Avia makes an argument that is specific to the CLRA claim only.

The CLRA prohibits certain conduct "undertaken by any person in a transaction intended to result or that results in the sale or lease of *goods or services* to any consumer." Cal. Civ. Code § 1770(a) (emphasis added).

> (a)    "Goods" means tangible chattels bought or leased for use primarily for personal, family, or household purposes, including certificates or coupons exchangeable for these goods . . . .
>
> (b)    "Services" means work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods.

Cal. Civ. Code § 1761. Plaintiffs allege that they "engaged in 'transactions' with Avia" resulting in the sale of goods or services because "they paid money for in-game cash to enter games." FAC ¶ 153. According to Avia, Plaintiffs have no viable CLRA claim because "goods or services" for purposes of the CLRA do not include (1) virtual currencies, (2) software, or (3) games/gambling.

1.     Virtual Currency

There is a split in authority as to whether virtual currency can be a good or service for purposes of the CLRA. Some courts, for instance, have held that, when one buys virtual currency – which will then be used to make purchases within an application – one is not buying a good because the CLRA defines a good as a *tangible* chattel. Virtual currency is not tangible, nor is a good purchased with the virtual currency. The implication here is that no service (for purposes of the CLRA) is involved either because the purchase is really of a good (not a service), albeit an intangible one.

This was the basic analysis of Judge Chhabria in *Reeves v. Niantic, Inc.*, No. 21-cv-05883-VC, 2022 U.S. Dist. LEXIS 97140 (N.D. Cal. May 31, 2022). Judge Chhabria noted that the plaintiff

> Reeves does not allege that the PokeCoins he purchased in the Pokemon virtual world were "goods" within the meaning of the statute. Nor could he. The CLRA defines "good" as "tangible chattels," including "certificates" or "coupons" that are

exchangeable for tangible chattels. PokeCoins are not tangible, nor are they certificates that can be exchanged for something tangible. When a consumer buys PokeCoins in the Pokemon virtual world, they are acquiring a certificate that merely allows them to buy virtual goods within that virtual world.

*Id.* at *4. As for services, Judge Chhabria stated: "When a consumer purchases a virtual certificate to exchange for virtual goods in a virtual world, they are not buying anything that resembles a 'service' as the statute defines that term. They are buying a 'good,' albeit an intangible one that is not covered by the statute." *Id.* He added that, until the legislature removes the word "intangible" from the definition of "good," "courts should not shoehorn transactions involving the purchase of intangible goods into the definition of 'services.'" *Id.* at *5; *see also Mai v. Supercell Oy*, 648 F. Supp. 3d 1130, 1136 (N.D. Cal. 2023) (Davila, J.) (in case where plaintiff purchased loot boxes with either real-world currency or in-game virtual currency in video games (loot boxes are randomized chances within a game to win prizes), "agree[ing] with other courts in this district in holding that virtual currency is not a good or service for purposes of the CLRA"); *Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1046 (N.D. Cal. 2020) (Gonzalez Rogers, J.) (taking note that *credit* is not deemed a tangible chattel; plaintiff's allegation that *Fortnite* players can use real money to purchase V-bucks which then can be used to purchase content with which to play the game is like an extension of credit).

Other courts, however, have taken a less restrictive approach, indicating that virtual currency that is purchased so as to be used within an application can be considered a service: the service being purchased is online entertainment. Essentially, these courts are willing to look beyond the immediate purchase of virtual currency and consider instead the broader context of what the purchase is intended to do. For example, in *Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243 (N.D. Cal. 2022) – a decision that preceded *Reeves* and *Mai* – Judge Orrick addressed a case involving the purchase of virtual currency in Roblox. He noted: "Roblox uses 'Robux,' an in-game currency that can be purchased with real money. Users can use Robux to purchase virtual items from Roblox." *Id.* at 1250. "Roblox provides users access to its metaverse, which is comfortably classified as an online entertainment service. When a user purchases Robux (with real money), they are engaging in a transaction with Roblox to make use of a part of that

30

entertainment service." *Id.* at 1263.

Notably, Judge Orrick acknowledged that there were some cases to the contrary. He noted that a decision from a state appellate court, *Berry v. American Express Publishing, Inc.*, 147 Cal. App. 4th 224 (2007), was

> the taproot for all of these cases. [*Berry*] held that the issuance of credit was not a CLRA service; it did not address in-game currency. The California Court of Appeal made that holding based largely on legislative history removing references to "credit" and on its finding that extension of credit is "separate and apart" from the sale or lease itself.

*Doe v. Roblox*, 602 F. Supp. 3d at 1263-64. Judge Orrick was not persuaded that *Berry* should provide the benchmark in his case because,

> [a]s explained above, when a consumer buys in-game currency, she is engaging with the online entertainment service in one of the key ways consumers are intended to. That transaction is at the core of the "service." And neither Roblox nor the district court cases cited pointed to anything in the legislative history that showed an intent to exempt things like in-game currency, which was crucial to *Berry*'s conclusion about credit.

*Id.* at 1264; *see also Ochoa v. Zeroo Gravity Games LLC*, No. CV 22-5896-GW-ASx, 2023 U.S. Dist. LEXIS 87587, at *29-30 (C.D. Cal. May 17, 2023) (deciding to follow *Doe v. Roblox*, although "the position espoused in *Mai* and other cases appears to be the majority," because "the CLRA's underlying purpose [is] to protect consumers" and the statute should be liberally construed). The Court notes that Judge Gonzalez Rogers has also appeared to change course from her earlier decision in *Epic Games* to fall more in line with Judge Orrick. *See C.W. v. Epic Games*, No. 19-cv-03629-YGR, 2020 U.S. Dist. LEXIS 162490, at *12-13 (N.D. Cal. Sept. 3, 2020) (acknowledging prior holding that virtual currency is not a good under the CLRA, but plaintiffs amended to explain that in-app purchases for virtual currency and content were "licenses for entertainment use, which qualify as 'services' under the CLRA"; adding that, "[w]hile traditional software products are not considered goods under the CLRA, it is not clear whether *Fortnite* technologically crosses over," and "[t]he Court finds that it is plausible that this may be a cross-over product [–] absent a full record, the CLRA is not subject to dismissal on this basis").

///

31

United States District Court
Northern District of California

*Roblox* is more persuasive than *Reeves*.  In the case at bar, players are buying the opportunity to play a game against a real live, human opponent.  That entertainment is a service being provided by Avia.  *See Zaragoza v. Apple Inc.*, No. 18-cv-06139-PJH, 2019 U.S. Dist. LEXIS 40916, *15 (N.D. Cal. Mar. 13, 2019) ("declin[ing] to consider the entirely-digital purchases alleged here as 'tangible chattels' – and therefore 'goods' – under the CLRA"; but adding "plaintiffs' complaint sufficiently alleges a service" under the CLRA: "[g]iven plaintiffs' allegations that their purchases included an ongoing ability to access the videos, and defendant's characterization of the purchases as licenses to view and stream video content from Apple, this claim presents factual questions inappropriate to resolve at this motion to dismiss stage about whether the alleged iTunes purchases on Apple TV constitute a service under the CLRA"); *cf. Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224 (2007) (not expressly holding entertainment is a service under the CLRA but addressing a CLRA claim predicated on entertainment as a service (FM or music services)).

2.    Software

Avia argues that, even if the Court rejects Avia's position on virtual currency, the Court should still dismiss the CLRA claim because Avia players are essentially buying software from the company, and software does not constitute either a good or a service for purposes of the CLRA.  Avia primarily relies on two decisions from Judge Koh in support.  *See Ferrington v. McAfee*, No. 10-CV-01455-LHK, 2010 U.S. Dist. LEXIS 106600, at *56-57 (N.D. Cal. Oct. 5, 2010) (stating that the issue is "a very close call" but concluding that "[t]he CLRA's express limitation of goods to 'tangible chattels' must be given meaning, and current California law suggests that these words exclude software from the Act's coverage"; adding that "software generally is not a service" given the definition of service as "'work, labor, and services,'" and, "[t]o the extent Plaintiffs argue that the particular subscription provided by Arpu should be considered a service," they "have not alleged sufficient facts as to the nature of the services provided by the . . . subscription to allow the Court to draw that conclusion"); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1070 (N.D. Cal. 2012) (noting that "this court has previously determined [in *Ferrington*] that the CLRA does not apply to the sale or license of

32

software, because software is neither a 'good' nor a 'service' covered by the CLRA").

The problem for Avia is that Judge Koh subsequently clarified that her decisions in *Ferrington* and *iPhone* should not be construed expansively. *See In re Yahoo! Inc. Customer Data Security Breach Litigation*, 313 F. Supp. 3d 1113 (N.D. Cal. 2018). In *Yahoo*, the defendants argued that the plaintiffs' CLRA claim was not viable because Yahoo Mail is neither a good nor a service for purposes of the statute. But Judge Koh rejected the suggestion that software can *never* be a good or service under the CLRA.

> *Ferrington* involved computer software downloaded directly from the Internet. The Court did not hold that software can never constitute a "good," but only "that *the software Plaintiffs purchased* [was] not a good covered by the CLRA." The Court based its analysis on the "CLRA's express limitation of goods to 'tangible chattels.'" The Court's statements do not foreclose the possibility that software may sometimes qualify as a "good" under the CLRA. In fact, in *In re iPhone*, which was decided shortly thereafter, this Court concluded that software downloaded into a tangible good may be subject to the CLRA where the claim arises from the "sale of [the] good, and not the downloading of free software."
>
> Certainly, too, software sold in a physical form may constitute "tangible chattels" and thus qualify as a "good" under the CLRA because "[a] consumer can purchase [the software] in a store, pick it up in her hands, and carry it home."

*Yahoo*, 313 F. Supp. at 1141.

Judge Koh then turned to the term "service." She stated that, in *Ferrington*, there was simply "one conclusory sentence with no analysis: 'software generally is not a service for purposes of the CLRA.'" *Id.* She added that "a court must analyze the particular facts at issue to determine whether the software at issue falls within the definition of 'service.' For example, Judge Tigar has explained that 'there are good reasons to consider antivirus software to be a "service" under the CLRA, since it continually updates and runs regular virus checking.'" *Id.* (quoting *Haskins v. Symantec Corp.*, No. 13-CV-01834-JST, 2013 U.S. Dist. LEXIS 169865, at *31 n.9 (N.D. Cal. Dec. 2, 2013)[10]). Ultimately, Judge Koh concluded that the plaintiffs had

---

[10] In *Haskins*, Judge Tigar also questioned the contention that software should not be deemed a good under the CLRA. *See Haskins*, 2013 U.S. Dist. LEXIS 169865, at *28-29 (stating that "[i]t seems unlikely that the Legislature knowingly exempted computer software from the CLRA's scope two years before the invention of Pong[;] [m]ore probably, the purpose of the language was

United States District Court
Northern District of California

sufficiently pled a service for purposes of the CLRA.

> The FAC pleads that Yahoo Mail is "one of the oldest email services" and the "primary service" provided by Yahoo.  Unlike in *Ferrington*, Plaintiffs have not purchased software that they downloaded from the Internet.  Rather, Plaintiffs have signed up for accounts on a web-based platform, maintained by Yahoo, where they can engage in activities ranging from private email communication to bank and stock trading to photo storage.  That Yahoo continually upkeeps and updates the system further solidifies that Yahoo is providing a "service," i.e., "work, labor, and services for other than a commercial or business use."  Moreover, as noted above, the FAC's repeated labeling of Yahoo's offerings as "services" is supported by the fact that Yahoo itself has Terms of Service and defines "Yahoo! Services" as including "communications tools, forums, shopping services, search services, personalized content and branded programming."  Thus, Plaintiffs have adequately pled that Yahoo provides a "service" that is subject to the CLRA.

*Id.* at 1142 (emphasis omitted).  *Compare Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1116 (N.D. Cal. 2016) (indicating that, because "ReCAPTCHA is only available online and it does not provide users with any kind of ongoing service," it is not a good or service for purposes of the CLRA).

In the reply brief, Avia acknowledges *Yahoo* but argues that "[n]one of the allegations before the court in [*Yahoo*] are present in this case.  To the contrary, Plaintiffs allege that Avia offers one thing: virtual games that the Plaintiffs used for an unknown period of time."  Reply at 12.  Avia's argument, however, disregards that reasonable inferences are to be made in Plaintiffs' favor and, further, elevates form over substance.  Under Avia's position, simply because a service *uses* software could take the service outside the protection of the CLRA.  That argument is not persuasive.

3.    Games/Gambling

This leaves Avia with the final argument that what it is offering to players are games or (per Plaintiffs) gambling which also cannot constitute a good or service for purposes of the CLRA.  There is case law to support Avia.  Specifically, in *Brill*, where the plaintiff argued that the

---

to exempt commodities such as credit or insurance from the CLRA's scope, since those commodities are inherently intangible promises which have no direct and concrete impact on the physical universe").

34

defendants cheated during live poker games held at a casino, a district court noted that

> [n]either party offers authority to support or refute the proposition that poker is a "service" under the CLRA, nor is the court aware of any California case directly addressing the issue.  Plaintiffs argue that "[t]he services Stones provided to Plaintiffs – the tables with requisite dealers, the supporting staff of security, management, directors, food staff, and the cage and its accompanying staff – constitute services under the statutory definition."  (Pls.' Opp'n to King's Mot. at 48.)  But by that logic, almost everything would fall under the definition of "service," turning it into a "general law."  *See Fairbanks*, 46 Cal. 4th at 65.   Gambling is not "work or labor, nor is it related to the sale or repair of any tangible chattel."  *See id.*, 46 Cal. 4th at 61 (holding life insurance is not a "service" under the CLRA); *see also Hall v. Sea World Entm't, Inc.*, No. 3:15-cv-660-CAB-RBB, 2015 U.S. Dist. LEXIS 174294 (S.D. Cal. 2015) (finding ticket to enter an amusement park was not a "service" under the CLRA[11]).  To find what is inherently a game a "service" requires a strained and unnatural reading of the statute.  Accordingly, plaintiffs' CLRA claim will be dismissed.

*Id.* at *16-17.

The reasoning in *Brill*, however, is problematic.  First, it does not seem to give credit to the fact that the CLRA is to "be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices . . . ."  Cal. Civ. Code § 1760.  Second, the condemnation of gambling as not involving work or labor is more from the perspective of the player rather than from the person or entity offering the game to play.  And if there is some kind of moral issue with gambling, that is a matter encompassed by the California public policy bar discussed above, not the CLRA.  *See Zhicheng Zhen v. Draftkings, Inc.*, No. 25-cv-04618-CRB, 2026 U.S. Dist. LEXIS 168882, at *23-24 (N.D. Cal. July 29, 2026) (holding that defendant did offer a service – acting as a bookmaker – even if it operated online).

---

[11] In *Hall*, the court held that "to hold that the tickets, or more specifically the admission to the parks that the tickets provide, constitute a service requires a strained and unnatural construction of the term." *Hall v. SeaWorld Entm't, Inc.*, No. 3:15-CV-660-CAB-RBB, 2015 U.S. Dist. LEXIS 174294, at *51 (S.D. Cal. Dec. 23, 2015).  However, the court in *Anderson v. Seaworld Parks & Entm't, Inc.*, No. 15-cv-02172-JSW, 2016 U.S. Dist. LEXIS 188044 (N.D. Cal. Nov. 7, 2016), reached a different result, holding that "the term 'services' encompasses the 'educational and entertainment services' [plaintiff] alleges she purchased from SeaWorld." *Id.* at *33.  Although the *Anderson* court deemed its decision "not for citation," a different district court still found the reasoning therein persuasive. *See Lum v. Merlin Ents. Grp. U.S. Holdings Inc.*, No. 20cv1049 JAH-MSB, 2023 U.S. Dist. LEXIS 47027, at *32 (S.D. Cal. Mar. 20, 2023) ("This Court is persuaded by the reasoning in *Anderson* that the entertainment services provided by Defendant Legoland are services as defined by the CLRA.").

35

4.    Summary

For the foregoing reasons, the Court rejects Avia's specific challenge to the CLRA claim–*i.e.*, it is at the very least plausible that Avia is offering a service for purposes of the CLRA.

## VII.    CONCLUSION

For the foregoing reasons, the Court rules as follows.

- The RICO claim is dismissed in its entirety, and, at this juncture, no amendment of the RICO claim is permitted.  Dismissal of the RICO claims means that the only defendant remaining in the case is Avia.

- Because there is no viable RICO claim which would be a basis for personal jurisdiction under the RICO statute, Galaxy is also dismissed on the basis that the Court has no personal jurisdiction over the defendant.  (The Court previously held that it lacks specific jurisdiction over Galaxy.)

- Plaintiffs' § 17200 and CLRA claims as pled against Avia are not barred by the California public policy related to gambling.

- For the § 17200 and CLRA claims, *Sonner* does not preclude Plaintiffs' claims for injunctive relief; however, Plaintiffs have not sufficiently alleged standing for the injunctive relief sought.  Plaintiffs also have failed to allege, with respect to restitution, that damages would be an inadequate remedy.  Plaintiffs have leave to amend for both injunctive relief and restitution.  Plaintiffs have sufficiently alleged reliance on the alleged false representations.

- Avia's challenge to the CLRA claim, on the basis that "goods or services" for purposes of the CLRA do not include (1) virtual currencies, (2) software, or (3) games/gambling, lacks merit.

/ / /

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

Thus, based on the Court's rulings above, Plaintiffs have a viable CLRA claim against Avia for damages only.  Plaintiffs have leave to amend to add factual allegations to support a claim for injunctive relief or restitution – for the CLRA claim and/or the § 17200 claim against Avia.  Any amended complaint shall be filed within three weeks of the date of this order.  Avia shall then have three weeks thereafter to respond to the amended complaint.

This order disposes of Docket Nos. 107, 109, and 110.

**IT IS SO ORDERED**.

Dated: August 13, 2026

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

37